**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENGAGE LEARNING, INC., *et al.*, | ) Case No. 13-44106 (ESS) |
| | ) Case No. 13-44105 (ESS) |
| | ) Case No. 13-44107 (ESS) |
| | ) Case No. 13-44108 (ESS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), having:[1]

a.    commenced the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") on July 2, 2013 (the "***Petition Date***");

b.    continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.    filed, on August 17, 2013, (i) the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 295], which plan and related documents were subsequently amended, (ii) the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 296], and (iii) the *Debtors' Motion for the Entry of an Order (A) Approving the Disclosure Statement; (B) Approving Solicitation Packages and Procedures for the Distribution Thereof; (C) Approving the Forms of Ballots and Manner of Notice; (D) Approving the Voting Record Date, Solicitation Deadline and Voting Deadline; and (E) Establishing Notice and Objection Procedures for Confirmation of the Plan* [Docket No. 297], which disclosure statement and related documents were subsequently amended and supplemented, including by the *Disclosure Statement for Debtors' Joint Plan of Reorganization*

---

[1]    Unless otherwise noted, capitalized terms not defined in this *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (this "***Confirmation Order***"), shall have the meanings ascribed to them in the Plan (as defined herein).  The rules of interpretation set forth in Article I.B of the Plan shall apply to this Confirmation Order.

*Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 782] (the "***Original Disclosure Statement***");

d.  filed, on December 27, 2013, the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Enter into Exit Financing Related Fee Letters, (B) Incur and Pay Associated Fees and Expenses, and (C) File the Exit Financing Letters Under Seal* [Docket No. 909];

e.  filed, on February 7, 2014, (i) the *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1070]; (ii) the *Supplemental Disclosure Statement Related to the Debtors' Amended Joint Plan of Reorganized Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1072]; and (iii) the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' and the Committee's Entry Into a Plan Support Agreement; (II) Approving the Disclosure Statement Supplement; (III) Authorizing Expedited Supplement Solicitation Procedures and the Modification of Deadlines Related Thereto; and (IV) Approving the Forms of the New Solicitation Materials* [Docket No. 1073] (the "***Disclosure Statement Motion***");

f.  filed, on February 12, 2014, the (i) *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1098] (as may be supplemented, amended, or modified from time to time prior to the Effective Date in accordance with the terms set forth therein and herein, the "***Plan***")[2] and (ii) the *Supplemental Disclosure Statement Related to the Debtors' Amended Joint Plan of Reorganized Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1099] (the "***Disclosure Statement Supplement***," and together with the Original Disclosure Statement, the "***Disclosure Statement***");

g.  caused revised solicitation materials and notice of the deadline for objecting to confirmation of the Plan to be distributed beginning on or about February 13, 2014, and continuing thereafter, consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and the Disclosure Statement Order (as defined herein), which Disclosure Statement Order also approved, among other things, solicitation procedures (the "***Solicitation Procedures***") the Distribution Election Procedures and related notices, forms, Ballots, and Master Ballots (collectively, the "***Solicitation Packages***"), as evidenced by, among other things, the *Affidavit of Donlin, Recano and Company, Inc. Regarding Service of Solicitation Packages with Respect to Supplemental Disclosure Statement Related to Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1140];

h.  caused notice of the Confirmation Hearing (the "***Confirmation Hearing Notice***") to be published on February 13, 2014, in the *New York Times* as evidenced by the *Certification of Publication of Confirmation Notice in the New York Times* of Maria Pannullo [Docket No. 1107];

---

[2]  Attached as **Exhibit 1** is the Plan as supplemented, amended, and modified as of the date hereof.

i.  caused the *Notice of Filing of Debtors' Distribution Election Procedures and Distribution Election Forms* (the "**Distribution Election Procedures**") [Docket No. 1119] to be distributed beginning on or about February 21, 2014;

j.  filed, on February 24, 2014, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket Nos. 1128, 1129, 1130] (as the same may have been subsequently modified, supplemented, or otherwise amended from time to time, the "**Plan Supplement**"), and with amendments to exhibits to the Plan Supplement filed thereafter [Docket Nos. 1170, 1176, 1190];

k.  filed, on March 5, 2014 the *Debtors' Motion for Entry of an Order Pursuant to Federal Rule of Bankruptcy Procedure 9019 Approving the Global Settlement Among the Debtors and the Supporting Parties* [Docket No. 1156] (the "**Global Settlement Motion**");[3]

l.  filed, on March 12, 2014, the *Declaration of Jung W. Song on Behalf of Donlin, Recano & Company, Inc. Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1203] (as may be amended, modified, or supplemented, the "**Voting Certification**");

m.  filed, on March 12, 2014, the *Debtors' (I) Memorandum of Law In Support of Confirmation of the Debtors' Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code and (II) Omnibus Reply to Objections Thereto* [Docket No. 1207] (the "**Confirmation Brief**");

n.  filed, on March 12, 2014, the *Debtors' Reply to the Objection of the United States Trustee to Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code and in Support of the Management Incentive Plan, the New Employment Agreements* [Docket No. 1209] (the "**Reply Brief**");

o.  filed, on March 12, 2014, the *Declaration of Richard D. Feintuch, Independent Director of Cengage Learning, Inc., in Support of Confirmation of the Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1204] (the "**Feintuch Declaration**");

p.  filed, on March 12, 2014, the *Declaration of William C. Kosturos, Managing Director of Alvarez & Marsal North America, LLC, in Support of Confirmation of the Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1205] (the "**Kosturos Declaration**," and, together with the Feintuch Declaration, the "**Confirmation Declarations**"); and

---

[3]  "**Global Settlement**" shall have the meaning ascribed to it in the Global Settlement Motion.

q.  served and will file the *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* with certain immaterial modifications to the version of the Plan filed on February 12, 2014.

This Court having:

a.  entered the (i) *Order (A) Approving the Disclosure Statement; (B) Approving Solicitation Packages and Procedures for the Distribution Thereof; (C) Approving the Forms of Ballots and Manner of Notice; (D) Approving the Voting Record Date, Solicitation Deadline and Voting Deadline; and (E) Establishing Notice and Objection Procedures for Confirmation of the Plan* [Docket No. 778] (*the "**Original Disclosure Statement Order**"*) on November 25, 2013 and the (ii) *Order (I) Approving the Debtors' and Committee's Entry Into a Plan Support Agreement; (II) Approving the Disclosure Statement Supplement; (III) Authorizing Expedited Supplemental Solicitation Procedures and the Modification of Deadlines Related Thereto; and (IV) Approving the Forms of the New Solicitation Materials* [Docket No. 1094] (the "**Supplemental Disclosure Statement Order**," and together with the Original Disclosure Statement Order, the "***Disclosure Statement Order***) on February 12, 2014;

b.  entered the *Order Authorizing the Debtors to (A) Enter into Engagement Letters to Obtain Exit Financing and Related Fee Letters, (B) Incur and Pay Associated Fees and Expenses, and (C) File the Exit Financing Letters Under Seal* [Docket No. 1051] (the "**Exit Financing Order**");

c.  set March 10, 2014, at 4:00 p.m. prevailing Eastern Time, as the deadline for voting on the Plan and the deadline for filing objections in opposition to the Plan (the "**Plan Objection Deadline**");

d.  set March 13, 2014, at 8:30 a.m. prevailing Eastern Time, as the date and time for the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

e.  reviewed the Plan, the Disclosure Statement, the Global Settlement Motion, the Confirmation Brief, the Reply Brief, the Confirmation Declarations, the Voting Certification, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

f.  held the Confirmation Hearing;

g.  heard the statements, arguments, and objections made by counsel in respect of Confirmation;

h.  considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation;

     i.       taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and arguments presented in the Chapter 11 Cases; and

     j.       overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated herein.

NOW, THEREFORE, the Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and all evidence proffered or adduced by counsel at the Confirmation Hearing and the entire record of these Chapter 11 Cases establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following Findings of Fact and Conclusions of Law and Orders:

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.**      **Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.**      **Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)).**

2.      The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b),

and the Court has jurisdiction to enter a Final Order determining that the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  Venue is proper before the Court pursuant to 28 U.S.C. § 1408.

**C.      Eligibility for Relief.**

3.      The Debtors are entities eligible for relief under section 109 of the Bankruptcy Code.

**D.      Commencement of the Chapter 11 Cases.**

4.      On the Petition Date, each of the Debtors commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  By prior order of the Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [Docket No. 31].  The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**E.      Notice and Transmittal of Solicitation Materials; Adequacy of Solicitation Notices.**

5.      The Plan, the Disclosure Statement, the Disclosure Statement Order, the ballots for voting on the Plan (the "***Ballots***"), the Confirmation Hearing Notice, the Distribution Election Forms, the Plan Supplement, and the other materials distributed by the Debtors in connection with Confirmation of the Plan (collectively, the "***Confirmation Materials***"), including but not limited to the Committee Solicitation Letter, were transmitted and served in compliance with the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, with the Local Bankruptcy Rules for the Eastern District of New York (the "***Local Rules***"), and with the procedures set forth in the Disclosure Statement Order.  Notice of the Confirmation Hearing was appropriate and satisfactory based upon the circumstances of the Debtors' Chapter 11 Cases.

6

The transmittal and service of the Confirmation Materials complied with the approved Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations. Because such transmittal and service were adequate and sufficient, no other or further notice is necessary or shall be required.

**F.      Voting.**

6.      On March 12, 2014, the Notice, Claims, and Solicitation Agent filed the Voting Certification with the Court. As evidenced by the Voting Certification, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, Solicitation Procedures, and the Local Rules.

**G.      Good Faith Solicitation (11 U.S.C. § 1125(e)).**

7.      Based on the record before the Court in the Chapter 11 Cases, the Debtors, the Committee, and the Supporting Parties, and their respective members, directors, officers, employees, representatives, attorneys, financial advisors, investment bankers, agents, restructuring advisors, and other professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Plan and their participation in the Chapter 11 Cases and the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**H.**    <u>**Plan Supplement.**</u>

8.    The filing and notice of the Plan Supplement was proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required.

**I.**    <u>**Modifications to the Plan.**</u>

9.    Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of solicitation described or set forth herein constitute technical changes or changes with respect to particular Claims made pursuant to the agreement of the Holders of such Claims and do not materially or adversely affect or change the treatment of any other Claims or Interests.    Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

**J.**    <u>**Objections.**</u>

10.    To the extent that any objections, reservations of rights, statements or joinders to Confirmation have not been resolved, withdrawn, waived, or settled prior to entry of this Confirmation Order or otherwise resolved herein or as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits based on the record before this Court.

**K.**    <u>**Burden of Proof.**</u>

11.    The Debtors, as the proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.

L.    **Bankruptcy Rule 3016.**

12.    The Plan is dated and identifies the Debtors as the Plan proponents, thereby satisfying Bankruptcy Rule 3016(a).    The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

M.    **Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

13.    The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

a.    <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  As required by section 1123(a)(1), in addition to Administrative Claims (including Accrued Professional Fee Claims) and  Priority Tax Claims, which need not be classified, Article III of the Plan designates 37 Classes of Claims and Interests.  As required by section 1122(a) of the Bankruptcy Code, the Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class.   Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests.  Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

b.    <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  Article III of the Plan specifies that Classes 1, 2, 20, 28, 36, and 37 are Unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

c.    <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.  Article III of the Plan sets forth the treatment of Classes 3–19, 21–27, and 29–35, which are the Impaired Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

d.    <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  Article III of the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class except to the extent that a Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

e.    <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>.  The Plan and the various documents included in the Plan Supplement provide adequate and proper means for implementation of the Plan, including, without limitation:  (i) the restructuring of the Debtors' balance sheet and other financial transactions provided for by the Plan; (ii) implementation of the Global Settlement among the Supporting Parties contemplated by Article IV.I of the Plan and the Global Settlement Motion; (iii) the New Corporate Governance Documents; (iv) the consummation of the

transactions contemplated by the Plan Support Agreement, including the Restructuring Transactions; (v) the cancellation of the CL Holdings Interests; (vi) the issuance of the New Equity; (vii) the cancellation of certain existing agreements, obligations, instruments, and Interests; (viii) the entrance into the Exit Revolver Facility and the New Debt Facility; (ix) the continued vesting of the assets of the Debtors' Estates in the Reorganized Debtors; and (x) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

f.      <u>Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.   The New Corporate Governance Documents prohibit the issuance of non-voting securities and provide an appropriate distribution of voting power among the several classes of securities possessing such power.   As such, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

g.      <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.   The Debtors' initial directors and officers, to the extent known, have been disclosed prior to the Confirmation Hearing and, to the extent not known, will be determined in accordance with the New Corporate Governance Documents, which is consistent with the interests of creditors and equity holders and public policy and satisfies section 1123(a)(7) of the Bankruptcy Code.

h.      <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>.   The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, and are therefore consistent with section 1123(b) of the Bankruptcy Code.

(i)     <u>Impairment/Unimpairment of Any Class of Claims or Interests (11 U.S.C. § 1123(b)(1))</u>.   Pursuant to the Plan, Classes 1, 2, 20, 28, 36, and 37 are Unimpaired, and Classes 3–19, 21–27, and 29–35 are Impaired as contemplated by section 1123(b)(1) of the Bankruptcy Code.

(ii)    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>.   Article V of the Plan provides for the assumption and, with respect to certain Executory Contracts and Unexpired Leases, assignment of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date unless such Executory Contract or Unexpired Lease:   (A) was previously rejected; (B) was previously expired or terminated pursuant to its own terms; (C) is the subject of a motion or notice to reject filed on or before the Confirmation Date; or (D) is designated specifically or by category on the Schedule of Rejected Executory Contracts and Unexpired Leases in the Plan Supplement.

(iii)   <u>Retention of Claims (11 U.S.C. § 1123(b)(3))</u>.   In accordance with section 1123(b)(3) of the Bankruptcy Code, Article IV.Z provides that, except where such Causes of Action have been expressly waived, relinquished,

exculpated, released, compromised, or settled under the Plan (including, without limitation, pursuant to Articles IV.BB, IV.CC, VIII.A, VIII.C, and VIII.E of the Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

(iv)    Other Appropriate Provisions (11 U.S.C. § 1123(b)(6)).  The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (A) distributions to Holders of Claims and Interests, (B) resolution of Disputed Claims, (C) allowance of certain Claims, (D) indemnification obligations, (E) releases by the Debtors of certain parties, (F) releases by certain third parties, (G) exculpations of certain parties, and (H) retention of Court jurisdiction, thereby satisfying the requirements of section 1123(b)(6).

i.    Cure of Defaults (11 U.S.C. § 1123(d)).  Article V.C of the Plan provides for the satisfaction of cure Claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  The cure amounts identified in the Schedule of Assumed Executory Contracts and Unexpired Leases (in the Plan Supplement) and any amendments thereto, as applicable, represent the amount, if any, that the Debtors shall pay in full and complete satisfaction of such cure Claims.  Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law.  As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

## N.    **The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

14.    The Debtors have complied with the applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code.  Specifically:

a.    the Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code;

b.    the Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

c.　the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in transmitting the Confirmation Materials and related notices and in soliciting and tabulating the votes on the Plan.

**O.**　**Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).**

15.　The Debtors have proposed the Plan (including the Plan Supplement and all other documents necessary to effectuate the Plan) in good faith and not by any means forbidden by the law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases and the formulation of the Plan.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and to effectuate a successful reorganization of the Debtors. The Plan was the product of extensive negotiations conducted at arm's length among the Debtors and certain of their key stakeholders, including the Committee and the Supporting Parties. Further, the Plan's classification, indemnification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each necessary for the Debtors' successful reorganization.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

**P.**　**Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

16.　Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has

been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

**Q.**     **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

17.     The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.  To the extent not disclosed in the Plan Supplement, the identities of the Reorganized Debtors' directors and officers shall be determined in accordance with the New Corporate Governance Documents.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**R.**     **No Rate Changes (11 U.S.C. § 1129(a)(6)).**

18.     Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction.

**S.**     **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**

19.     Each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

20.     The liquidation analysis attached as **Exhibit F** to the Disclosure Statement (the "***Liquidation Analysis***") and the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to the Confirmation Hearing or in the Confirmation Declaration: (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims in every Class will recover as much or more under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if the

Debtors were liquidated under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the "best interest of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

**T.**      **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).**

21.      Classes 1, 2, 20, 28, 36, and 37 are Unimpaired by the Plan pursuant to section 1124 of the Bankruptcy Code and, accordingly, Holders of Claims or Interests in such Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 3, 12, 16, 21–24, 26, 29–32, and 34 are Impaired by the Plan and have voted to accept the Plan, as established by the Voting Certification. No Classes are Impaired by the Plan and voted to reject the Plan, as established by the Voting Certification. Holders of Claims or Interests in Classes 4–11, 13–15, 17–19, 25, 27, 33, and 35 will not receive or retain any property on account of their Claims or Interests and, accordingly, such Claims and Interests are Impaired and such Holders are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**U.**      **Treatment of Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Priority Non-Tax Claims (11 U.S.C. § 1129(a)(9)).**

22.      The treatment of Administrative Claims and Priority Tax Claims pursuant to Articles II and III of the Plan satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(9) of the Bankruptcy Code.

**V.**      **Acceptance By at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10)).**

23.      Claims in Classes 3–19, 21–27, and 29–35 are Impaired by the Plan. Classes 3, 12, 16, 21–24, 26, 29–32, and 34 have voted to accept the Plan, as established by the Voting Certification. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**W.**   **Feasibility (11 U.S.C. § 1129(a)(11)).**

24.     The evidence proffered or adduced at the Confirmation Hearing and set forth in Confirmation Declarations (a) is reasonable, persuasive, and credible, (b) has not been controverted by other evidence, (c) utilizes reasonable and appropriate methodologies and assumptions, and (d) establishes that the Plan is feasible and that there is a reasonable prospect of the Reorganized Debtors being able to meet their financial obligations under the Plan and in the ordinary course of their business, and that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors. Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**X.**   **Payment of Fees (11 U.S.C. § 1129(a)(12)).**

25.     As set forth in Article II.D of the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code, and any interest thereon pursuant to section 3717 of title 31 of the United States Code, due and payable through the Effective Date shall be paid by the Debtors on or before the Effective Date and amounts due thereafter shall be paid by the Reorganized Debtors in the ordinary course of business until the Court enters a final decree closing the Debtors' Chapter 11 Cases, dismisses the Chapter 11 Cases, or converts the Chapter 11 Cases to another chapter in bankruptcy.

**Y.**   **Retiree Benefits (11 U.S.C. § 1129(a)(13)).**

26.     Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for "retiree benefits" (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to section 1114 of the Bankruptcy Code. The Debtors do not provide any "retiree benefits" plans within the meaning of section 1114 of the Bankruptcy Code. Accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**Z.**    <u>**No Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).**</u>

27.    The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**AA.**    <u>**The Debtors Are Not an Individual (11 U.S.C. § 1129(a)(15)).**</u>

28.    The Debtors are not an individual. Accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**BB.**    <u>**No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16)).**</u>

29.    The Debtors are a moneyed, business, or commercial corporation. Accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**CC.**    <u>**Confirmation of Plan Over Non-Acceptance of Impaired Classes (11 U.S.C. § 1129(b)).**</u>

30.    The Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the requirements of section 1129(a)(8) have not been met, because the Debtors have demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly" and is "fair and equitable" with respect to the Rejecting Classes.

31.    The Plan does not "discriminate unfairly" against any Holders of Claims or Interests in any Class that voted or is deemed to reject the Plan (the "***Rejecting Classes***"). The treatment of such Holders is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment, and the Debtors have a valid rationale, including for the rationales articulated in the Global Settlement Motion and the Confirmation Brief, for the Plan's classification scheme and the disparate treatment, if any, provided for different Classes.

32.     The Plan is also "fair and equitable" with respect to each Rejecting Class. To the extent any Holder of Claims or Interests junior to any Rejecting Class is receiving a distribution under the Plan, such distribution arises (a) on account of the Global Settlement implemented by the Plan and the agreements of the Supporting Parties in connection with the Global Settlement and under the Plan or (b) with respect to the Intercompany Interests, as a matter of administrative convenience, for the ultimate benefit of the Holders of New Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to Holders of Allowed Claims and <u>not</u> on account of the applicable Holder's Intercompany Interest.

33.     The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

**DD.     <u>Only One Plan (11 U.S.C. § 1129(c)).</u>**

34.     The Plan is the only plan filed in the Chapter 11 Cases, and, accordingly, section 1129(c) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**EE.     <u>Principal Purpose of the Plan (11 U.S.C. § 1129(d)).</u>**

35.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, thereby satisfying section 1129(d) of the Bankruptcy Code.

**FF.     <u>Not Small Business Cases (11 U.S.C. § 1129(e)).</u>**

36.     These Chapter 11 Cases are not small business cases, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**GG.     <u>Plan Implementation.</u>**

37.     The terms of the Plan, including, without limitation, the Plan Supplement and all exhibits and schedules thereto, the Plan Support Agreement, and all other documents filed in

connection with the Plan or the Plan Support Agreement, and/or executed or to be executed in connection with the transactions contemplated by the Plan and all amendments and modifications of any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications (collectively, the "***Plan Documents***") are incorporated by reference, are approved in all respects, and constitute an integral part of this Confirmation Order.

## HH. <u>Binding and Enforceable.</u>

38.     The Plan and the Plan Documents have been negotiated in good faith and at arm's length and, subject to the occurrence of the Effective Date, shall bind any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not the Claim or Interest is Impaired under the Plan, whether or not such Holder has accepted the Plan, and whether or not such Holder is entitled to a distribution under the Plan.   The Plan and the Plan Documents constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms.   Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, and the Plan Documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

## II. <u>Vesting of Assets.</u>

39.     Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.   On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or

approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## JJ. <u>Management Incentive Plan.</u>

40.     The Management Incentive Plan is an essential element of the Plan, and the terms of the Management Incentive Plan and the payments contemplated therein are reasonable and comparable to the market.   Additionally, the Debtors have provided sufficient and adequate notice of the terms of the Management Incentive Plan.   The terms and conditions of the Management Incentive Plan have been negotiated in good faith and at arm's length with the Debtors' primary stakeholders, including the Committee and the Supporting Parties.

## KK. <u>Approval of Exit Revolver Facility.</u>

41.     The Exit Revolver Facility is an essential element of the Plan, is necessary for Confirmation and the consummation of the Plan, and is critical to the overall success and feasibility of the Plan, and entry into the Exit Revolver Facility Agreement and the other Exit Revolver Facility Documents is in the best interests of the Debtors, their Estates, and all Holders of Claims or Interests.   The Debtors have exercised reasonable business judgment in determining to enter into the Exit Revolver Facility Agreement and the other Exit Revolver Facility Documents and have provided sufficient and adequate notice of the material terms of the Exit Revolver Facility, which material terms were filed as part of the Plan Supplement.   The terms and conditions of the Exit Revolver Facility are fair and reasonable, and the Exit Revolver Facility was negotiated in good faith and at arm's length.   The Debtors are authorized, without further approval of the Court or any other party, to execute and deliver all agreements, guarantees, instruments, mortgages, control agreements, certificates, and other documents relating to the Exit Revolver Facility and to perform their obligations thereunder, including,

without limitation, the payment of all fees, indemnities, and expenses provided therein and/or in the Exit Financing Order.

**LL.**     **Approval of New Debt Facility**

42.     The New Debt Facility is an essential element of the Plan, is necessary for Confirmation and the consummation of the Plan, and is critical to the overall success and feasibility of the Plan, and entry into the New Debt Facility Agreement and the other New Debt Facility Documents is in the best interests of the Debtors, their Estates, and all Holders of Claims or Interests.  The Debtors have exercised reasonable business judgment in determining to enter into the New Debt Facility Agreement and the other New Debt Facility Documents and have provided sufficient and adequate notice of the material terms of the New Debt Facility, which material terms were filed as part of the Plan Supplement.  The terms and conditions of the New Debt Facility are fair and reasonable, and the New Debt Facility was negotiated in good faith and at arm's length.  The Debtors are authorized, without further approval of the Court or any other party, to execute and deliver all agreements, guarantees, instruments, mortgages, control agreements, certificates, and other documents relating to the New Debt Facility and to perform their obligations thereunder, including, without limitation, the payment of all fees, indemnities, and expenses provided therein and/or in the Exit Financing Order.

**MM.**   **Issuance of New Equity.**

43.     Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity and any other securities to be issued and distributed (including the distributions described in the Restructuring Transactions), whether on the Effective Date or any other date of a distribution thereafter, pursuant to the terms of the Plan and/or in accordance with this Confirmation Order on account of, and in exchange for, Claims (including, without limitation) against the Debtors comply with section 1145 of the Bankruptcy Code and shall be

exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New Equity, shall be subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (c) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New Corporate Governance Documents, and (d) applicable regulatory approval, if any.

44.     Each share of the New Equity issued and distributed pursuant to the Plan shall be uncertificated and duly authorized, validly issued, and fully paid and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, and which shall be in form and substance acceptable to the Required Consenting Lenders and consistent with the terms of the Plan Support Agreement, which terms and conditions shall bind each Entity receiving such distribution or issuance. The New Equity need not be issued through the facilities of the Depository Trust Company ("**DTC**") and the Debtors may require recipients thereof to identify themselves through the provision of information requested by the Debtors. The Debtors and/or Reorganized Debtors may reflect the issuance of New Equity with the delivery of certificates solely at the request of a recipient of New Equity. Should the Reorganized Debtors

elect on a date post-Effective Date to reflect any ownership of the New Equity through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than this Confirmation Order with respect to the treatment of the New Equity under applicable securities laws.

45.     For all purposes under the Plan (including the Management Incentive Plan), the New Equity shall be ascribed a value equal to the implied value of the New Equity given a total enterprise value of the Reorganized Debtors of $3.6 billion.

**NN.     Executory Contracts and Unexpired Leases.**

46.     The Debtors have exercised sound business judgment in determining whether to assume or reject each of their Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, Article V of the Plan, and as set forth in the Plan Supplement.  Except as set forth herein and/or in separate orders entered by the Court relating to assumption of Executory Contracts or Unexpired Leases, the Debtors have cured or provided adequate assurances that the Debtors will cure defaults (if any) under or relating to each Executory Contract or Unexpired Lease assumed under the Plan.

47.     Nothing in the Plan or the Confirmation Order shall prevent a party to an Executory Contract rejected pursuant to the Plan from filing a Proof of Claim based on such rejection within 30 days after the effective date of rejection of such Executory Contract.  Nothing in the Plan or this Confirmation Order shall prevent a party to an Executory Contract assumed pursuant to the Plan, or otherwise, from continuing to prosecute an objection to the Cure Cost related to such assumed Executory Contract if such objection is timely filed on or before the Voting Deadline but not resolved before the Effective Date.

**OO.** **Discharge, Compromise, Settlement, Release, Exculpation, and Injunction**
**Provisions.**

48.     The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article IV and Article VIII of the Plan.  Sections 105(a) and 1123(b) of the Bankruptcy Code permit issuance of the injunctions and approval of the releases, exculpations, and injunctions set forth in Article IV and Article VIII of the Plan.  Based upon the record of the Chapter 11 Cases and the evidence proffered or adduced at the Confirmation Hearing, the Court finds that the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article IV and Article VIII of the Plan are consistent with the Bankruptcy Code and applicable law.  Further, the discharge, compromises, settlements, releases, exculpations, and injunctions contained in Article IV and Article VIII of the Plan are integral components of the Plan and the Global Settlement.  The discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article IV and Article VIII of the Plan are hereby approved and authorized in their entirety.

49.     The distributions and other consideration received by Holders of First Lien Claims and Holders of Second Lien Claims under the Plan are sufficient under Bankruptcy Rule 9019 to support the binding waivers and releases of any and all claims and causes of action that have been asserted or could have been asserted prior to the Effective Date with respect to any disputes arising in connection with or otherwise related to the Second Lien Intercreditor Agreement: (a) against the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims by the First Lien Credit Facility Agents, First Lien Indenture Trustee, and each Holder of First Lien Claims (and for each of the foregoing, their respective successors or assigns); or (b) against the First Lien Credit Facility Agents, First Lien Indenture Trustee, and/or any Holder of

First Lien Claims by the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims (and for each of the foregoing, their respective successors or assigns).

**PP.** **Debtor Release.**

50.     The releases described in Articles IV.BB, IV.CC, and VIII.C of the Plan are an integral part of the Plan and represent a valid exercise of the Debtors' business judgment.  For the reasons set forth in the Global Settlement and based on the compromises and settlements contained in the Plan, the releases provided for in the Plan are in the best interests of the Debtors. The releases described in Articles IV.BB, IV.CC, and VIII.C of the Plan are: (a) in exchange for good and valuable consideration provided by the Releasees; (b) a good-faith compromise and settlement of the Causes of Action released by the Debtors; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors or any Holder of a Claim or Interest that would have been legally entitled to assert any Cause of Action on behalf of any of the Debtors or the Estates from asserting any Cause of Action released by the releases described in Articles IV.BB, IV.CC, and VIII.C of the Plan against any of the Releasees.

**QQ.** **Third-Party Release.**

51.     The releases described in Article VIII.D of the Plan are an integral part of the Plan. The releases described in Article VIII.D of the Plan are : (a) in exchange for good and valuable consideration provided by the Releasees; (b) a good-faith compromise and settlement of the Causes of Action released by the Releasees; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any

Cause of Action released by the releases described in Article VIII.D of the Plan against any of the Releasees.

**RR.**  **Exculpation.**

52.  The exculpation provisions set forth in Article VIII.E of the Plan are essential to the Plan.  The record in the Chapter 11 Cases fully supports the exculpation provisions, and the exculpation provisions set forth in Article VIII.E of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation.

**SS.**  **Injunction.**

53.  The injunction provisions set forth in Article VIII.F of the Plan are essential to the Plan; are necessary to preserve and enforce the releases set forth in Articles IV.BB, IV.CC, VIII.C, and VIII.D of the Plan, the exculpation provisions in Article VIII.E of the Plan; and the compromises and settlements implemented under the Plan; and are narrowly tailored to achieve that purpose.

54.  The releases set forth in Articles IV.BB, IV.CC, VIII.C, and VIII.D of the Plan, the exculpation provisions set forth in Article VIII.E of the Plan, and the injunction provisions set forth in Article VIII.F the Plan: (a) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) are an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) are an integral element of the transactions incorporated into the Plan; (d) confer material benefits on, and are in the best interests of, the Debtors, the Estates, and their creditors; (e) are important to the overall objectives of the Plan to finally resolve all Claims or Causes of Action among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and (f) are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law. The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support

releases set forth in Articles IV.BB, IV.CC, VIII.C, and VIII.D of the Plan, the exculpation provisions set forth in Article VIII.E of the Plan, and the injunction provisions set forth in Article VIII.F the Plan.

**TT.** **Global Settlement.**

55.     Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Global Settlement and related relief requested in the Global Settlement Motion or as otherwise provided under the Plan include, among other things, subject in all respects to the language of the Plan, (a) the settlement of pending and anticipated litigation of various Debtor-creditor and inter-creditor disputes and issues, (b) the total enterprise value of the Reorganized Debtors is $3.6 billion for all purposes under the Plan, (c) the settlement of potential litigation of all issues and Claims against the Debtors including in each case with respect to substantive consolidation, treatment of Secured Claims against multiple Debtors, the validity and enforceability of Intercompany Claims, the allocation of asset values, which assets are encumbered and unencumbered, the voidability of liens, the validity and enforceability of subordination and turnover provisions in intercreditor agreements, claims and causes of action related to intercreditor agreements, (d) the settlement of certain Claims and Causes of Action asserted or that the PIK Notes Trustee asserts or could be asserted for the benefit of the Holders of PIK Notes Claims, and (e) the settlement of certain Claims and Causes of Action relating to, among other things, the Debtors and the Chapter 11 Cases, against the Releasees, including all pre-Effective Date Claims and Causes of Action which may be asserted against Apax, or each of the Releasees and Apax's respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such,

at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax, as more fully set forth in the Plan.

56.     The Global Settlement and related relief requested in the Global Settlement Motion (a) are a permitted means of implementing the Plan pursuant to section 1123(b) of the Bankruptcy Code; (b) are an integral element of the transactions incorporated into the Plan; (c) confer material benefits on, and are in the best interests of, the Debtors, the Estates, and their creditors; (d) are important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (e) are fair and equitable and represent a resolution within the range of reasonableness; and (f) are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, Bankruptcy Rule 9019, and other applicable law.    The Global Settlement Motion and the Global Settlement are therefore approved.

**UU.**     **Retention of Jurisdiction.**

57.     Except as otherwise provided in any of the Plan Documents, the Court shall retain jurisdiction over these Chapter 11 Cases and all matters arising out of, or related to, these Chapter 11 Cases and the Plan, including the matters set forth in Article XI of the Plan.

**VV.**     **Good Faith.**

58.     The Debtors have proposed the Plan in good faith, with the legitimate and honest purposes of maximizing the value of each of the Debtors' Estates for the benefit of their stakeholders.  The Plan gives effect to many of the Debtors' restructuring initiatives, including implementing a value maximizing restructuring transaction.  Accordingly, the Debtors and the Supporting Parties (and all of their respective stockholders, members, officers, directors, agents, financial advisers, attorneys, employees, partners, Affiliates, and representatives) have been, are,

and will continue to act in good faith if they proceed to:  (a) consummate the Plan and the Restructuring Transactions and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order.  Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code and the aforementioned parties have acted in good faith within the meaning of sections 1125(e) and 1126(e) the Bankruptcy Code.

* * * * *

## II. ORDER

BASED ON THE FORGOING, IT IS HEREBY ORDERED:

### A.   Confirmation.

59.     The Plan, including all exhibits to the Plan, the Plan Supplement, and all exhibits to the Plan Supplement, shall be, and hereby are, confirmed under section 1129 of the Bankruptcy Code.  The terms of the Plan Documents are incorporated by reference into, and are an integral part of, the Plan and this Confirmation Order and are authorized and approved, and the Debtors are authorized to implement their provisions and consummate the Plan without any further authorization except as expressly required by the Plan or this Confirmation Order.

### B.   Objections.

60.     All objections, responses, reservations, statements, and comments in opposition to the Plan, other than those resolved or withdrawn with prejudice prior to, or on the record at, the Confirmation Hearing are overruled on the merits.

### C.   Plan Implementation.

61.     General Authorization.   The transactions described in the Plan and the Plan Documents are hereby approved.  On or before the Effective Date, and after the Effective Date, as necessary, and without any further order of the Court or other authority, the Debtors and/or the Reorganized Debtors and their respective directors, officers, members, agents, attorneys, financial advisors, and investment bankers are authorized and empowered pursuant to section 1142(b) of the Bankruptcy Code and other applicable state laws to and shall (i) grant, issue, execute, deliver, file, or record any agreement, document, or security, and the documents contained in the Plan or the Plan Supplement (as modified, amended, and supplemented pursuant to the provisions of the Plan governing such modifications, amendments, and supplements), in substantially the form included therein, or any other documents related thereto and (ii) take any

action necessary or appropriate to implement, effectuate, and consummate the Plan and the Plan Documents in accordance with their terms. All such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Court without further approval, act, or action under any applicable law, order, rule, or regulation, including, among other things, (i) all transfers of assets that are to occur pursuant to the Plan, (ii) the incurrence of all obligations contemplated by the Plan and the making of all distributions under the Plan, and (iii) entering into any and all transactions, contracts, leases, instruments, releases, and other documents and arrangements permitted by applicable law, order, rule, or regulation. The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of the Debtors and/or the Reorganized Debtors or any officer thereof to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order pursuant to section 1142(b) of the Bankruptcy Code. Pursuant to section 1142 of the Bankruptcy Code, to the extent that, under applicable nonbankruptcy law or the rules of any stock exchange, any of the foregoing actions that would otherwise require approval of the equity holders or directors (or any equivalent body) of the Debtors or the Reorganized Debtors, such approval (including any board resolution required to confirm that the New Equity shall be uncertificated) shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable law of the jurisdiction of incorporation or formation without any requirement of further action by the equity holders or directors (or any equivalent body) of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Debtors or the Reorganized Debtors, as applicable, shall, if required, file any documents required to be filed in such jurisdictions so as to effectuate the provisions of the Plan.

Any or all documents contemplated herein shall be accepted by each of the respective filing offices and recorded, if required, in accordance with applicable law and shall become effective in accordance with their terms and the provisions of such applicable law. All counterparties to any documents described in this paragraph are hereby directed to execute such documents as may be required or provided by such documents, without any further order of the Court.

62. No Action. Pursuant to the appropriate provisions of the General Corporation Law of the State of Delaware (including section 303 thereof), section 1142(b) of the Bankruptcy Code, or other applicable law, this Confirmation Order shall constitute all authorizations required for the Debtors and/or the Reorganized Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the New Corporate Governance Documents, the Exit Revolver Facility, the New Debt Facility, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the conversion of CL Holdings into a Delaware corporation, and the respective directors, stockholders, managers, or members of the Debtors or the Reorganized Debtors shall not be required to take any actions in connection with the implementation of the Plan, including but not limited to the New Corporate Governance Documents, the Exit Revolver Facility, and the New Debt Facility, each of which shall be hereby approved and adopted and effective upon the Effective Date.

**D.      Binding Effect.**

63. On the date of and after entry of this Confirmation Order and subject to the occurrence of the Effective Date, the Plan and the Plan Documents shall bind any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not: (a) the Claim or Interest is Impaired under the Plan, (b) such Holder has accepted the Plan, (c) failed to vote to accept or reject the Plan or voted to reject the Plan, (d) whether or not such Holder is

31

entitled to a distribution under the Plan, (e) will receive or retain any property or interests in property under the Plan, and (f) has filed a Proof of Claim in the Chapter 11 Cases. The Plan and the Plan Documents constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan and the Plan Documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

E.      **New Corporate Governance Documents; New Equity.**

64.     On the Effective Date, the Reorganized Debtors shall enter into the New Corporate Governance Documents, and the New Corporate Governance Documents shall, as of the Effective Date, be valid, binding, and enforceable in accordance with their terms, and each Holder of New Equity shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtors.

65.     Each Person or Entity that receives shares of New Equity pursuant to the Plan shall automatically be deemed a party to the New Shareholders Agreement and the New Registration Rights Agreement, in accordance with their terms, whether it receives shares on or after the Effective Date and regardless of whether it executes a signature page to the New Shareholders Agreement or the New Registration Rights Agreement.

66.     Each Person or Entity that receives shares of New Equity pursuant to the Management Incentive Plan shall be subject to the restrictions contained in the Management Incentive Plan whether it receives awards thereunder on or after the Effective Date, and, from and after the date on which any Management Shareholder (as defined in the New Shareholders Agreement) becomes a holder of Company Common Shares (as defined in the New Shareholders Agreement) pursuant to the terms of the Management Incentive Plan, such Management Shareholder shall automatically be bound by the New Shareholders Agreement regardless of

whether it executed a signature page to the New Shareholders Agreement; provided that such Management Shareholder shall not be required as a condition or requirement of participating in a transaction subject to Sections 4.1 or 4.2 of the New Shareholder Agreement to agree to any restrictive covenants that impose greater restrictions than those to which such Management Shareholder is otherwise already bound (*e.g.*, pursuant to his or her employment agreement with the applicable Debtor).

67.     Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity and any other securities to be issued and distributed  (including the distributions described in the Restructuring Transactions), whether on the Effective Date or any other date of a distribution thereafter, pursuant to the terms of the Plan and/or in accordance with this Confirmation Order on account of, and in exchange for, Claims (including, without limitation) against the Debtors comply with section 1145 of the Bankruptcy Code and shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.  In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New Equity, shall be subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (c) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New Corporate Governance Documents, and (d) applicable regulatory approval, if any.

68.     Each share of the New Equity issued and distributed pursuant to the Plan and this Confirmation Order shall be duly authorized, validly issued, and fully paid and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, and which shall be in form and substance acceptable to the Required Consenting Lenders and consistent with the terms of the Plan Support Agreement, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**F.      Plan Classification Controlling.**

69.     The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder.   The classifications set forth on the Ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan:  (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

**G.      Operation as of the Effective Date.**

70.     Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims against or Interests in the Debtors (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are

parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. This Confirmation Order shall not be stayed and the terms and conditions of this Confirmation Order shall be immediately effective and enforceable upon its entry.

## H.    Restructuring Transactions.

71.    The Debtors and the Reorganized Debtors are authorized to implement and consummate the Restructuring Transactions pursuant to the Plan and the Plan Supplement (as may be amended) and are authorized to execute and deliver all necessary documents or agreements required to perform their obligations thereunder. The Restructuring Transactions pursuant to the Plan are approved and authorized in all respects.

## I.    Distributions.

72.    Subject to Article VI of the Plan, all amounts and securities necessary for the Debtors (on the Effective Date) or the Reorganized Debtors or the Disbursing Agent (on or after the Effective Date) to make payments or distributions pursuant hereto shall be obtained from the New Equity, the Exit Revolver Facility, the New Debt Facility, Cash of the Debtors, or other assets of the Debtors as set forth in the Plan.

73.    As set forth in the Plan, the Withheld Apax Distribution will be $12.0 million in Cash (subject to increase by the amount of any Withheld Apax Distribution Gross-Up) and will be distributed to all non-Apax Holders of Allowed Second Lien Claims (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), Allowed Senior Notes Claims (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), Allowed General Unsecured Claims, and Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution as set forth in Article III.B of the Plan.

74.     As set forth in the Plan, notwithstanding any transfer of an Other Unsecured Claim held by Apax, Apax shall cause the Withheld Apax Distribution to be $12.0 million in Cash plus the amount of any Withheld Apax Distribution Gross-Up (if any) to be paid in Cash, including, in each case to the extent necessary (or if Apax so elects), through the payment of Cash by Apax to the Debtors on or prior to the Effective Date.

75.     As set forth in the Plan and subject to the Distribution Election Procedures, for the avoidance of doubt, the applicability of the Equity Election Cap (as described in Article IV.B. of the Plan and including as to any election made by Apax) shall be determined based solely on the identity and holdings of the Holder that would be entitled to receive a distribution of New Equity and/or Cash in respect of such election as of the Distribution Record Date and, so long as such Holder is not Apax (or an Affiliate thereof), such determination shall be made without any regard to Apax's holdings at any time.

76.     To the extent that the Cash that is reserved on the Effective Date to fund payments required under the Plan exceeds the actual amount of payments required under the Plan, such excess shall be distributed to the Holders of First Lien Claims as Distributable Cash as part of one, or a series of, subsequent distribution(s); provided that, for the avoidance of doubt, Holders of First Lien Claims, in their capacities as such, shall not be entitled to, or receive any, distribution from the Other Unsecured Creditor Distribution.

## J.     Retained Assets.

77.     To the extent that the retention by the Debtors of assets held immediately prior to emergence in accordance with the Plan is deemed, in any instance, to constitute a "transfer" of property, such transfer of property to the Debtors (a) is or shall be a legal, valid, and effective transfer of property, (b) vests or shall vest the Debtors with good title to such property, free and clear of all liens, charges, Claims, encumbrances, or interests, except as expressly provided in the

Plan or this Confirmation Order, (c) does not and shall not constitute an avoidable transfer under the Bankruptcy Code or under applicable nonbankruptcy law, and (d) does not and shall not subject the Debtors to any liability by reason of such transfer under the Bankruptcy Code or under applicable nonbankruptcy law, including by laws affecting successor or transferee liability.

**K.** **Treatment of Executory Contracts and Unexpired Leases.**

78. Assumption of the Executory Contracts and Unexpired Leases listed on Exhibit A of the Plan Supplement is hereby authorized. Rejection of the Executory Contracts and Unexpired Leases listed on Exhibit B of the Plan Supplement is hereby authorized. Unless an Executory Contract or Unexpired Lease (a) was previously rejected, (b) was previously expired or terminated pursuant to its own terms, (c) is the subject of a motion or notice to reject filed on or before the Confirmation Date, or (d) is designated specifically or by category on the Schedule of Rejected Executory Contracts, such Executory Contract or Unexpired Lease shall be deemed to have been assumed by the applicable Debtor.

79. Unless a party to an Executory Contract has objected to the Cure Costs identified in the Plan Supplement and any amendments thereto, as applicable, the Debtors shall pay such Cure Costs in accordance with the terms of the Plan and the assumption and assignment of any Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment. Any disputed Cure Costs shall be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law.

80.     Any party to an Executory Contract whose contract is not listed on Exhibit A of the Plan Supplement and not listed on Exhibit B of the Plan Supplement shall be deemed to have a Cure Cost of $0.00.

81.     Executory Contracts and Unexpired Leases entered into by the Debtors after the Petition Date are not being assumed or rejected pursuant to the Plan and remain enforceable after the Effective Date by all parties pursuant to their terms.

82.     Pursuant to Article V.C of the Plan, any Executory Contract or Unexpired Lease that is subject to an unresolved objection to the assumption of such Executory Contract or Unexpired Lease that is pending as of the Confirmation Date will not be assumed until entry of a Final Order resolving the dispute and approving the assumption of such Executory Contract or Unexpired Lease or as may be agreed upon by the Debtors or the Reorganized Debtors and the counterparty; provided that prior to the Effective Date, the Debtors, in consultation with the advisors to the Required Consenting Lenders, the First Lien Credit Facility Administrative Agent, and the Committee, or after the Effective Date, the Reorganized Debtors, may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court; provided, further, that notwithstanding anything to the contrary in the Plan, the Debtors reserve the right, in consultation with the advisors to the Required Consenting Lenders, the First Lien Credit Facility Administrative Agent, and the Committee, to either reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after the entry of a Final Order resolving an objection to assumption, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

83.     If the rejection of an executory contract or unexpired lease by the Debtors under the Plan results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or its properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel to the Debtors on or before thirty (30) days after the Confirmation Date.

**L.      Exit Revolver Facility.**

84.     The Exit Revolver Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Revolver Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Reorganized Debtors, as the case may be, in connection therewith, including, without limitation, the payment of all fees, indemnities, and expenses provided for therein or otherwise) and the granting of any liens and security interests and entry into and filing of any mortgages in favor of the agent or lenders, as applicable, under the Exit Revolver Facility securing such obligations (i) are hereby approved; (ii) shall be deemed to be valid, binding, and enforceable against the Debtors, the Reorganized Debtors, and their Affiliates party thereto in accordance with their terms, without any further corporate action required by the Debtors or the Reorganized Debtors, as the case may be; and (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Revolver Facility.

85.     The Debtors and the Reorganized Debtors, as the case may be, are hereby authorized, without any further corporate action, to execute and deliver the Exit Revolver Facility Documents and any and all security agreements, guarantees, mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the Exit

Revolver Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the Exit Revolver Facility and any liens and security interests in favor of the lenders under the Exit Revolver Facility securing such obligations, and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities. The Reorganized Debtors may use the Exit Revolver Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

86.     Subject to the occurrence of the Effective Date, the Exit Revolver Facility Documents and any and all security agreements, guarantees, mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the Exit Revolver Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the Exit Revolver Facility, and any liens and security interests in favor of the lenders under the Exit Revolver Facility securing such obligation shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms. The financial accommodations to be extended pursuant to the Exit Revolver Facility Documents by the Debtors to the lenders and other parties thereunder, the guarantees, mortgages, pledges, liens, and other security interests provided by the Debtors in connection therewith, and all other consideration granted pursuant to or in connection with the Exit Revolver Facility are being extended, and shall be deemed to have been extended, in good faith, for reasonably equivalent value, and for legitimate business purposes as an inducement to the lenders and other parties

under the Exit Revolver Facility to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance or recharacterization. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Court's retention of jurisdiction shall not govern the enforcement of the Exit Revolver Facility Documents or any other documents executed in connection with the Exit Revolver Facility or any rights or remedies related thereto.

87.     On the Effective Date, the Reorganized Debtors shall collateralize with Cash the First Lien Credit Facility Existing Letters of Credit in an amount equal to 105% of the face amount of such First Lien Credit Facility Existing Letters of Credit until such time as the First Lien Credit Facility Existing Letters of Credit are replaced by letters of credit issued under the Exit Revolver Facility.

## M.     New Debt Facility

88.     The New Debt Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the New Debt Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Reorganized Debtors, as the case may be, in connection therewith, including, without limitation, the payment of all fees, indemnities, and expenses provided for therein or otherwise) and the granting of any liens and security interests and entry into and filing of any mortgages in favor of the agent or lenders under the New Debt Facility, as applicable, securing such obligations (i) are hereby approved; (ii) shall be deemed to be valid, binding, and enforceable against the Debtors, the Reorganized Debtors, and their Affiliates party thereto in accordance with their terms, without any further corporate action required by the Debtors or the Reorganized Debtors, as the case may be; and (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Debt Facility.

41

89.     The Debtors and the Reorganized Debtors, as the case may be, are hereby authorized, without any further corporate action, to execute and deliver the New Debt Facility Documents and any and all security agreements, guarantees,  mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the New Debt Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the New Debt Facility and any liens and security interests in favor of the lenders under the New Debt Facility securing such obligations, and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities.  The Reorganized Debtors may use the New Debt Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

90.     Subject to the occurrence of the Effective Date, the New Debt Facility Documents and any and all security agreements, guarantees, mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the New Debt Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the New Debt Facility, and any liens and security interests in favor of the lenders under the New Debt Facility securing such obligation shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  The financial accommodations to be extended pursuant to the New Debt Facility Documents by the Debtors to the lenders and other parties thereunder, the guarantees, mortgages, pledges, liens, and other security interests

provided by the Debtors, and all other consideration granted pursuant to or in connection with the New Debt Facility are being extended, and shall be deemed to have been extended, in good faith, for reasonably equivalent value, and for legitimate business purposes as an inducement to the lenders and other parties under the New Debt Facility to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance or recharacterization. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Court's retention of jurisdiction shall not govern the enforcement of the New Debt Facility Documents or any other documents executed in connection with the New Debt Facility or any rights or remedies related thereto.

**N.**     **Directors and Officers of Reorganized Debtors.**

91.     The Reorganized Debtors' initial directors and officers, to the extent known, have been disclosed prior to the Confirmation Hearing. To the extent that any director or officer has not yet been determined, such determination will be made in accordance with the New Corporate Governance Documents and such appointment is hereby approved.

**O.**     **Management Incentive Plan**

92.     The Management Incentive Plan is hereby approved in its entirety and shall be implemented on the Effective Date by Reorganized Cengage without any further action by the New Board or the Bankruptcy Court. In accordance with the Management Incentive Plan, securities representing eighty (80) percent of the New Equity to be granted under the Management Incentive Plan shall be issued, allocated, and distributed on the Effective Date in accordance with the Management Incentive Plan and the Amended MIP Term Sheet, as defined in Exhibit A to the Plan Support Agreement.

P.      **Exemption from Transfer Taxes.**

93.     In accordance with section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the creation and recording of any mortgage, deed of trust, or other security interest as collateral security for the Exit Revolver Facility, the New Debt Facility, or otherwise, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp or similar tax.

Q.      **Exclusivity.**

94.     The Debtors' exclusive periods to file a plan of reorganization and solicit votes thereon, pursuant to section 1121(d) of the Bankruptcy Code, are hereby extended through the Effective Date; provided that such extension is without prejudice to parties' rights to seek to shorten, subject to the Plan Support Agreement, such exclusive periods for cause pursuant to section 1121(d) of the Bankruptcy Code.

R.      **Governmental Approvals Not Required.**

95.     This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and the Plan Documents.

S.      **Filing and Recording.**

96.     This Confirmation Order is and shall be binding upon and shall govern the acts of all persons or entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any stamp tax or similar tax imposed by state or local law.

**T.** **Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies; Binding Effect of Releases and Exculpation.**

97.     Pursuant to section 1141(d) of the Bankruptcy Code and Article VIII.A of the Plan, except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all debt (as such term is defined in section 101 of the Bankruptcy Code) that arose before the Confirmation Date, any debts of any kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, and the rights and Interests of any Holders of Interests whether or not:  (a) a Proof of Claim based on such debt or Interest is Filed; (b) a Claim or Interest based upon such debt is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  These Orders shall be a judicial determination of the discharge of all Claims and equity Interests subject to the Effective Date occurring, except as provided for under section 1141(d)(6) of the Bankruptcy Code.

98.     Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and in consideration for the classification, distributions, releases, and other benefits

provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a

good faith compromise and settlement of all Claims, Interests, controversies, inter-creditor and

inter-debtor issues and disputes (including those described in the Disclosure Statement), or issues

relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest

may have with respect to any Allowed Claim or Interest, or any distribution to be made on

account of such Allowed Claim or Interest, all as reflected in the Global Settlement.  The Global

Settlement is hereby approved, as it is in the best interests of the Debtors, their Estates, and

Holders of Claims and Interests and is fair, equitable, and within the range of reasonableness.  In

accordance with the provisions of the Plan and subject to Article IV.AA and Article VII of the

Plan, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, without

any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective

Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their

Estates and Causes of Action against other Entities.

99.     Upon the Effective Date, all Avoidance Actions are hereby waived, released, and

extinguished pursuant to the Plan.

100.     Upon the Effective Date, except the adversary proceeding styled *Cole v. Cengage*

*Learning, Inc. (In re Cengage Learning, Inc.)*, No. 14-1020 (ESS) (Bankr. E.D.N.Y.) or as

otherwise provided by the Plan or this Confirmation Order, all ongoing litigation, including any

adversary proceedings and contested matters in the Chapter 11 Cases (and related motions)

pending as of the Confirmation Date shall be deemed dismissed with prejudice.  For the

avoidance of doubt and, except as expressly set forth in the Plan, any and all inter-creditor

disputes that either have been asserted or could have been asserted by any person or Entity with

respect to the Debtors or the Chapter 11 Cases prior to the Effective Date, including those arising

in connection with or otherwise related to the Second Lien Intercreditor Agreement, shall be waived and released by each such person or entity and the pending adversary proceeding relating thereto are hereby dismissed with prejudice as of the Effective Date of the Plan; provided that the foregoing shall not be deemed to waive or release any intercreditor disputes not related to the Debtors or the Chapter 11 Cases or as otherwise set forth in Article VIII.D or Article VIII.E of the Plan; provided, further, that, notwithstanding anything to the contrary in the Plan, the distributions and other consideration received by Holders of First Lien Claims and Holders of Second Lien Claims under the Plan shall be deemed sufficient under Bankruptcy Rule 9019 to support the binding waivers and releases of any and all claims and causes of action that have been asserted or could have been asserted prior to the Effective Date with respect to any disputes arising in connection with or otherwise related to the Second Lien Intercreditor Agreement:  (a) against the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims by the First Lien Credit Facility Agents, First Lien Indenture Trustee, and each Holder of First Lien Claims (and for each of the foregoing, their respective successors or assigns); or (b) against the First Lien Credit Facility Agents, First Lien Indenture Trustee, and/or any Holder of First Lien Claims by the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims (and for each of the foregoing, their respective successors or assigns).

101.    All release and exculpation provisions contained in the Plan, including, without limitation, in Article VIII of the Plan, are approved in their entirety and shall be effective and binding on all Persons to the extent provided therein.

## U.    Record Date for Distributions to Holders of First Lien Credit Facility Claims.

102.    The Distribution Record Date for purposes of determining the Holders of First Lien Credit Facility Claims shall be the Confirmation Date.  The Reorganized Debtors and the First Lien Credit Facility Administrative Agent shall have no obligation to recognize the transfer,

assignment or sale of, or any participation in, any First Lien Credit Facility Claim that is not reflected on the First Lien Credit Facility Administrative Agent's register prior to the close of business on the Confirmation Date, and will be entitled for all purposes to recognize and distribute only to those Holders of First Lien Credit Facility Claims that are Holders of  such First Lien Credit Facility Claims per the register kept by the First Lien Credit Facility Administrative Agent as of the close of business on the Confirmation Date.  Notwithstanding anything to the contrary in the Plan, the timing of any subsequent distributions made after the Initial Distribution Date to Holders of First Lien Credit Facility Claims or First Lien Notes Claims shall be at the sole discretion of the Disbursing Agent for the distributions to Holders of First Lien Credit Facility Claims and the Disbursing Agent for the distributions to First Lien Notes Claims, respectively, which Disbursing Agents shall be entitled to make, at their respective election, subsequent interim distributions or solely a final distribution once all reserves contemplated in the Plan have been released; provided that such Disbursing Agents shall make such distributions at least semi-annually so long as such Disbursing Agent holds at least $2,500,000 in Cash to be distributed; provided further that nothing in this paragraph affects any obligation of the Reorganized Debtors to make subsequent distributions to such Disbursing Agents (including as to the timing of any such subsequent distributions).

## V.     Record Date for Distributions to Holders of General Unsecured Claims and First Lien Swap Claims.

103.     Except as otherwise provided in the Distribution Election Procedures, the Distribution Record Date applicable to General Unsecured Claims and First Lien Swap Claims shall be the Confirmation Date.

### W.    **Debtor Release; Third Party Release.**

104.    Each of the release provisions as set forth in, among others, Articles IV.BB, IV.CC, VIII.C, and VIII.D of the Plan, (i) is (a) in exchange for good and valuable consideration provided by the Releasees; (b) a good-faith compromise and settlement of the Causes of Action released by the Releasees or Debtors, as applicable; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Cause of Action released by Articles IV.BB, IV.CC, VIII.C, and VIII.D of the Plan against any of the Releasees; (ii) is hereby incorporated in its entirety as if set forth at length, and (iii) shall be immediately effective as of the Effective Date of the Plan, as set forth in and subject to the other provisions of the Plan.

### X.    **Exculpation.**

105.    The exculpation provisions set forth in Article VIII.E of the Plan are essential to the Plan.  The record in the Chapter 11 Cases fully supports the exculpation provisions, and the exculpation provisions set forth in Article VIII.E of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation.   The exculpation provisions set forth in Article VIII.E of the Plan are (i) hereby incorporated in their entirety as if set forth at length, and (iii) shall be immediately effective as of the Effective Date of the Plan, as set forth in and subject to the other provisions of the Plan.

### Y.    **Notice of Entry of Confirmation Order and Occurrence of the Effective Date.**

106.    No later than 10 days after the occurrence of the Effective Date, the Debtors shall file with the Court and serve by first class mail or overnight delivery service a notice of the entry of this Confirmation Order and occurrence of the Effective Date, in substantially the form annexed hereto as **Exhibit 3** (the "***Confirmation and Effective Date Notice***"), on each of the

following at their respective addresses last known to the Debtors: (a) the United States Trustee for Region 2; (b) counsel to the Committee; (c) counsel to the First Lien Credit Facility Administrative Agent; (d) the Prepetition Indenture Trustees; (e) counsel to the Ad Hoc First Lien Group; (f) counsel to Apax; (g) the United States Attorney for the Eastern District of New York; (h) the Internal Revenue Service; (i) all parties on the master service list filed with the Court; (j) all persons or entities listed in the Debtors' schedules of assets and liabilities, or any amendments thereto; and (k) any other known Holders of Claims or Interests; provided, that the Confirmation Notice shall not be served upon any person or entity to whom the Debtors have mailed other notices during the Chapter 11 Cases that have been returned as undelivered, unless the Debtors have been informed in writing by such person or entity of that person or entity's new address. Such service shall constitute adequate and sufficient notice pursuant to Bankruptcy Rule 2002(f)(7), 2002(i)-(l) and 3020(c) of the confirmation of the Plan, the entry of this Confirmation Order and occurrence of the Effective Date.

## Z. __Cancellation of Liens.__

107. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns. The Reorganized Debtors shall be authorized to file

any necessary or desirable documents to evidence such release in the name of such Secured Party.

**AA.**    **Cancellation of Existing Securities and Agreements.**

108.    Except to the extent provided in the Plan, including in Article IV.N thereof, any document, agreement, or instrument evidencing any Claim or Equity Interest shall be deemed automatically cancelled and of no force and effect on the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and any and all obligations or liabilities of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests shall be discharged.

**BB.**    **Professional Compensation and Reimbursement Claims.**

109.    All entities seeking awards by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date and the Effective Date, as applicable, under sections 327, 328, 330, and 331 of the Bankruptcy Code shall (a) file, on or before the date that is 60 days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Court in accordance with the order(s) relating to or allowing any such Professional Claim.

**CC.**    **Return of Deposits.**

110.    All utilities, including any Person who received a deposit or other form of "adequate assurance" of performance pursuant to section 366 of the Bankruptcy Code during the Chapter 11 Cases (collectively, the "Deposits"), whether pursuant to the *Order Determining Adequate Assurance of Payment for Future Utility Services* [Docket No. 218] or otherwise, including, gas, electric, telephone, data, cable, trash, and sewer services, are directed to return

such Deposits to the Reorganized Debtors, either by setoff against postpetition indebtedness or by Cash refund, within 30 days following the Effective Date.

**DD.  Claims of Worthlessness with Respect to Certain Interests.**

111.    For the avoidance of doubt, nothing herein, in the Plan, or in the Bankruptcy Court's *Final Order Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities and for Related Relief* [Docket No. 152] (the "***WSD Procedures Order***") shall be construed to enjoin (a) any "50% Shareholder" (as defined in the WSD Procedures Order) from (i) filing any federal or state tax return, (ii) filing any amendment to such a return, or (iii) distribute any K-1 or other information statement, if any, to its partners or members, claiming or reflecting any deduction for worthlessness of an Interest in the Debtors, for a tax year ending after the Effective Date, or (b) any partner or owner of such "50% Shareholder" from taking or causing to be taken any such action with respect to a tax year ending after the Effective Date.

**EE.  Effect of Confirmation Order on Other Orders.**

112.    Unless expressly provided for herein, nothing in the Plan or this Confirmation Order shall affect any orders entered in the Chapter 11 Cases pursuant to section 365 of the Bankruptcy Code or Bankruptcy Rule 9019.

**FF.  Specific Provisions.**

113.    Notwithstanding anything to the contrary in the Plan, the setoff rights of the California Franchise Tax Board, if any, are preserved and the Debtors and the California Franchise Tax Board will work in good faith to reconcile and resolve setoff rights.

114.    Notwithstanding any other term or provision in the Plan (including without limitation Article IV.N of the Plan) or this Confirmation Order, nothing in the Plan or this Confirmation Order (i) will prejudice any of the rights, claims, or defenses of the Debtors, the

Reorganized Debtors, the Debtors' insurers ("**Insurers**"), or the Debtors' sureties ("**Sureties**") under any insurance policies under which Debtors or Reorganized Debtors seek coverage (the "**Policies**"), any surety bonds issued by Sureties at the request of the Debtors (the "**Bonds**"), and any agreements related to the Policies and/or Bonds, including but not limited to agreements of indemnity, guarantees, and letters of credit (together, with the Policies and Bonds, the "**Insurance Agreements**"); (ii) will modify any of the terms, conditions, limitations, and/or exclusions contained in the Insurance Agreements, which shall remain in full force and effect; (iii) shall be deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Insurance Agreements, or create any right of action against the Insurers and/or Sureties that does not otherwise exist under applicable non-bankruptcy law; (iv) shall be deemed to prejudice any of the Insurers' and/or Sureties' rights and/or defenses in any pending or subsequent litigation in which the Insurers, Sureties, Debtors, or Reorganized Debtors may seek any declaration regarding the nature and/or extent of any insurance coverage under the Insurance Agreements; (v) shall be deemed to alter the continuing duties and obligations of any insured, principal, and/or indemnitor under the Insurance Agreements (including the issuer of any letter of credit); or (vi) shall be construed as an acknowledgment that the Insurance Agreements cover or otherwise apply to any claims or that any claims are eligible for payment under any of the Insurance Agreements.

115.    No Person shall have Administrative Claims Allowed or paid in the Chapter 11 Cases against the Debtors or their Estates on account of the Management Incentive Plan, the New Management Employment Agreements, or the Separation Agreement and General Release included in Exhibit J to the Plan Supplement.

GG.    **Inconsistency.**

116.    In the event of any inconsistency between the Plan (including the Plan Supplement) and this Confirmation Order, this Confirmation Order shall govern.  To the extent any provision of any final Plan Supplement document may conflict or is inconsistent with any provision in the Plan, the terms of the final Plan Supplement document shall govern and be binding and exclusive.

HH.    **Injunctions and Automatic Stay.**

117.    Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on this Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect through and including the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

II.    **Authorization to Consummate.**

118.    The Debtors are authorized to consummate the Plan and the Restructuring Transactions at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation set forth in Article IX of the Plan.

JJ.    **Substantial Consummation.**

119.    On the Effective Date of the Plan, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**KK.**   **No Waiver.**

120.   The failure to specifically include any particular Plan Document or provision of the Plan or Plan Document in this Confirmation Order will not diminish the effectiveness of such document or provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in their entirety, the Plan Documents are approved in the entirety, and all are incorporated herein by this reference.

**LL.**   **Severability.**

121.   Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable in accordance with its terms, (b) integral to the Plan and may not be deleted or modified except in accordance with Article X.A of the Plan, and (c) nonseverable and mutually dependent.

**MM.**   **Administrative Claims Bar Date.**

122.   Unless otherwise provided by the Plan, this Confirmation Order, any other applicable order of the Bankruptcy Court, or agreed to by the Holder of an Allowed Administrative Claim and the Debtors, all requests for Payment of Administrative Claims must be Filed and served on the Debtors no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

**NN.**   **Effect of Non-Occurrence of Effective Date.**

123.   If the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement, compromise, release, waiver, discharge, and exculpation embodied

in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, the Global Settlement, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and without legal effect; and (c) nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

**OO.**     **Debtors' Actions Post-Confirmation Through the Effective Date.**

124.    During the period from entry of this Confirmation Order through and until the Effective Date, each of the Debtors shall continue to operate their business as a debtor in possession, subject to the oversight of the Court as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Confirmation Order and any order of the Court that is in full force and effect.

**PP.**     **Conditions to Effective Date**

125.    The Plan shall not become effective unless and until the conditions set forth in Article IX.A of the Plan have been satisfied or waived pursuant to Article IX.B. of the Plan.

**QQ.**     **References to Plan Provisions.**

126.    The failure specifically to include or to refer to any article, section, or provision in the Plan, Plan Supplement, or any other Plan Document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision.

**RR.**  **Final Order**

127.   This Confirmation Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.



Dated: Brooklyn, New York
      March 14, 2014

                                       **Elizabeth S. Stong**
                          **United States Bankruptcy Judge**

**<u>Exhibit 1</u>**

**Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-44106 (ESS) |
| | ) | Case No. 13-44105 (ESS) |
| | ) | Case No. 13-44107 (ESS) |
| | ) | Case No. 13-44108 (ESS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

**DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

Jonathan S. Henes
Christopher J. Marcus
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP

300 N. LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Counsel to the Debtors and Debtors in Possession

Dated:  March 12, 2014

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**........................................................................................................1
- A. Defined Terms .................................................................................................1
- B. Rules of Interpretation .................................................................................19
- C. Appendices and Plan Documents.................................................................19
- D. Computation of Time ....................................................................................20
- E. Governing Law...............................................................................................20
- F. Reference to Monetary Figures ...................................................................20

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**........................20
- A. Administrative Claims ..................................................................................20
- B. Accrued Professional Compensation Claims ..............................................21
- C. Priority Tax Claims.......................................................................................21
- D. U.S. Trustee Fees ...........................................................................................22

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**...........................22
- A. Summary of Classification............................................................................22
- B. Treatment of Claims and Interests ..............................................................23
- C. Non-Substantive Consolidation ...................................................................37
- D. Allowance of Certain Claims ........................................................................37
- E. Confirmation of All Cases .............................................................................38
- F. Special Provision Governing Unimpaired Claims ......................................38
- G. Elimination of Vacant Classes .....................................................................38
- H. Voting Classes; Presumed Acceptance by Non-Voting Classes .................38
- I. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................38
- J. Intercompany Interests..................................................................................39

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .............................................39
- A. Sources of Consideration for Plan Distributions........................................39
- B. Restrictions on New Equity Distributed as Part of the Other Unsecured Creditor Distribution .............................................................................39
- C. Withheld Apax Distribution ..........................................................................39
- D. PIK Notes Settlement.....................................................................................40
- E. Exit Revolver Facility ....................................................................................40
- F. New Debt Facility ...........................................................................................41
- G. Total Enterprise Value and Issuance of New Equity...................................41
- H. New Corporate Governance Documents and New Shareholders Agreement .....................................41
- I. Global Settlement and General Settlement of Claims.................................42
- J. Section 1145 Exemption ................................................................................42
- K. Listing of New Equity....................................................................................43
- L. Reporting Obligations....................................................................................43
- M. Release of Liens ..............................................................................................43
- N. Cancellation of Securities and Agreements ................................................43
- O. First Lien Credit Facility Existing Letters of Credit. ................................45
- P. Restructuring Transactions ..........................................................................45
- Q. Corporate Action............................................................................................46
- R. Effectuating Documents; Further Transactions..........................................46
- S. Exemption from Certain Taxes and Fees ....................................................46
- T. Corporate Existence .......................................................................................47
- U. Vesting of Assets in the Reorganized Debtors .............................................47
- V. Assumption of Directors and Officers Insurance Policies ..........................47
- W. Indemnification Provisions in New Corporate Governance Documents..........................47

i

X.     Directors and Officers of Reorganized Cengage and the Other Reorganized Debtors ...................48
Y.     Management Incentive Plan.................................................................................................48
Z.     Preservation of Causes of Action .......................................................................................48
AA.     Post-Effective Date Role of the Committee ........................................................................48
BB.     Release of 2007 LBO Claims.............................................................................................49
CC.     Release of Avoidance Actions ............................................................................................49
DD.     Disallowance of Certain Claims Held by Apax ..................................................................49

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......................50**
A.     Assumption of Executory Contracts and Unexpired Leases ...............................................50
B.     Rejection of Executory Contracts and Unexpired Leases ...................................................50
C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases........................50
D.     Claims Based on Rejection of Executory Contracts and Unexpired Leases .........................51
E.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases...........52
F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements.......................52
G.     Reservation of Rights.........................................................................................................52

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................................52**
A.     Timing and Calculation of Amounts to Be Distributed ......................................................52
B.     Distributions Generally; Disbursing Agent........................................................................53
C.     Rights and Powers of Disbursing Agent.............................................................................53
D.     Distributions on Account of Claims Allowed After the Effective Date...................................53
E.     Disputed General Unsecured Claims Reserve.....................................................................54
F.     Delivery of Distributions and Undeliverable or Unclaimed Distributions................................54
G.     Compliance with Tax Requirements/Allocations................................................................56
H.     Claims Paid or Payable by Third Parties............................................................................56

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS...............................................................................................................57**
A.     Resolution of Disputed Claims ..........................................................................................57
B.     Disallowance of Claims .....................................................................................................58
C.     Amendments to Claims .....................................................................................................58

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .....................59**
A.     Discharge of Claims and Termination of Interests; Compromise and Settlement of
Claims, Interests, and Controversies ..................................................................................59
B.     Subordinated Claims .........................................................................................................59
C.     Debtor Release...................................................................................................................60
D.     Third-Party Release...........................................................................................................60
E.     Exculpation .......................................................................................................................61
F.     Injunction .........................................................................................................................62
G.     Setoffs ...............................................................................................................................62
H.     Special Provision Governing Accrued Professional Compensation Claims and Final Fee
Applications......................................................................................................................63
I.     Special Provision Regarding the PIK Notes Indenture Trustee and the Subordinated
Notes Indenture Trustee ....................................................................................................63

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN...............................63**
A.     Conditions Precedent to Consummation of the Plan...........................................................63
B.     Waiver of Conditions ........................................................................................................64
C.     Effective Date ...................................................................................................................64
D.     Effect of Non-Occurrence of Conditions to the Effective Date ...........................................64

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN................................64**
A.     Modification and Amendments..........................................................................................64
B.     Effect of Confirmation on Modifications............................................................................64

    C.       Revocation or Withdrawal of the Plan ....................................................................64

**ARTICLE XI. RETENTION OF JURISDICTION** ................................................................................**65**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ..............................................................................**66**
    A.       Immediate Binding Effect ......................................................................................66
    B.       Additional Documents ............................................................................................67
    C.       Consultation with the First Lien Credit Facility Administrative Agent, the First Lien
           Indenture Trustee, and the Supporting Parties .....................................................67
    D.       Payment of Certain Fees ........................................................................................67
    E.       Reservation of Rights .............................................................................................69
    F.       Successors and Assigns ..........................................................................................69
    G.       Service of Documents ............................................................................................69
    H.       Term of Injunctions or Stays .................................................................................69
    I.        Entire Agreement ...................................................................................................70
    J.       Severability of Plan Provisions .............................................................................70

K&E 27168105

## INTRODUCTION

Cengage Learning, Inc. and the other Debtors in the above-captioned Chapter 11 Cases respectfully propose the following amended joint plan for the resolution of outstanding claims against, and interests in, the Debtors (as defined herein) pursuant to the Bankruptcy Code (as defined herein).  Holders of claims and interests may refer to the Disclosure Statement (as defined herein) for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, accomplishments during these Chapter 11 Cases (as defined herein), and projections of future operations, as well as a description and summary of the Plan (as defined herein) and certain related matters.  The Debtors are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used herein, capitalized terms have the meanings set forth below.

1.      "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including transaction or sale fees) for services rendered by a Professional through and including the Effective Date, whether such amounts are billed or unbilled, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "*Ad Hoc First Lien Group*" refers to that certain group of Holders of First Lien Claims, solely in their capacity as Holders of First Lien Claims, represented by Milbank, Tweed, Hadley & McCloy LLP as set forth in the statements filed pursuant to Bankruptcy Rule 2019.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation Claims (to the extent Allowed by the Bankruptcy Court); (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including but not limited to the U.S. Trustee Fees; and (d) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in these Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

4.      "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, subject to any exceptions specifically set forth in the Plan or a Final Order which shall serve as the deadline for filing and service of a request for payment of an administrative claim, other than a claim arising under section 503(b)(9) of the Bankruptcy Code, which shall be subject to the Claims Bar Date.

5.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "*Affiliated Lender*" shall have the meaning ascribed to such term in the First Lien Credit Agreement.

7.      "*Allowed*" means with respect to Claims: (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; <u>provided</u>, that with

respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time, as may be extended by the Bankruptcy Court from time to time, fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Except for any Claim Allowed pursuant to the Plan, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it is determined to owe such Debtor or Reorganized Debtor, as applicable, pursuant to a Final Order or an agreement between such Entity and such Debtor or Reorganized Debtor.  "Allow" and "Allowing" shall have correlative meanings.

8. "*Apax*" means Apax Partners, L.P. and the funds affiliated with or managed or advised by Apax Partners, L.P. or its affiliates (including any Affiliated Lender) that indirectly hold Interests or Claims in the Debtors, each of their respective co-investment funds and affiliates (including Apax Europe VII L.P. and Apax US VII L.P.), and any Person or Entity that has a direct or indirect interest in any of the foregoing Persons or Entities.

9. "*Apax Debt Claims*" means the First Lien Claims, the Second Lien Claims, the Senior Notes Claims, and the Subordinated Notes Claims, in each case in respect of principal and interest, held by Apax.

10. "*Apax Fees*" means the fees to be paid on the Effective Date to Apax set forth in Article XII.D.3.

11. "*Apax Share Amount*" means Cash in the amount of $218,055.91.

12. "*Approval Order*" means the *Order (I) Approving the Debtors' and the Committee's Entry Into the Plan Support Agreement; (II) Approving the Disclosure Statement Supplement; (III) Authorizing Expedited Supplemental Solicitation Procedures and the Modification of Deadlines Related Thereto; and (IV) Approving the Forms of the New Solicitation Materials* [Docket No. 1094].

13. "*Available Cash*" means any Cash remaining on any of the Debtors' balance sheets as of the Effective Date after funding all payments and reserves required under the Plan (other than distributions on account of principal and interest to the Holders of First Lien Claims), including the Other Unsecured Creditor Distribution (for the avoidance of doubt, any cash not distributed to the Holders of Other Unsecured Claims should be included in Available Cash); provided that, to the extent that the Cash that is reserved on the Effective Date to fund payments required under the Plan exceeds the actual amount of payments required under the Plan, such excess shall be distributed to the Holders of First Lien Claims as Distributable Cash as part of one, or a series of, subsequent distribution(s); provided that, for the avoidance of doubt, Holders of First Lien Claims, in their capacities as such, shall not be entitled to, or receive any, distribution from the Other Unsecured Creditor Distribution.

14. "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 542, 544, 545, 547, 548, 550, 551, 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

15. "*Balance Sheet Cash*" means an amount agreed to by the Debtors and the Required Consenting Lenders, in consultation with the Supporting Parties, which amount agreed to by the Debtors and the Required Consenting Lenders, in consultation with the Supporting Parties, shall not be less than $50 million nor greater than $175 million and shall be disclosed in the Plan Supplement.

16. "*Ballot*" means each of the forms of ballot approved by the Bankruptcy Court pursuant to the Approval Order and distributed to holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan.

17.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–et seq., as may be amended from time to time.

18.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of New York having jurisdiction over these Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code and/or Administrative Order #264 of the District Court, the United States District Court for the Eastern District of New York.

19.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to these Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

20.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21.    "*Cash*" means the legal tender of the United States of America and/or equivalents thereof.

22.    "*Cash Collateral Orders*" means, collectively, the *Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing*, entered July 3, 2013 [Docket No. 40], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time; the *Final Order (I) Authorizing the Use of Cash Collateral and (II) Granting Adequate Protection to Prepetition Secured Parties*, entered August 20, 2013 [Docket No. 303], as amended by the *Order Amending the Final Order (I) Authorizing the Use of Cash Collateral and (II) Granting Adequate Protection to Prepetition Secured Parties* [Docket No. 591]; the *Stipulation and Consent Order* [Docket No. 1004]; the *Stipulation and Consent Order* [Docket No. 1021]; the *Third Supplemental Stipulation and Consent Order* [Docket No. 1049]; and the Approval Order, and as may be further amended, modified, or supplemented by the Bankruptcy Court from time to time.

23.    "*Causes of Action*" means any Claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counter claims, and crossclaims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) of any of the Debtors and/or the Estates that are pending or may be asserted against any Person or Entity on or after the date hereof, whether known, unknown, suspected or unsuspected, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured including, but not limited to under the Bankruptcy Code, and whether asserted or assertable directly or derivatively, in contract or in tort, in law, equity or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

24.    "*Cengage Interests*" means Interests in Cengage Learning Holdings II, L.P. (or such entity, as reorganized, that is the first-tier holding company of the assets of the Debtors).

25.    "*Centerbridge*" means Centerbridge Partners, L.P. and the funds affiliated with Centerbridge Partners, L.P. that directly or indirectly hold Claims against or Interests in the Debtors.

26.    "*Chapter 11 Cases*" means the jointly administered Chapter 11 Cases commenced by the Debtors and styled In re Cengage Learning, Inc., et al., Chapter 11 Case No. 13-44106 (ESS), which are currently pending before the Bankruptcy Court.

27.    "*Charging Lien*" means any Lien or other priority in payment to which a Prepetition Indenture Trustee is entitled under the terms of a Prepetition Indenture to assert against distributions to be made to Holders of Claims under such Prepetition Indenture.

28.     "*CL Holdco*" means Cengage Learning Holdco, Inc.

29.     "*CL Holdco Interests*" means Interests in CL Holdco.

30.     "*CL Holdings*" means Cengage Learning Holdings II, L.P.

31.     "*CL Holdings Interests*" means Interests in CL Holdings.

32.     "*CLAI*" means Cengage Learning Acquisitions, Inc.

33.     "*CLAI Interests*" means Interests in CLAI.

34.     "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

35.     "*Claims Bar Date*" means the date by which a Proof of Claim must be or must have been Filed, as established by (a) the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 477] entered on September 13, 2013 or (b) a Final Order of the Bankruptcy Court.

36.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be specifically fixed by an order of the Bankruptcy Court for cause shown pursuant to Bankruptcy Rule 9006(b)(1), which may be further extended from time to time, on notice of the motion seeking such order to, among others, all Holders of Disputed Claims as of the date of such motion.

37.     "*Claims Register*" means the official register of Claims maintained by the Notice, Claims, and Solicitation Agent.

38.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

39.     "*CLI*" means Cengage Learning, Inc.

40.     "*CLI Interests*" means Interests in CLI.

41.     "*Committee*" means the official committee of unsecured creditors appointed in these Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on July 10, 2013, as may be reconstituted from time to time.

42.     "*Committee Members*" means (a) Wilmington Trust National Association, in its capacity as the Senior Notes Indenture Trustee, (b) Wells Fargo Bank National Association, in its capacity as the PIK Notes Indenture Trustee, (c) Bennett Management Corporation, (d) RR Donnelley & Sons Company, (e) Gary B. Shelly, (f) Carl S. Warren, and (g) Central National-Gottesman Inc., each solely in its capacity as a member of the Committee.

43.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Bankruptcy Court in these Chapter 11 Cases.

44.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on its docket in these Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

45.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code as such hearing may be adjourned or continued from time to time.

K&E 27168105

46.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the *Debtors' Motion for Entry of an Order, Pursuant to Federal Rule of Bankruptcy Procedure 9019, Approving the Global Settlement Among the Debtors and the Supporting Parties* (which shall be filed prior to the Confirmation Hearing and considered at the Confirmation Hearing), which order shall be reasonably acceptable in form and substance to the Supporting Parties.

47.     "*Consenting Second Lien Note Holders*" means the Holders of Second Lien Claims that executed the Plan Support Agreement, together with their permitted successors and assigns.

48.     "*Consummation*" means the occurrence of the Effective Date.

49.     "*Cure Cost*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

50.     "*Debtor Release*" means the release provision set forth in Article VIII.C hereof.

51.     "*Debtors*" means, as applicable: (a) CL Holdings, (b) CL Holdco, (c) CLI, and (d) CLAI.

52.     "*Description of Transaction Steps*" means the description of the Restructuring Transactions set forth in the Plan Supplement, which shall be reasonably acceptable in form and substance to the Supporting Parties.

53.     "*Director*" means any director of the Debtors or the General Partner of CL Holdings.

54.     "*Disbursing Agent*" means, on the Effective Date, the Debtors or their agent or any other Entity or Entities designated by the Debtors, and with respect to distributions to Holders of Other Unsecured Claims, subject to Article VI.F.2, reasonably acceptable to the Committee, to make or facilitate distributions that are to be made on or after the Effective Date pursuant to the Plan.

55.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 25, 2013, as supplemented by the *Supplemental Disclosure Statement Related to Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 12, 2014, and as amended, supplemented, or modified from time to time thereafter, including all exhibits and schedules thereto, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

56.     "*Disputed*" means, with respect to any Claim or Interest, any portion (including, when appropriate, the whole) of any Claim or Interest that is not yet Allowed or deemed Allowed pursuant to this Plan.

57.     "*Distributable Cash*" means Available Cash less Balance Sheet Cash.

58.     "*Distribution Election*" means the election, in accordance with the terms hereof, that Holders of Second Lien Claims, Senior Notes Claims, and General Unsecured Claims will be entitled to make regarding whether to receive their distribution in Cash, New Equity, or a combination of both, which shall be made on the Distribution Election Form, which will be distributed in a separate mailing from the Ballots pursuant to procedures agreed to by the Supporting Parties.

59.     "*Distribution Election Form*" means a form that will be received by Holders of Second Lien Claims, Senior Notes Claims, and General Unsecured Claims on which each Holder will be permitted to make the Distribution Election pursuant to the Plan subject to the terms set forth in Article IV.B and Article IV.C, which form and related procedures will be approved by an order of the Bankruptcy Court, and reasonably acceptable to the Supporting Parties.

60.     "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims or Interests, other than Holders of First Lien Notes Claims, Second Lien Claims, Senior Notes Claims, and PIK Notes Claims, are eligible to receive distributions hereunder, which shall be (a) the Confirmation Date or (b) such other date as designated in a Bankruptcy Court order prior to the Effective Date, including as set forth in the Distribution Election Procedures [Docket No. 1119]. Distributions to Holders of First Lien Notes Claims, Second Lien Claims, Senior Notes Claims, and PIK Notes Claims shall be made to such Holders in exchange for such securities, subject to the terms of the Distribution Election Procedures (which apply to the Holders of Claims entitled to make the Distribution Election).  Subject to the terms and conditions of this Plan, the securities relating to each of the First Lien Notes Claims, Second Lien Notes Claims, Senior Notes Claims, and PIK Notes Claims shall be deemed cancelled as of the Effective Date.

61.     "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

62.     "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article IX.A hereof have been satisfied or waived (in accordance with Article IX.B hereof).

63.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

64.     "*Equity Term Sheet*" means that certain Cengage Learning — Equity Term Sheet attached hereto as **Exhibit B** provided that to the extent the Equity Term Sheet conflicts with the Plan Term Sheet, the Plan Term Sheet shall control.

65.     "*Estate*" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to section 541 of the Bankruptcy Code.

66.     "*Exculpated Parties*" means (a) each Debtor; (b) the Debtors' Directors as of the Confirmation Date and the Debtors' former Directors; (c) the Debtors' officers as of the Confirmation Date and the Debtors' former officers; (d) each Holder of a First Lien Claim; (e) the First Lien Credit Facility Agents; (f) the First Lien Indenture Trustee; (g) the Committee; (h) the Committee Members or any Entity previously serving as a member of the Committee, including the Booksource and BOKF, NA, d/b/a Bank of Oklahoma, in its capacity as indenture trustee; (i) the Exit Revolver Facility Agent; (j) the Exit Revolver Facility Arrangers; (k) the lenders under the Exit Revolver Facility; (l) the New Debt Facility Agent; (m) the New Debt Facility Arrangers; (n) the lenders under the New Debt Facility; (o) Apax and OMERS; (p) the Second Lien Indenture Trustee, (q) the Consenting Second Lien Noteholders, (r) the Senior Notes Indenture Trustee, (s) the Subordinated Notes Indenture Trustee, (t) the PIK Notes Indenture Trustee, (u) Centerbridge, and (v) each of the foregoing entities' respective successors and assigns, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such.

67.     "*Exculpation*" means the exculpation provision set forth in Article VIII.E hereof.

68.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

69.     "*Exit Revolver Facility*" means that new revolving credit facility in the amount of no less than $200 million and up to $400 million to be entered into by the Debtors, which shall be in form and substance acceptable to the Debtors, the Exit Revolver Facility Agent, the Exit Revolver Facility Arrangers, the lenders under the Exit Revolver Facility, and reasonably acceptable to the Required Consenting Lenders and shall be on terms consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets in all respects.

70.     "*Exit Revolver Facility Agent*" means the administrative agent under the Exit Revolver Facility, or any successor thereto.

71.    "*Exit Revolver Facility Agreement*" means those certain credit agreements effectuating the Exit Revolver Facility to be entered into as of and subject to the occurrence of the Effective Date, by and among certain of the Reorganized Debtors, as borrowers, the Exit Revolver Facility Agent, the lenders named therein, and the other parties thereto, as amended, supplemented or otherwise modified from time to time, which shall be in form and substance consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets in all respects and otherwise reasonably acceptable to the Required Consenting Lenders.

72.    "*Exit Revolver Facility Arrangers*" means the joint lead arrangers of the Exit Revolver Facility.

73.    "*Exit Revolver Facility Documents*" means the Exit Revolver Facility Agreement and, collectively, all related agreements, documents, or instruments to be executed or delivered in connection with the Exit Revolver Facility, the forms of which shall be included as an exhibit to the Plan Supplement and which shall be in form and substance consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets in all respects and otherwise reasonably acceptable to the Required Consenting Lenders.

74.    "*Extended Revolver*" means the obligations under the revolving credit facility maturing April 10, 2017 issued under the First Lien Credit Facility Agreement.

75.    "*Extended Term Loan*" means the obligations under the term loan facility maturing July 5, 2017 issued under the First Lien Credit Facility Agreement.

76.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in these Chapter 11 Cases with the Bankruptcy Court, or other court of competent jurisdiction, or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice, Claims, and Solicitation Agent.

77.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has not been reversed, stayed, modified, or amended, as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

78.    "*First Lien Claim*" means any First Lien Credit Facility Claim, First Lien Notes Claim, or First Lien Swap Claim.

79.    "*First Lien Claim Distribution*" means (a) 100% of the New Equity less any New Equity distributed as part of the Other Unsecured Creditor Distribution, and subject to dilution for the Management Incentive Plan, (b) the New Debt Facility Consideration, and (c) the Distributable Cash, in each case as allocable to Holders of Allowed First Lien Secured Claims and Allowed First Lien Deficiency Claims, including Apax.

80.    "*First Lien Credit Facility*" means that certain credit facility, including a letter of credit facility, entered into pursuant to the First Lien Facility Credit Agreement.

81.    "*First Lien Credit Facility Administrative Agent*" means JPMorgan Chase Bank, N.A., in its capacity as, successor administrative agent and successor collateral agent under the First Lien Credit Facility.

82.    "*First Lien Credit Facility Agents*" means, collectively, (a) the First Lien Credit Facility Administrative Agent, (b) Citigroup Global Markets Inc., UBS Securities LLC, and Mizuho Corporate Bank, Ltd., each in its capacity as documentation agent under the First Lien Credit Facility, (c) JPMorgan Chase Bank, N.A., in its capacity as syndication agent under the First Lien Credit Facility, (d) J.P. Morgan Securities Inc., Citigroup Global Markets Inc., and UBS Securities LLC, each in its capacity as joint lead arranger and bookrunner under the

7

First Lien Credit Facility, and (e) J.P. Morgan Securities LLC, in its capacity as amendment agreement lead arranger.

83.      "*First Lien Credit Facility Agreement*" means that certain credit agreement, dated as of July 5, 2007, as amended by the Incremental Amendment, dated as of May 30, 2008, and the Amendment Agreement, dated as of April 10, 2012, by and among certain of the Debtors, JPMorgan Chase Bank, N.A., as administrative agent, and the other lenders party thereto.

84.      "*First Lien Credit Facility Claim*" means any Claim against any Debtor arising under or related to the First Lien Credit Facility or the First Lien Credit Facility Documents, including all accrued and unpaid interest, fees, costs, expenses, indemnities, and other charges thereunder.

85.      "*First Lien Credit Facility Documents*" means the First Lien Credit Facility Agreement and each of the other documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the First Lien Credit Facility.

86.      "*First Lien Credit Facility Existing Letters of Credit*" means all outstanding and undrawn letters of credit under the First Lien Credit Facility.

87.      "*First Lien Credit Facility Issuing Bank*" means JPMorgan Chase Bank, N.A., in its capacity as an issuer of letters of credit under the First Lien Credit Facility, and any affiliate thereof that issued any letter of credit under the First Lien Credit Facility.

88.      "*First Lien Credit Facility Lenders*" means collectively, the lenders under the First Lien Credit Facility, including those lenders party to the Unextended Revolver, Extended Revolver, Unextended Term Loan, Incremental Term Loan, and Extended Term Loan.

89.      "*First Lien Deficiency Claim*" means any First Lien Claim or portion thereof that is not an Allowed First Lien Secured Claim.

90.      "*First Lien Documents*" means (a) the First Lien Credit Facility Documents, (b) the First Lien Notes Documents, and (c) the First Lien Swap Documents.

91.      "*First Lien Indenture*" means that certain indenture, dated as of April 10, 2012, by and among CLAI, the guarantors party thereto, and the First Lien Indenture Trustee, providing for the issuance of 11.50% senior secured notes due 2020.

92.      "*First Lien Indenture Trustee*" means The Bank of New York Mellon, in its capacity as trustee under the First Lien Indenture.

93.      "*First Lien Intercreditor Agreement*" means that certain First Lien Intercreditor Agreement, dated as of April 10, 2012.

94.      "*First Lien Notes*" means those certain notes issued pursuant to the First Lien Notes Indenture.

95.      "*First Lien Notes Claim*" means any claim against any Debtor arising under or related to the First Lien Notes or First Lien Indenture, including all accrued and unpaid interest, fees, costs, expenses, indemnities, and other charges thereunder.

96.      "*First Lien Notes Documents*" means the First Lien Notes Indenture and each of the other documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the First Lien Notes.

97.      "*First Lien Secured Claim*" means any First Lien Claim that is Secured.

98. "*First Lien Swap Claim*" means any claim against any Debtor arising under or related to the First Lien Swaps.

99. "*First Lien Swap Documents*" means (a) that certain confirmation of the swap transaction between CLAI and Citibank N.A., dated as of April 21, 2010; (b) that certain confirmation of the swap transaction between CLAI and Goldman Sachs Bank USA, dated as of April 16, 2010; (c) that certain confirmation of the swap transaction between CLAI and UBS AG, London Branch, dated as of March 5, 2010; (d) that certain confirmation of the swap transaction between CLAI and The Royal Bank of Scotland plc, dated as of March 1, 2010; (e) that certain confirmation of the swap transaction between CLAI and UBS AG, London Branch, dated as of February 17, 2010; and (f) that certain confirmation of the swap transaction between CLAI and Morgan Stanley Capital Services Inc., dated as of March 19, 2010, and, in each case, all ancillary documents and schedules related thereto.

100. "*First Lien Swaps*" means those certain swap transactions entered into by certain of the Debtors, the terms of which are set forth in the First Lien Swap Documents.

101. "*General Unsecured Claim*" means a Claim against the specified entity that is not Secured and that is not: (a) a Superpriority Claim; (b) an Administrative Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) a First Lien Deficiency Claim; (f) a Second Lien Claim; (g) a Senior Notes Claim; (h) a PIK Notes Claim; (i) a Subordinated Notes Claim; (j) a Section 510(b) Claim; or (i) an Intercompany Claim.

102. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

103. "*GUC Distribution*" means that portion of the Other Unsecured Creditor Distribution allocable to Holders of General Unsecured Claims against CLAI and CLI as set forth in Articles III.B.26 and III.B.34 hereof.

104. "*Holder*" means any Entity holding a Claim or an Interest.

105. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

106. "*Incremental Term Loan*" means the obligations under the term loan facility maturing July 5, 2014 issued under the First Lien Credit Facility Agreement.

107. "*Indemnification Provision*" means each of the Debtors' indemnification provisions in place as of the Confirmation Date whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the benefit of the Debtors' independent Director and any officer and directors as of the Confirmation Date that will be employed by the Reorganized Debtors as an officer or director on and after the Effective Date.

108. "*Initial Board Term*" means the first two years following the Effective Date.

109. "*Initial Distribution Date*" means the Effective Date or as soon as practicable thereafter.

110. "*Intercompany Claims*" means any Claim of a Debtor against another Debtor or subsidiary of a Debtor.

111. "*Intercompany Interests*" means, collectively, the CL Holdco Interests, the CLAI Interests, and the CLI Interests.

112. "*Interests*" means the common stock, limited partnership interests, limited liability company interests, and any other equity, ownership, or profits interests issued by any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, limited partnership interests, limited liability company interests, or other equity, ownership, or profits interests issued by any Debtor (whether or not arising under or in connection with any employment agreement).

9

113.     "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 285], entered on August 15, 2013, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

114.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

115.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

116.     "*Management Incentive Plan*" means that certain post-Effective Date management equity incentive plan, the material terms of which are attached hereto as **Exhibit A**; provided that any changes to such plan shall require the consent of the Debtors and the Debtors' management and shall be reasonably acceptable to the Required Consenting Lenders and on terms consistent with the Plan Support Agreement.

117.     "*New Board*" means the board of directors, board of managers, or equivalent governing body of each of the Reorganized Debtors, as applicable, which shall be consistent with the Plan Support Agreement and Term Sheets in all respects and reasonably acceptable to the Required Consenting Lenders, and as set forth in the terms of the applicable New Corporate Governance Documents.

118.     "*New Bylaws*" means the bylaws, limited liability company agreement, or functionally equivalent document, as applicable, of the Reorganized Debtors, the form of which shall be included in the Plan Supplement, in form and substance consistent with the Plan Support Agreement and reasonably acceptable to the Required Consenting Lenders, and which shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity.

119.     "*New Certificates of Incorporation*" means the certificates of incorporation, certificate of formation, or functionally equivalent document, as applicable, of each of the Reorganized Debtors, the form of which shall be included in the Plan Supplement, in form and substance consistent with the Plan Support Agreement and reasonably acceptable to the Required Consenting Lenders, and which shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity.

120.     "*New Corporate Governance Documents*" means, as applicable, (a) the New Certificates of Incorporation, (b) the New Bylaws, (c) the New Shareholders Agreement, and (d) the New Registration Rights Agreement, in each case to be filed as part of the Plan Supplement.

121.     "*New Debt Alternative Facility*" means, if the Reorganized Debtors do not enter into the New Debt Rollover Facility, a term loan facility in the amount of $1,500 million to $1,750 million to be entered into by the Reorganized Debtors as of and subject to the occurrence of the Effective Date in form and substance consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets in all respects and otherwise reasonably acceptable to the Required Consenting Lenders.

122.     "*New Debt Alternative Facility Documents*" means, collectively, all related agreements, documents, or instruments to be executed or delivered in connection with the New Debt Alternative Facility, the form of which shall be included as an exhibit to the Plan Supplement and shall be in form and substance consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets in all respects and otherwise reasonably acceptable to the Required Consenting Lenders.

123.     "*New Debt Facility*" means the New Debt Rollover Facility or the New Debt Alternative Facility, as applicable.

124.     "*New Debt Facility Agent*" means the administrative agent under the New Debt Facility, or any successor thereto.

125.     "*New Debt Facility Agreement*" means that certain credit agreement effectuating the New Debt Facility to be entered into as of and subject to the occurrence of the Effective Date, by and among certain of the

Reorganized Debtors, as borrowers, the New Debt Facility Agent, the lenders named therein, and the other parties thereto, as amended, supplemented or otherwise modified from time to time and which shall be in form and substance consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets and otherwise reasonably acceptable to the Required Consenting Lenders.

126. "*New Debt Facility Consideration*" means the New Debt Rollover Facility or cash received from the Reorganized Debtors' entry, on the Effective Date, into the New Debt Alternative Facility.

127. "*New Debt Facility Documents*" means the New Debt Alternative Facility Documents or the New Debt Rollover Facility Documents, as applicable.

128. "*New Debt Rollover Facility*" means, if the Reorganized Debtors do not enter into the New Debt Alternative Facility, a term loan facility in the amount of $1,500 million to be entered into by the Reorganized Debtors as of and subject to the occurrence of the Effective Date in form and substance consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets in all respects and otherwise acceptable to the Required Consenting Lenders.

129. "*New Debt Rollover Facility Documents*" means, collectively, all related agreements, documents, or instruments to be executed or delivered in connection with the New Debt Rollover Facility, the material terms of which shall be included as an exhibit to the Plan Supplement and shall be in form and substance consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets in all respects and otherwise reasonably acceptable to the Required Consenting Lenders.

130. "*New Equity*" means the common stock of Reorganized Cengage.

131. "*New Management Employment Agreements*" means the amended management employment agreements to be included in the Plan Supplement, which shall be on terms consistent with the Plan Support Agreement and shall be reasonably acceptable to the Required Consenting Lenders.

132. "*New Registration Rights Agreement*" means the registration rights agreement of the Reorganized Debtors with respect to the New Equity to be effective on the Effective Date, binding on those parties as set forth in such agreement filed with the Plan Supplement, and in form and substance reasonably acceptable to the Required Consenting Lenders, which shall be on terms consistent with the Plan Support Agreement and Term Sheets and which shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity.

133. "*New Shareholders Agreement*" means the shareholders agreement (or functionally equivalent document, as applicable) of the Reorganized Debtors with respect to the New Equity to be effective on the Effective Date, binding on those parties as set forth in such agreement filed with the Plan Supplement, and in form and substance reasonably acceptable to the Required Consenting Lenders, which shall be on terms consistent with the Plan Support Agreement and Term Sheets and which shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity.

134. "*Notice, Claims, and Solicitation Agent*" means Donlin, Recano & Company, Inc., in its capacity as notice, claims, and solicitation agent for the Debtors.

135. "*Non-Estate Fees*" means the reasonable and documented fees and expenses incurred in connection with the Debtors' reorganization and the Chapter 11 Cases, through the Effective Date (and for any reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases on or after the Effective Date in connection with supporting the Plan in any appeal of confirmation that continued after the Effective Date or with respect to performance of any of such parties' obligations under the Plan) by the Consenting Second Lien Noteholders (solely with respect to such Holders' professional fees and expenses), the Subordinated Notes Indenture Trustee, and Centerbridge (solely with respect to such Holders' professional fees and expenses).

136. "*OMERS*" means OMERS Capital Partners and the funds affiliated with OMERS Capital Partners that indirectly hold Interests in the Debtors, each of their respective co-investment funds and affiliates, and any Person or Entity that has a direct or indirect interest in any of the foregoing Persons or Entities.

137. "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) a Superpriority Claim, (b) an Administrative Claim, or (c) a Priority Tax Claim.

138. "*Other Secured Claim*" means any Secured Claim against any Debtor that is not a First Lien Secured Claim or a Secured Tax Claim.

139. "*Other Unsecured Claim*" means the Second Lien Claims, the Senior Notes Claims, the Subordinated Notes Claims, and the General Unsecured Claims.

140. "*Other Unsecured Creditor Distribution*" means (a) on the Effective Date, New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form ) in an aggregate amount of $225 million, which is subject to the terms set forth in Article IV.B and Article IV.C and (b) the Withheld Apax Distribution; provided that for the avoidance of doubt, Holders of other Classes of Claims, including Priority Tax Claims, Administrative Claims, Secured Claims, First Lien Deficiency Claims, Intercompany Claims, Section 510(b) Claims, and Other Priority Claims shall not be entitled to any recovery from the Other Unsecured Creditor Distribution; provided further, that for the avoidance of doubt, (x) the distribution of the Other Unsecured Creditor Distribution to the Holders of Second Lien Claims shall not be subject to any subordination or turnover under the Second Lien Intercreditor Agreement and the distribution of Other Unsecured Creditor Distribution pursuant to Article III.B shall not be subject to any subordination or turnover to the Holders of First Lien Claims and (y) the allocation of the Other Unsecured Creditor Distribution pursuant to Article III.B gives effect to the subordination and turnover rights of the Holders of the Second Lien Claims and Senior Notes Claims against Holders of Subordinated Notes Claims.

141. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

142. "*Petition Date*" means July 2, 2013, the date on which the Debtors filed their petitions for relief commencing these Chapter 11 Cases.

143. "*PIK Notes*" means those certain 13.75% Senior PIK Notes due 2015 issued under the PIK Notes Indenture.

144. "*PIK Notes Claim*" means any Claim against any Debtor for principal, all accrued and unpaid interest arising from or based upon the PIK Notes or the PIK Notes Indenture, and certain fees, costs, expenses, indemnities, and other charges under the PIK Notes or the PIK Notes Indenture for purposes of asserting the Charging Lien in favor of the PIK Notes Indenture Trustee.

145. "*PIK Notes Documents*" means the PIK Notes Indenture and each of the other documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the PIK Notes.

146. "*PIK Notes Indenture*" means that certain indenture dated October 31, 2008, by and among CL Holdco, CL Holdings, as guarantor, and Wells Fargo Bank National Association, as trustee, providing for the issuance of 13.75% Senior PIK Notes due 2015.

147. "*PIK Notes Indenture Trustee*" means Wells Fargo Bank National Association, in its capacity as trustee under the PIK Notes Indenture.

148. "*PIK Notes Settlement Recovery Amount*" means Cash in the amount of $856,344.09 from the Other Unsecured Creditor Distribution, which amount includes the portion of the Withheld Apax Distribution

allocable to Holders of Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution as set forth in Article III.B and subject to the terms set forth in Article IV.D.

149. "*PIK Notes Settlement Total Amount*" means Cash in the amount of $1,074,400.00 from the Other Unsecured Creditor Distribution (comprised of the PIK Notes Settlement Recovery Amount plus the Apax Share Amount), which amount includes the portion of the Withheld Apax Distribution allocable to Holders of Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution as set forth in Article III.B and subject to the terms set forth in Article IV.D.

150. "*PIK Settlement Date*" means February 1, 2014.

151. "*Plan*" means this *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 10, 2014, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of the Plan as if set forth herein.

152. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, all materially consistent with Sections 3.01(a)(ii)-(iv) of the Restructuring Support Agreement, the Plan Support Agreement, and the Term Sheets, to be Filed and served consistent with the requirements under the order approving the Disclosure Statement and the Approval Order 14 days prior to the Voting Deadline (except with respect to (a) below, which shall be Filed and served no later than seven days prior to the Confirmation Hearing), as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) to the extent known, the identity of members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the term sheet for the Exit Revolver Facility; (e) the term sheet for the New Debt Facility; (f) the New Corporate Governance Documents; (g) a list of the Retained Causes of Action; (h) the New Management Employment Agreements; (i) the Management Incentive Plan; (j) the Description of Transaction Steps; (k) the percentages referenced in the definition of "Withheld Apax Distribution Gross-Up;" (l) the amount of the Balance Sheet Cash and the estimated amount of Available Cash; and (m) the implied price per share or New Equity under the Plan; in each case, without limiting the consents otherwise required herein, in form and substance acceptable to the First Lien Credit Facility Administrative Agent; provided that the First Lien Credit Facility Administrative Agent shall have no consent rights to the extent that the terms and conditions of the Plan Supplement documents are provided for in, and consistent with, Sections 3.01(a)(ii)–(iv) of the Restructuring Support Agreement and the Term Sheets with such changes that are not materially adverse to the First Lien Credit Facility Administrative Agent.

153. "*Plan Support Agreement*" means that certain Plan Support Agreement, dated as of February 1, 2014, and all exhibits attached thereto, including the Plan Term Sheet, which is attached hereto as **Exhibit F**, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof. To the extent the terms and conditions of the Restructuring Support Agreement conflict with the Plan Support Agreement, the terms and conditions of the Plan Support Agreement shall govern.

154. "*Plan Term Sheet*" means that certain Cengage Learning Holdings II, L.P., et al. Plan Term Sheet, dated February 1, 2014, attached as **Exhibit A** to the Plan Support Agreement.

155. "*Post-Effective Date Committee Reserve Account*" means an account to hold and maintain $150,000 in Cash of the Other Unsecured Creditor Distribution allocated to Holders of General Unsecured Claims that shall be reserved and escrowed for the benefit of the professionals of the post-Effective Date Committee or subcommittee until such time as consented to by the Committee or upon resolution of the Disputed Claims as set forth in Article IV.AA.

156. "*Prepetition Indentures*" means, collectively, the First Lien Indenture, the Second Lien Indenture, the Senior Notes Indenture, the PIK Notes Indenture, and the Subordinated Notes Indenture.

K&E 27168105

157.    "*Prepetition Indenture Trustees*" means, collectively, the First Lien Indenture Trustee, the Second Lien Indenture Trustee, the Senior Notes Indenture Trustee, the PIK Notes Indenture Trustee, and the Subordinated Notes Indenture Trustee.

158.    "*Prepetition Notes*" means, collectively, the First Lien Notes, the Second Lien Notes, the Senior Notes, the PIK Notes, and the Subordinated Notes.

159.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

160.    "*Pro Rata*" means, as applicable, the proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion to the aggregate amount that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

161.    "*Professional*" means an Entity:  (a) retained in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*, entered August 15, 2013 [Docket No. 284], as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

162.    "*Professional Fee Escrow Account*" means an interest-bearing account to hold and maintain an amount of Cash initially equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

163.    "*Professional Fee Reserve Amount*" means the aggregate unpaid Accrued Professional Compensation Claims prior to and as of the Confirmation Date plus fees and expenses for each Professional to be incurred through the Effective Date as estimated in accordance with Article II.B.3 hereof.

164.    "*Proof of Claim*" means a proof of Claim, including on account of any Claim arising under section 503(b)(9) of the Bankruptcy Code, Filed against any of the Debtors in these Chapter 11 Cases.

165.    "*Purchaser*" means each limited liability company to be formed or caused to be formed by the Debtors that purchases and is vested with all the assets (other than the Retained Assets) of the Debtors pursuant to the Plan.

166.    "*Qualified Public Offering*" means an underwritten public offering of the New Equity so long as the New Equity, in connection with such offering, will be listed on a national securities exchange.

167.    "*Reinstated*" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Interest so as to leave such Claim or Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual

14

pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder.

168.     "*Releasee*" means, collectively, in each case in their capacity as such:  (a) each Debtor and Reorganized Debtor; (b) the Debtors' Directors as of the Confirmation Date and the Debtors' former Directors; (c) the Debtors' officers as of the Confirmation Date and the Debtors' former officers; (d) the First Lien Credit Facility Agents; (e) the First Lien Indenture Trustee; (f) each Holder of a First Lien Claim; (g) the Committee; (h) the Committee Members or any entity previously serving as a member of the Committee, including Booksource and BOKF, NA, d/b/a Bank of Oklahoma, in its capacity as indenture trustee; (i) the Exit Revolver Facility Agent; (j) the Exit Revolver Facility Arrangers; (k) the lenders under the Exit Revolver Facility; (l) the New Debt Facility Agent; (m) the New Debt Facility Arrangers; (n) the lenders under the New Debt Facility; (o) Apax and OMERS; (p) without limiting in any way the preceding clause "o," any party (including Apax) in any capacity related to (i) the purchase by Apax of the Company's prepetition debt, (ii) the repurchase by the Company of its own prepetition debt, and (iii) the 2007 acquisition of the Debtors by Apax and OMERS; (p) the Second Lien Indenture Trustee; (q) the Consenting Second Lien Noteholders; (r) the Senior Notes Indenture Trustee; (s) the Subordinated Notes Indenture Trustee; (t) the PIK Notes Indenture Trustee; (u) Centerbridge; and (v) each of the foregoing entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such.

169.     "*Releasing Parties*" means, collectively:  (a) the Debtors; (b) the Debtors' Directors and officers as of the Confirmation Date and the Debtors' former Directors and officers (in each case, solely in their capacities as such); (c) the Committee; (d) the Committee Members or any entity previously serving as a member of the Committee, including Booksource and BOKF, NA, d/b/a Bank of Oklahoma, in its capacity as indenture trustee; (e) the Debtors' indirect and direct equity holders, solely in their capacities as such, including Apax and OMERS solely in their capacities as indirect and direct equity holders and not in any other capacity; (f) all Holders of Claims who submit a Ballot and do not elect to opt out of the Third Party Release on their Ballot by marking the appropriate box on the Ballot; (g) to the fullest extent permitted by law, all Holders of Claims and Interests that are presumed to accept the Plan; (h) the Second Lien Indenture Trustee; (i) the Consenting Second Lien Noteholders; (j) the Senior Notes Indenture Trustee; (k) the Subordinated Notes Indenture Trustee; (l) the PIK Notes Indenture Trustee; and (m) Centerbridge.

170.     "*Reorganized Debtors*" means each of the Debtors, on or after the Effective Date, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise.

171.     "*Reorganized Cengage*" means either (a) CL Holdings as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise or (b) a new corporation that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Equity to be distributed or sold pursuant to the Plan as determined by the Debtors with the consent of the Required Consenting Lenders and as consistent with the Plan Support Agreement.

172.     "*Reporting Requirements*" means the reporting requirements under the Securities Exchange Act.

173.     "*Required Consenting Lenders*" means those Holders who were signatories to the Restructuring Support Agreement together holding, controlling, or having the ability to control more than 66 2/3% of the aggregate amount of First Lien Claims that were subject to the Restructuring Support Agreement as of date of termination of the Restructuring Support Agreement.

174.     "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement dated as of July 2, 2013, and all exhibits attached thereto, including the term sheets attached thereto, by and between the Debtors and certain Holders of First Lien Claims, as subsequently amended, supplemented, or otherwise modified from time to time.

175. "*Restructuring Term Sheet*" means that certain Cengage Learning Holdings II, L.P., et al. Restructuring Term Sheet, dated July 2, 2013, attached hereto as **Exhibit E**; provided that to the extent the Restructuring Term Sheet conflicts with the Plan Term Sheet, the Plan Term Sheet shall control.

176. "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, consistent with the terms of the Plan Support Agreement and which shall be subject to the reasonable consent of the Supporting Parties, including (a) the execution and delivery of appropriate agreements or other documents of merger, sale, consolidation, equity issuance, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of sale, equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) if implemented pursuant to the Plan, all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (d) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate.

177. "*Retained Assets*" shall have the meaning ascribed to such term in the Description of Transaction Steps.

178. "*Retained Causes of Action*" shall mean those Causes of Action of the Debtors as listed by the Debtors on a schedule filed as part of the Plan Supplement that the Reorganized Debtors shall retain pursuant to Article IV.Z of the Plan, which list, for the avoidance of doubt, shall not include any Avoidance Action or those Causes of Action released, waived, exculpated, relinquished, compromised, or settled by the Plan.

179. "*Rollover Facility Term Sheet*" means that certain Senior Secured Rollover Exit Term Loan Facility Summary of Proposed Terms and Conditions attached hereto as **Exhibit D**; provided that to the extent the Rollover Facility Term Sheet conflicts with the Plan Term Sheet, the Plan Term Sheet shall control.

180. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, including any Cure Costs related thereto, in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

181. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

182. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

183. "*Second Lien Notes*" means those certain 12.00% Senior Secured Second Lien Notes due 2019 issued under the Second Lien Indenture.

184. "*Second Lien Claim*" means any Claim against any Debtor for principal, all accrued and unpaid interest arising from or based upon the Second Lien Notes or the Second Lien Indenture, and certain fees, costs, expenses, indemnities, and other charges under the Second Lien Notes or the Second Lien Indenture for purposes of asserting the Charging Lien in favor of the Second Lien Indenture Trustee.

185. "*Second Lien Indenture*" means that certain indenture dated July 5, 2012, by and among CLAI, the guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, providing for the issuance of 12.00% Senior Secured Second Lien Notes due 2019.

186.    "*Second Lien Indenture Trustee*" means CSC Trust Company of Delaware, in its capacity as successor trustee under the Second Lien Indenture.

187.    "*Second Lien Intercreditor Agreement*" means that certain Second Lien Intercreditor Agreement, dated as of July 5, 2012.

188.    "*Second Lien Notes Documents*" means the Second Lien Indenture and each of the other documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Second Lien Notes.

189.    "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

190.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

191.    "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

192.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

193.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

194.    "*Senior Notes*" means those certain 10.50% Senior Notes due 2015 issued under the Senior Notes Indenture.

195.    "*Senior Notes Claim*" means any Claim against any Debtor for principal, all accrued and unpaid interest arising from or based upon the Senior Notes or the Senior Notes Indenture, and certain fees, costs, expenses, indemnities, and other charges under the Senior Notes or the Senior Notes Indenture for purposes of asserting the Charging Lien in favor of the Senior Notes Indenture Trustee.

196.    "*Senior Notes Documents*" means the Senior Notes Indenture and each of the other documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Senior Notes.

197.    "*Senior Notes Indenture*" means that certain indenture dated July 5, 2007, by and among TL Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuance of 10.50% Senior Notes due 2015.

198.    "*Senior Notes Indenture Trustee*" means Wilmington Trust, N.A., in its capacity as successor trustee under the Senior Notes Indenture.

199.    "*Subordinated Notes*" means those certain 13.25% Senior Subordinated Discount Notes due 2015, issued under the Subordinated Notes Indenture.

200.     "*Subordinated Notes Claim*" means any Claim against any Debtor for principal and all accrued and unpaid interest arising from or based upon the Subordinated Notes or the Subordinated Notes Indenture.

201.     "*Subordinated Notes Documents*" means the Subordinated Notes Indenture and each of the other documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Subordinated Notes.

202.     "*Subordinated Notes Indenture*" means that certain indenture dated July 5, 2007, by and among TL Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuances of 13.25% Senior Subordinated Discount Notes due 2015.

203.     "*Subordinated Notes Indenture Trustee*" means U.S. Bank, N.A. in its capacity as successor trustee under the Subordinated Notes Indenture.

204.     "*Superpriority Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code with priority over any and all Administrative Claims against the Debtors, including amounts owing pursuant to the Cash Collateral Orders.

205.     "*Supporting Parties*" means the Consenting Credit Agreement Lenders, the Consenting First Lien Agent, the Consenting First Lien Noteholders, the Committee, the Consenting Second Lien Noteholders, the Consenting Second Lien Trustee, the Consenting Centerbridge Lenders, the Consenting Apax Parties, the Consenting Senior Unsecured Notes Trustee and the PIK Notes Trustee (in each case, subject to and as defined in the Plan Support Agreement and on a several, not joint and several, basis), and any subsequent person or entity that becomes a party to the Plan Support Agreement in accordance with the terms of the Plan Support Agreement.

206.     "*Term Sheets*" means the Plan Term Sheet, the Restructuring Term Sheet (to the extent it does not conflict with the Plan Term Sheet), the Rollover Facility Term Sheet (to the extent it does not conflict with the Plan Term Sheet), and the Equity Term Sheet (to the extent it does not conflict with the Plan Term Sheet), collectively.

207.     "*Third-Party Release*" means the release provision set forth in Article VIII.D hereof.

208.     "*U.S. Trustee*" means the United States Trustee for the Eastern District of New York.

209.     "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

210.     "*Unexpired Lease*" means an unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

211.     "*Unextended Revolver*" means the obligations under the revolving credit facility matured July 5, 2013, issued under the First Lien Credit Facility Agreement.

212.     "*Unextended Term Loan*" means the obligations under the term loan facility maturing July 5, 2014, issued under the First Lien Credit Facility Agreement.

213.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

214.     "*Voting Deadline*" means 4:00 p.m., prevailing Eastern Time, on March 10, 2014.

215.     "*Voting Record Date*" means 5:00 p.m., prevailing Eastern Time, on February 7, 2014.

216.     "*Withheld Apax Distribution*" means an aggregate of $12.0 million of Cash (subject to increase as set forth in this paragraph for the benefit solely of non-Apax Holders of Allowed Second Lien Claims and/or non-Apax Holders of Allowed Senior Notes Claims as set forth below) funded at Apax's election immediately prior

to the Effective Date either (a) from the first Cash distributions that would be received by Apax in its capacity as a Holder of Allowed Second Lien Claims and Allowed Senior Notes Claims, which shall be withheld from Apax by the Debtors or (b) Cash contributed by Apax to the Debtors and, in either case, distributed to all non-Apax Holders of Allowed Second Lien Claims, Allowed Senior Notes Claims, Allowed General Unsecured Claims, and Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution as set forth in Article III.B and subject to the terms set forth in Article IV.C. If as of the Distribution Record Date, Apax shall have effected any sale, transfer, or assignment of any of its Allowed Second Lien Claims or Allowed Senior Notes Claims to any Person in accordance with the Plan Support Agreement (each such Person, an "*Apax Transferee*"), then immediately prior to the Effective Date Apax shall, by payment to the Debtors, increase in Cash the portion of the Withheld Apax Distribution allocable under the Plan solely to all non-Apax Holders of Allowed Second Lien Claims and/or non-Apax Holders of Allowed Senior Notes Claims, as applicable, by the Withheld Apax Distribution Gross-Up. For the avoidance of doubt, each Apax Transferee and each of its direct and indirect successors, transferees, and assigns shall be deemed a "non-Apax Holder" and, accordingly, shall be entitled to share in the Withheld Apax Distribution, as increased in accordance with the foregoing.

217.    "*Withheld Apax Distribution Gross-Up*" means the increase in the amount of the Withheld Apax Distribution for the benefit solely of non-Apax Holders of Allowed Second Lien Claims and/or non-Apax Holders of Allowed Senior Notes Claims to ensure that the incremental percentage recovery to non-Apax Holders (after giving effect to any PIK Notes recovery hereunder), calculated as of the entry of the Approval Order based upon the greater of (a) the Second Lien Claims and Senior Notes Claims held by Apax as of the Petition Date or (b) the amount of the Allowed Apax Claims set forth in Article III.D of the Plan, attributable to their allocable portion of the Withheld Apax Distribution, remains the same and is not reduced as a result of any sale, transfer, or assignment to an Apax Transferee (as defined in the definition of the "Withheld Apax Distribution"), which amount shall be expressed as a percentage of the amount of transferred Allowed Second Lien Claims and transferred Allowed Senior Notes Claims, as applicable, and shall be filed as part of the Plan Supplement.

## B.    Rules of Interpretation

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless expressly stated herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms hereof; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

If the Holders who were signatories to the Restructuring Support Agreement do not continue to have the ability to control at least 66 2/3% of the amount of First Lien Claims that were subject to the Restructuring Support Agreement as of the date of termination of the Restructuring Support Agreement, then the consent or reasonable acceptance of the Required Consenting Lenders where required under the Plan shall be void *ab initio*.

## C.    Appendices and Plan Documents

The Plan Supplement and any exhibits, appendices, supplements, annexes to the Plan or any Plan Supplement document are incorporated into the Plan by reference and are a part of the Plan as if set forth herein.

K&E 27168105

D.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

E.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors shall be governed by the laws of the state of incorporation or formation (if applicable) of the applicable Debtor or applicable Reorganized Debtor.

F.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

Unless the Holder of an Allowed Administrative Claim agrees to less-favorable treatment, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim: (1) on the Effective Date or as soon as practicable thereafter, or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors and the Holders of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth by an order of the Bankruptcy Court.

Except for Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code, Claims of Professionals and Claims of Governmental Units, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Debtors and the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, in each case, unless otherwise extended by the Bankruptcy Court, at the request of the Reorganized Debtors.

Any requests for payment of Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be disallowed automatically

without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.

### B.    *Accrued Professional Compensation Claims*

#### 1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be filed no later than sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.

#### 2.    Professional Fee Escrow Account

Notwithstanding anything contrary in the Cash Collateral Order, in accordance with Article II.B.3 hereof, on the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors' Estates or of the Reorganized Debtors.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.  To the extent the Professional Fee Escrow Account does not have sufficient funds to satisfy all Allowed Accrued Professional Compensation Claims, any Allowed Accrued Professional Compensation Claims not paid with funds in the Professional Fee Escrow Account shall be satisfied and paid in Cash by the Reorganized Debtors.

#### 3.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtors, counsel to the Ad Hoc First Lien Group, counsel to the First Lien Credit Facility Administrative Agent, counsel to the First Lien Indenture Trustee, counsel to Apax, and counsel to the Committee no later than five days prior to the anticipated Effective Date; provided, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional or otherwise binding on such Professional.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

#### 4.    Post-Effective Date Fees and Expenses

Without limiting Article XII.D hereof, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional (with the exception of Professionals retained by or on behalf of the Committee) or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors on or after the Effective Date; provided that the Professionals retained by or on behalf of the Committee will solely have the rights to payment set forth in Article IV.AA.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### C.    *Priority Tax Claims*

Unless the Holder of an Allowed Priority Tax Claim agrees to less-favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, on the Initial Distribution Date, at the option of the Debtors, one of the

K&E 27168105

following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim plus, to the extent provided for by the Bankruptcy Code, interest at the rate determined under applicable non-bankruptcy law; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by the Bankruptcy Code, interest at the rate determined under applicable non-bankruptcy law, payable in equal monthly payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

D.    *U.S. Trustee Fees*

Until these Chapter 11 Cases are converted, dismissed, or closed by entry of a final decree, whichever occurs first, the Debtors (prior to or on the Effective Date) or the Reorganized Debtors (after the Effective Date) shall (1) pay all U.S. Trustee Fees for each quarter (including any fraction thereof) and (2) schedule quarterly status conferences with the Bankruptcy Court.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.

A.    *Summary of Classification*

All Claims and Interests, other than Administrative Claims (including Accrued Professional Compensation Claims) and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. For all purposes under the Plan, Class 1 and Class 2 will contain sub-Classes for each of the Debtors (*i.e.*, there will be four sub-Classes in each of Class 1 and Class 2, certain of which may be vacant). Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.G hereof.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | First Lien Secured Claims against CL Holdings | Impaired | Entitled to Vote |
| 4 | First Lien Deficiency Claims against CL Holdings | Impaired | Deemed to Reject |
| 5 | Second Lien Claims against CL Holdings | Impaired | Deemed to Reject |
| 6 | Senior Notes Claims against CL Holdings | Impaired | Deemed to Reject |
| 7 | PIK Notes Claims against CL Holdings | Impaired | Deemed to Reject |
| 8 | Subordinated Notes Claims against CL Holdings | Impaired | Deemed to Reject |
| 9 | General Unsecured Claims against CL Holdings | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

22

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 11 | CL Holdings Interests | Impaired | Deemed to Reject |
| 12 | First Lien Secured Claims against CL Holdco | Impaired | Entitled to Vote |
| 13 | First Lien Deficiency Claims against CL Holdco | Impaired | Deemed to Reject |
| 14 | Second Lien Claims against CL Holdco | Impaired | Deemed to Reject |
| 15 | Senior Notes Claims against CL Holdco | Impaired | Deemed to Reject |
| 16 | PIK Notes Claims against CL Holdco | Impaired | Entitled to Vote |
| 17 | Subordinated Notes Claims against CL Holdco | Impaired | Deemed to Reject |
| 18 | General Unsecured Claims against CL Holdco | Impaired | Deemed to Reject |
| 19 | Section 510(b) Claims against CL Holdco | Impaired | Deemed to Reject |
| 20 | CL Holdco Interests | Unimpaired | Presumed to Accept |
| 21 | First Lien Secured Claims against CLAI | Impaired | Entitled to Vote |
| 22 | First Lien Deficiency Claims against CLAI | Impaired | Entitled to Vote |
| 23 | Second Lien Claims against CLAI | Impaired | Entitled to Vote |
| 24 | Senior Notes Claims against CLAI | Impaired | Entitled to Vote |
| 25 | Subordinated Notes Claims against CLAI | Impaired | Deemed to Reject |
| 26 | General Unsecured Claims against CLAI | Impaired | Entitled to Vote |
| 27 | Section 510(b) Claims against CLAI | Impaired | Deemed to Reject |
| 28 | CLAI Interests | Unimpaired | Presumed to Accept |
| 29 | First Lien Secured Claims against CLI | Impaired | Entitled to Vote |
| 30 | First Lien Deficiency Claims against CLI | Impaired | Entitled to Vote |
| 31 | Second Lien Claims against CLI | Impaired | Entitled to Vote |
| 32 | Senior Notes Claims against CLI | Impaired | Entitled to Vote |
| 33 | Subordinated Notes Claims against CLI | Impaired | Deemed to Reject |
| 34 | General Unsecured Claims against CLI | Impaired | Entitled to Vote |
| 35 | Section 510(b) Claims against CLI | Impaired | Deemed to Reject |
| 36 | CLI Interests | Unimpaired | Presumed to Accept |
| 37 | Intercompany Claims | Unimpaired | Presumed to Accept |

B.  *Treatment of Claims and Interests*

The treatment and voting rights provided to each Class for distribution purposes is specified below:

1. Class 1 - Other Priority Claims

    (a) *Classification*:  Class 1 consists of all Other Priority Claims.

    (b) *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) such other date as may be ordered by the Bankruptcy Court.

    (c) *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2. Class 2 - Other Secured Claims

    (a) *Classification*:  Class 2 consists of all Other Secured Claims.

    (b) *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash on (i) the Effective Date or as

K&E 27168105

soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) such other date as may be ordered by the Bankruptcy Court.

(c)  *Voting*:  Class 2 is Unimpaired, and Holders of Class 2 Other Secured Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.  Class 3 - First Lien Secured Claims against CL Holdings

(a)  *Classification*:  Class 3 consists of all First Lien Secured Claims against CL Holdings.

(b)  *Treatment*: Except to the extent that a Holder of an Allowed First Lien Secured Claim against CL Holdings agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CL Holdings, each Holder of an Allowed First Lien Secured Claim against CL Holdings, including Apax, shall receive its Pro Rata share of (i) the First Lien Claim Distribution allocable to  CL Holdings on account of their Secured Claims against CL Holdings and (ii) subject to Article III.B.20, the CL Holdco Interests that are the collateral of the Holders of First Lien Secured Claims against CL Holdings, in each case as allocable to Holders of Allowed First Lien Secured Claims against CL Holdings.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Secured Claims held by such Holder against CL Holdings shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.

(c)  *Voting*:  Class 3 is Impaired. Therefore, Holders of Class 3 First Lien Secured Claims against CL Holdings are entitled to vote to accept or reject the Plan.

4.  Class 4 - First Lien Deficiency Claims against CL Holdings

(a)  *Classification*:  Class 4 consists of all First Lien Deficiency Claims against CL Holdings.

(b)  *Treatment*:  Holders of First Lien Deficiency Claims against CL Holdings shall not receive any distribution on account of such Claims, and First Lien Deficiency Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)  *Voting*:  Class 4 is Impaired, and Holders of First Lien Deficiency Claims against CL Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 4 First Lien Deficiency Claims against CL Holdings are not entitled to vote to accept or reject the Plan.

5.  Class 5 - Second Lien Claims against CL Holdings

(a)  *Classification*:  Class 5 consists of all Second Lien Claims against CL Holdings.

(b)  *Treatment*:  Holders of Second Lien Claims against CL Holdings shall not be entitled to and shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date.

K&E 27168105

(c)    *Voting*:  Class 5 is Impaired, and Holders of Second Lien Claims against CL Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 5 Second Lien Claims against CL Holdings are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 - Senior Notes Claims against CL Holdings</u>

(a)    *Classification*:  Class 6 consists of all Senior Notes Claims against CL Holdings.

(b)    *Treatment*:  Holders of Senior Notes Claims against CL Holdings shall not be entitled to and shall not receive any distribution on account of such Claims, and Senior Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 6 is Impaired, and Holders of Senior Notes Claims against CL Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6 Senior Notes Claims against CL Holdings are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7- PIK Notes Claims against CL Holdings</u>

(a)    *Classification*:  Class 7 consists of all PIK Notes Claims against CL Holdings.

(b)    *Treatment*:  Holders of PIK Notes Claims against CL Holdings shall not be entitled to and shall not receive any distribution on account of such Claims, and PIK Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 7 is Impaired, and Holders of PIK Notes Claims against CL Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 PIK Notes Claims against CL Holdings are not entitled to vote to accept or reject the Plan.

8.    <u>Class 8 - Subordinated Notes Claims against CL Holdings</u>

(a)    *Classification*:  Class 8 consists of all Subordinated Notes Claims against CL Holdings.

(b)    *Treatment*:  Holders of Subordinated Notes Claims against CL Holdings shall not be entitled to and shall not receive any distribution on account of such Claims, and Subordinated Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 8 is Impaired, and Holders of Subordinated Notes Claims against CL Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 8 Subordinated Notes Claims against CL Holdings are not entitled to vote to accept or reject the Plan.

9.    <u>Class 9 - General Unsecured Claims against CL Holdings</u>

(a)    *Classification*:  Class 9 consists of all General Unsecured Claims against CL Holdings.

(b)    *Treatment*:  Holders of General Unsecured Claims against CL Holdings shall not be entitled to and shall not receive any distribution on account of such Claims, and General Unsecured Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 9 is Impaired, and Holders of General Unsecured Claims against CL Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 9 General Unsecured Claims against CL Holdings are not entitled to vote to accept or reject the Plan.

10.    Class 10 - Section 510(b) Claims against CL Holdings

(a)    *Classification*:  Class 10 consists of all Section 510(b) Claims against CL Holdings.

(b)    *Treatment*:  Holders of Section 510(b) Claims against CL Holdings shall not be entitled to and shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 10 is Impaired, and Holders of Section 510(b) Claims against CL Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 10 Section 510(b) Claims against CL Holdings are not entitled to vote to accept or reject the Plan.

11.    Class 11 - CL Holdings Interests

(a)    *Classification*:  Class 11 consists of all CL Holdings Interests.

(b)    *Treatment*:  Holders of CL Holdings Interests shall not be entitled to and shall not receive any distribution on account of such CL Holdings Interests, and CL Holdings Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect.

(c)    *Voting*:  Class 11 is Impaired, and Holders of CL Holdings Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of CL Holdings Interests are not entitled to vote to accept or reject the Plan.

12.    Class 12 - First Lien Secured Claims against CL Holdco

(a)    *Classification*:  Class 12 consists of all First Lien Secured Claims against CL Holdco.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Secured Claim against CL Holdco agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CL Holdco, each Holder of an Allowed First Lien Secured Claim against CL Holdco, including Apax, shall receive its Pro Rata share of (i) the First Lien Claim Distribution allocable to CL Holdco on account of their Secured Claims against CL Holdco and (ii) subject to Article III.B.28, the CLAI Interests that are the collateral of the Holders of First Lien Secured Claims against CL Holdco, in each case as allocable to Holders of Allowed First Lien Secured Claims against CL Holdco.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CL Holdco shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.

(c)    *Voting*:  Class 12 is Impaired. Therefore, Holders of Class 12 First Lien Secured Claims against CL Holdco are entitled to vote to accept or reject the Plan.

K&E 27168105

13.     Class 13 - First Lien Deficiency Claims against CL Holdco

    (a)     *Classification*:  Class 13 consists of all First Lien Deficiency Claims against CL Holdco.

    (b)     *Treatment*:  Holders of First Lien Deficiency Claims against CL Holdco shall not be entitled to and shall not receive any distribution on account of such Claims, and First Lien Deficiency Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date.

    (c)     *Voting*:  Class 13 is Impaired, and Holders of First Lien Deficiency Claims against CL Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 13 First Lien Deficiency Claims against CL Holdco are not entitled to vote to accept or reject the Plan.

14.     Class 14 - Second Lien Claims against CL Holdco

    (a)     *Classification*:  Class 14 consists of all Second Lien Claims against CL Holdco.

    (b)     *Treatment*:  Holders of Second Lien Claims against CL Holdco shall not be entitled to and shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date.

    (c)     *Voting*:  Class 14 is Impaired, and Holders of Second Lien Claims against CL Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 14 Second Lien Claims against CL Holdco are not entitled to vote to accept or reject the Plan.

15.     Class 15 - Senior Notes Claims against CL Holdco

    (a)     *Classification*:  Class 15 consists of all Senior Notes Claims against CL Holdco.

    (b)     *Treatment*:  Holders of Senior Notes Claims against CL Holdco shall not be entitled to and shall not receive any distribution on account of such Claims, and Senior Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date.

    (c)     *Voting*:  Class 15 is Impaired, and Holders of Senior Notes Claims against CL Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 15 Senior Notes Claims against CL Holdco are not entitled to vote to accept or reject the Plan.

16.     Class 16 - PIK Notes Claims against CL Holdco

    (a)     *Classification*:  Class 16 consists of all PIK Notes Claims against CL Holdco.

    (b)     *Treatment*:  Except to the extent that a Holder of an Allowed PIK Notes Claim against CL Holdco agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and compromise of each and every Allowed PIK Notes Claim against CL Holdco, each Holder of an Allowed PIK Notes Claim against CL Holdco shall:

        (i)     to the extent that the Class of Holders of PIK Notes Claims votes to accept the Plan and the PIK Notes Indenture Trustee does not take any action on or after the PIK Settlement Date in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support

Agreement, receive, on the Effective Date, its share of the PIK Notes Settlement Recovery Amount, which amount shall be shared Pro Rata amongst all Holders of Allowed PIK Notes Claims in accordance with and subject to the terms of the PIK Notes Indenture and shall not be subject to any subordination right or obligation; provided, such distributions shall be subject to the application of the Charging Lien of the PIK Notes Indenture Trustee for payment of unpaid fees and costs of the PIK Notes Indenture Trustee; or

(ii)    to the extent that the Class of Holders of PIK Notes Claims does not vote to accept the Plan and/or the PIK Notes Indenture Trustee takes any action on or after the PIK Settlement Date in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement, not be entitled to and shall not receive any portion of the PIK Notes Settlement Recovery Amount or any other distribution on account of such Claims, and the PIK Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date; provided that the PIK Notes Settlement Recovery Amount and the Apax Share Amount shall be added to and included in the Distributions of Holders of Senior Notes Claims, including Apax (other than with respect to any Withheld Apax Distribution), and General Unsecured Claims as provided under the Plan;

provided that, in either case, Holders of PIK Notes Claims against CL Holdco shall receive Cash in the amount of $1,300,000.00, which shall be available for distribution, subject to the Charging Lien, on account of Allowed PIK Notes Claims against CL Holdco; provided, such distributions shall be subject to the application of the Charging Lien of the PIK Notes Indenture Trustee for payment of unpaid fees and costs of the PIK Notes Indenture Trustee; provided however that the Holders of PIK Notes Claims shall not be entitled to receive such Cash in the amount of $1,300,000.00 if the PIK Notes Indenture Trustee is directed by Holders of PIK Notes Claims to take action (and does take such action on or after the PIK Settlement Date) in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement.

(c)    *Voting*: Class 16 is Impaired. Therefore, Holders of Class 16 PIK Notes Claims against CL Holdco as of the Voting Record Date are entitled to vote to accept or reject the Plan.

17.    <u>Class 17 - Subordinated Notes Claims against CL Holdco</u>

(a)    *Classification*: Class 17 consists of all Subordinated Notes Claims against CL Holdco.

(b)    *Treatment*: Holders of Subordinated Notes Claims against CL Holdco shall not be entitled to and shall not receive any distribution on account of such Claims, and Subordinated Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*: Class 17 is Impaired, and Holders of Subordinated Notes Claims against CL Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 17 Subordinated Notes Claims against CL Holdco are not entitled to vote to accept or reject the Plan.

18.    <u>Class 18 - General Unsecured Claims against CL Holdco</u>

(a)    *Classification*: Class 18 consists of all General Unsecured Claims against CL Holdco.

K&E 27168105

(b)     *Treatment*:  Holders of General Unsecured Claims against CL Holdco shall not be entitled to and shall not receive any distribution on account of such Claims, and General Unsecured Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class 18 is Impaired, and Holders of General Unsecured Claims against CL Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 18 General Unsecured Claims against CL Holdco are not entitled to vote to accept or reject the Plan.

19.     <u>Class 19 - Section 510(b) Claims against CL Holdco</u>

(a)     *Classification*:  Class 19 consists of all Section 510(b) Claims against CL Holdco.

(b)     *Treatment*:  Holders of Section 510(b) Claims against CL Holdco shall not be entitled to and shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class 19 is Impaired, and Holders of Section 510(b) Claims against CL Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 19 Section 510(b) Claims against CL Holdco are not entitled to vote to accept or reject the Plan.

20.     <u>Class 20 - CL Holdco Interests</u>

(a)     *Classification*:  Class 20 consists of all CL Holdco Interests.

(b)     *Treatment*:  To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CL Holdco Interests shall be Reinstated on the Effective Date.

(c)     *Voting*:  Class 20 is Unimpaired, and Holders of CL Holdco Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of CL Holdco Interests are not entitled to vote to accept or reject the Plan.

21.     <u>Class 21 - First Lien Secured Claims against CLAI</u>

(a)     *Classification*:  Class 21 consists of all First Lien Secured Claims against CLAI.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLAI agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLAI, each Holder of an Allowed First Lien Secured Claim against CLAI, including Apax, shall receive its Pro Rata share of (i) the First Lien Claim Distribution allocable to the Secured Claims against CLAI and (ii) subject to Article III.B.36, the CLI Interests that are the collateral of the Holders of First Lien Secured Claims against CLAI, in each case as allocable to Holders of Allowed First Lien Secured Claims against CLAI.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.

29

(c)     *Voting*:  Class 21 is Impaired.  Therefore, Holders of Class 21 First Lien Secured Claims against CLAI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

22.     Class 22 - First Lien Deficiency Claims against CLAI

(a)     *Classification*:  Class 22 consists of all First Lien Deficiency Claims against CLAI.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claims against CLAI, each Holder of an Allowed First Lien Deficiency Claim against CLAI, including Apax, shall receive its Pro Rata share of the First Lien Claim Distribution allocable to Holders of Allowed First Lien Deficiency Claims against CLAI. Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of First Lien Note Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.

(c)     *Voting*:  Class 22 is Impaired.  Therefore, Holders of Class 22 First Lien Deficiency Claims against CLAI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

23.     Class 23 - Second Lien Claims against CLAI

(a)     *Classification*:  Class 23 consists of all Second Lien Claims against CLAI.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLAI, each Holder of an Allowed Second Lien Claim against CLAI shall receive on the Effective Date from the Other Unsecured Creditor Distribution:

(i)     New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form  and shall be subject to the terms set forth in Article IV.B) in an aggregate amount of $140,625,000, which amount shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims, including Apax, against CLI and CLAI (subject to the withholding of $7,500,000 from the Withheld Apax Distribution);

(ii)    Cash in the amount of $7,500,000 from the Withheld Apax Distribution (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims against CLI and CLAI other than Apax; and

(iii)   Cash in the aggregate amount of $12,057,330.52, which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Second Lien Claims, including Allowed Second Lien Claims held by Apax, against CLI and CLAI; provided, such distributions shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee.

K&E 27168105

    (c)    *Voting*:  Class 23 is Impaired.  Therefore, Holders of Class 23 Second Lien Claims against CLAI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

24.    <u>Class 24 - Senior Notes Claims against CLAI</u>

    (a)    *Classification*:  Class 24 consists of all Senior Notes Claims against CLAI.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Senior Notes Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLAI, Holders of Allowed Senior Notes Claims against CLAI shall receive on the Effective Date from the Other Unsecured Creditor Distribution:

        (i)    New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form  and shall be subject to the terms set forth in Article IV.B) in an aggregate amount of $72,137,796, which amount shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims, including Apax, against CLI and CLAI (subject to the withholding of $3,847,349 in Cash from the Withheld Apax Distribution); <u>provided</u>, that the aggregate amount to be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims, including Apax, shall be increased to $73,020,533 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof; and

        (ii)    Cash in the aggregate amount of $3,847,349 from the Withheld Apax Distribution (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims against CLI and CLAI other than Apax; <u>provided</u>, that such aggregate amount from the Withheld Apax Distribution shall be increased to $3,894,428 (subject to increase by the amount of any Withheld Apax Distribution Gross-Up) if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof.

        (iii)    Cash in the aggregate amount of $1,450,000.00, which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Senior Notes Claims, including Allowed Senior Notes Claims held by Apax, against CLI and CLAI; <u>provided</u>, such distributions shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee.

    (c)    *Voting*:  Class 24 is Impaired.  Therefore, Holders of Class 24 Senior Notes Claims against CLAI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

25.    <u>Class 25 - Subordinated Notes Claims against CLAI</u>

    (a)    *Classification*:  Class 25 consists of all Subordinated Notes Claims against CLAI.

    (b)    *Treatment*:  After giving effect to the subordination and turnover provisions of the Subordinated Notes Indenture with respect to Second Lien Claims and Senior Notes Claims in accordance with the terms and conditions of the Subordinated Notes Indenture, Holders of Subordinated Notes Claims against CLAI shall not be entitled to and shall not

receive any distribution on account of such Claims, and Subordinated Notes Claims against CLAI shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c) *Voting*: Class 25 is Impaired, and Holders of Subordinated Notes Claims against CLAI are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 25 Subordinated Notes Claims against CLAI are not entitled to vote to accept or reject the Plan.

26.    Class 26 - General Unsecured Claims against CLAI

(a) *Classification*:  Class 26 consists of all General Unsecured Claims against CLAI.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed General Unsecured Claim against CLAI, each Holder of an Allowed General Unsecured Claim against CLAI shall receive from the Other Unsecured Creditor Distribution:

(i)    New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form  and shall be subject to the terms set forth in Article IV.B) in an aggregate amount of $11,217,204, which amount shall be shared Pro Rata amongst all Holders of Allowed General Unsecured Claims against CLAI and Allowed General Unsecured Claims against CLI; <u>provided</u> that the aggregate amount shall be increased to $11,354,467 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof;

(ii)   Cash in the amount of $598,251 from the Withheld Apax Distribution less the funding of the Post-Effective Date Committee Reserve plus any unspent amounts in the Post-Effective Date Committee Reserve Account, which aggregate amount of Cash shall be shared Pro Rata amongst all Holders of General Unsecured Claims against CLAI and General Unsecured Claims against CLI; <u>provided</u> that the aggregate amount from the Withheld Apax Distribution shall be increased to $605,572 less the funding of the Post-Effective Date Committee Reserve plus any unspent amounts in the Post-Effective Date Committee Reserve Account, if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof; and

<u>provided</u>, that to the extent that recoveries to Holders of Allowed General Unsecured Claims against CLAI would exceed 7.2%, any such excess in distributions shall be instead distributed Pro Rata amongst Holders of Allowed General Unsecured Claims against CLI.

(c) *Voting*:  Class 26 is Impaired.  Therefore, Holders of Class 26 General Unsecured Claims against CLAI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

27.    Class 27 - Section 510(b) Claims against CLAI

(a) *Classification*:  Class 27 consists of all Section 510(b) Claims against CLAI.

(b)    *Treatment*:  Holders of Section 510(b) Claims against CLAI shall not be entitled to and shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CLAI shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 27 is Impaired, and Holders of Section 510(b) Claims against CLAI are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 27 Section 510(b) Claims against CLAI are not entitled to vote to accept or reject the Plan.

28.    <u>Class 28 - CLAI Interests</u>

(a)    *Classification*:  Class 28 consists of all CLAI Interests.

(b)    *Treatment*:  To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CLAI Interests shall be Reinstated on the Effective Date.

(c)    *Voting*:  Class 28 is Unimpaired, and Holders of CLAI Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of CLAI Interests are not entitled to vote to accept or reject the Plan.

29.    <u>Class 29 - First Lien Secured Claims against CLI</u>

(a)    *Classification*:  Class 29 consists of all First Lien Secured Claims against CLI.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLI, each Holder of an Allowed First Lien Secured Claim against CLI, including Apax, shall receive its Pro Rata share of the First Lien Claim Distribution allocable to Holders of Allowed First Lien Secured Claims against CLI.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.

(c)    *Voting*:  Class 29 is Impaired.  Therefore, Holders of Class 29 First Lien Secured Claims against CLI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

30.    <u>Class 30 - First Lien Deficiency Claims against CLI</u>

(a)    *Classification*:  Class 30 consists of all First Lien Deficiency Claims against CLI.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claim against CLI, each Holder of an Allowed First Lien Deficiency Claim against CLI, including Apax, shall receive its Pro Rata share of the First Lien Claim Distribution allocable to Holders of Allowed First Lien Deficiency Claims against CLI. Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of the First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.

33

(c)     *Voting*:  Class 30 is Impaired.  Therefore, Holders of Class 30 First Lien Deficiency Claims against CLI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

31.     Class 31 - Second Lien Claims against CLI

(a)     *Classification*:  Class 31 consists of all Second Lien Claims against CLI.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLI, each Holder of an Allowed Second Lien Claim against CLI shall receive on the Effective Date from the Other Unsecured Creditor Distribution:

  (i)    New Equity, subject to dilution for the Management Incentive Plan and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form  and shall be subject to the terms set forth in Article IV.B) in an aggregate amount of $140,625,000, which amount shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims, including Apax, against CLI and CLAI (subject to the withholding of $7,500,000 in Cash from the Withheld Apax Distribution);

  (ii)   Cash in the amount of $7,500,000 from the Withheld Apax Distribution (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims against CLI and CLAI other than Apax; and

  (iii)  Cash in the aggregate amount of $12,057,330.52, which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Second Lien Claims, including Allowed Second Lien Claims held by Apax, against CLI and CLAI; provided, such distributions shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee.

(c)     *Voting*:  Class 31 is Impaired.  Therefore, Holders of Class 31 Second Lien Claims against CLI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

32.     Class 32 - Senior Notes Claims against CLI

(a)     *Classification*:  Class 32 consists of all Senior Notes Claims against CLI.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Senior Notes Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLI, Holders of Allowed Senior Notes Claims against CLI shall receive on the Effective Date from the Other Unsecured Creditor Distribution:

  (i)    New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form  and shall be subject to the terms set forth in Article IV.B) in an aggregate amount of $72,137,796, which amount shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims (including Apax) against CLI and CLAI (subject to the withholding of $3,847,349 in Cash from the Withheld Apax Distribution); provided, that such aggregate amount to be shared Pro Rata amongst all Holders of Allowed Senior

34

Notes Claims against CLI, including Apax, shall be increased to $73,020,533 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof;

    (ii)    Cash in the aggregate amount of $3,847,349 from the Withheld Apax Distribution (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims against CLI and CLAI other than Apax; provided, that such aggregate amount from the Withheld Apax Distribution shall be increased to $3,894,428 (subject to increase by the amount of any Withheld Apax Distribution Gross-Up) if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof;

    (iii)    Cash in the aggregate amount of $1,450,000.00, which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Senior Notes Claims, including Allowed Senior Notes Claims held by Apax, against CLI and CLAI; provided, such distributions shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee.

    (c)    *Voting*:  Class 32 is Impaired.  Therefore, Holders of Class 32 Senior Notes Claims against CLI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

33.    <u>Class 33 - Subordinated Notes Claims against CLI</u>

    (a)    *Classification*:  Class 33 consists of all Subordinated Notes Claims against CLI.

    (b)    *Treatment*:  After giving effect to the subordination and turnover provisions of the Subordinated Notes Indenture with respect to Second Lien Claims and Senior Notes Claims in accordance with the terms and conditions of the Subordinated Notes Indenture, Holders of Subordinated Notes Claims against CLI shall not be entitled to and shall not receive any distribution on account of such Claims, and Subordinated Notes Claims against CLI shall be discharged, cancelled, released, and extinguished as of the Effective Date.

    (c)    *Voting*: Class 33 is Impaired, and Holders of Subordinated Notes Claims against CLI are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 33 Subordinated Notes Claims against CLI are not entitled to vote to accept or reject the Plan.

34.    <u>Class 34 - General Unsecured Claims against CLI</u>

    (a)    *Classification*:  Class 34 consists of all General Unsecured Claims against CLI.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Class 34 General Unsecured Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Class 34 General Unsecured Claim against CLI, each Holder of an Allowed Class 34 General Unsecured Claim against CLI shall receive on the Effective Date from the Other Unsecured Creditor Distribution:

    (i)    New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form  and shall be subject to the terms

35

set forth in Article IV.B) in an aggregate amount of $11,217,204, which amount shall be shared Pro Rata amongst all Holders of Allowed General Unsecured Claims against CLAI and Allowed General Unsecured Claims against CLI; provided, that such aggregate amount shall be increased to $11,354,467 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof;

(ii)    Cash in the amount of $598,251 from the Withheld Apax Distribution less the funding of the Post-Effective Date Committee Reserve plus any unspent amounts in the Post-Effective Date Committee Reserve Account, which aggregate amount of Cash shall be shared Pro Rata amongst all Holders of General Unsecured Claims against CLAI and General Unsecured Claims against CLI; provided, that such aggregate amount from the Withheld Apax Distribution shall be increased to $605,572 less the funding of the Post-Effective Date Committee Reserve plus any unspent amount in the Post-Effective Date Committee Reserve Account if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof; and

provided, that to the extent that recoveries to Holders of Allowed General Unsecured Claims against CLAI would exceed 7.2%, any such excess in distributions shall be instead distributed Pro Rata amongst Holders of Allowed General Unsecured Claims against CLAI.

(c)    *Voting*:  Class 34 is Impaired.  Therefore, Holders of Class 34 General Unsecured Claims against CLI as of the Voting Record Date are entitled to vote to accept or reject the Plan.

35.    <u>Class 35 - Section 510(b) Claims against CLI</u>

(a)    *Classification*:  Class 35 consists of all Section 510(b) Claims against CLI.

(b)    *Treatment*:  Holders of Section 510(b) Claims against CLI shall not be entitled to and shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CLI shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class 35 is Impaired, and Holders of Section 510(b) Claims against CLI are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 35 Section 510(b) Claims against CLI are not entitled to vote to accept or reject the Plan.

36.    <u>Class 36 - CLI Interests</u>

(a)    *Classification*:  Class 36 consists of all CLI Interests.

(b)    *Treatment*:  To the extent not otherwise transferred by CLAI to Reorganized Cengage, CLI Interests shall be reinstated on the Effective Date.

(c)    *Voting*:  Class 36 is Unimpaired, and Holders of CLI Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of CLI Interests are not entitled to vote to accept or reject the Plan.

37.    <u>Class 37 - Intercompany Claims</u>

(a)    *Classification*:  Class 37 consists of all Intercompany Claims.

(b)     *Treatment*:  Holders of Intercompany Claims shall not receive any distribution on account of such Claims, and the Intercompany Claims shall be Reinstated or cancelled as of the Effective Date at the election of the Debtors; provided that such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the Holders of First Lien Claims or Holders of Second Lien Claims, Senior Notes Claims, Subordinated Notes Claims, PIK Notes Claims, or General Unsecured Claims or on the PIK Notes Settlement Total Amount, the PIK Notes Settlement Recovery Amount, or the Apax Share Amount, and any such cancellation or reinstatement that has such an adverse effect shall be null and void *ab initio*.

(c)     *Voting*:  Class 37 is Unimpaired, and Holders of Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

## C.     *Non-Substantive Consolidation*

Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as specifically set forth herein, nothing in this Plan or the Disclosure Documents shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim.

## D.     *Allowance of Certain Claims*

The First Lien Claims for principal, interest, and swap transaction obligations under the First Lien Documents shall be deemed permanently Allowed Claims under the Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims in their entirety in an aggregate amount of $4,638,485,331.80 ($13,321,318.29 on account of First Lien Swap Claims; $56,043.21 on account of letter of credit fees under the First Lien Credit Facility;  $14,432,263.71 on account of prepetition interest under the First Lien Credit Facility; $3,867,842,720.48 on account of outstanding principal and letters of credit under the First Lien Credit Facility;[1] $725,000,000.00 on account of outstanding principal under the First Lien Indenture; and $17,832,986.11 on account of interest under the First Lien Indenture) plus all prepetition claims for accrued and accruing fees, expenses, indemnification, and reimbursement subject to and payable under Article XII.D hereof in accordance with the terms of the First Lien Documents against each of CL Holdings, CL Holdco, CLAI, and CLI.

The Second Lien Claims for principal and interest obligations under the Second Lien Notes Documents shall be deemed permanently Allowed Claims under the Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims in their entirety in the amount of $753,103,855.00 against each of CL Holdings, CL Holdco, CLAI, and CLI.

The Senior Notes Claims for principal and interest obligations under the Senior Notes Documents shall be deemed permanently Allowed Claims under the Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims in their entirety in the amount of $306,331,899.00 against each of CL Holdings, CL Holdco, CLAI, and CLI.

The Subordinated Notes Claims for principal and interest obligations under the Subordinated Notes Documents shall be deemed permanently Allowed Claims under the Plan and not subject to challenge, reduction,

---

[1]     This amount assumes that the First Lien Credit Facility Existing Letters of Credit remain undrawn on the Effective Date and that no distribution will be made on account of such obligations.

recharacterization, defense, offset, or counterclaims in their entirety in the amount of $140,074,142.56 against each of CL Holdings, CL Holdco, CLAI, and CLI.

The PIK Notes Claims for principal and interest obligations under the PIK Notes Documents shall be deemed permanently Allowed Claims under the Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims in their entirety in the amount of $67,664,181.41 against each of CL Holdings and CL Holdco.

The Apax Debt Claims and the Apax Fees shall be permanently Allowed under the Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims and the Holders of such Claims shall receive their distribution consistent with Article VI of the Plan on the Initial Distribution Date, and to the extent applicable, thereafter (in the case of the Apax Debt Claims) or on the Effective Date (in the case of the Apax Fees), as applicable, and shall otherwise receive the applicable treatment provided for such Allowed Claims under the Plan, in full and final satisfaction of all Claims held by Apax against the Debtors.  The amount of the Apax Debt Claims held by Apax as of the effective date of the Plan Support Agreement are Allowed in the amount of (w) $857,092,041.19 of Allowed First Lien Claims (of which $725,410,806.19 is Allowed First Lien Credit Facility Claims and $131,681,235.00 is Allowed First Lien Note Claims), (x) $364,134,234.55 of Allowed Second Lien Claims, (y) $93,519,614.33 of Allowed Senior Notes Claims, and (z) $25,619,525.86 of Allowed Subordinated Notes Claims.

E.      *Confirmation of All Cases*

If the Plan is not confirmed as to one or more of the Debtors but the other Debtors determine, with the consent of the Supporting Parties, to proceed with the Plan, then the Debtor(s) as to which the Plan may not be confirmed shall be severed from, and the Plan shall not apply to, such Debtor(s).

F.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

G.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

I.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

*J.      Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.      Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, the Restructuring Transactions. All amounts and securities necessary for the Debtors (on the Effective Date) or the Reorganized Debtors or the Disbursing Agent (after the Effective Date) to make payments or distributions pursuant hereto shall be obtained from the New Equity, the New Debt Facility, Cash of the Debtors, or other assets of the Debtors.

*B.      Restrictions on New Equity Distributed as Part of the Other Unsecured Creditor Distribution*

The New Equity to be distributed as part of the Other Unsecured Creditor Distribution is subject to the following terms:

(1) the calculation of the value of New Equity for the purpose of such distribution shall be based on a $3.6 billion total enterprise value for the Reorganized Debtors less the amount of the New Debt Facility (which shall be in an amount between $1.5 billion and $1.75 billion) plus Balance Sheet Cash;

(2) an election of New Equity shall only be permitted if after giving effect to the election such Holder (on the Effective Date) would not have more than 14.9% of the New Equity first taking into account other New Equity such Holder would receive under the Plan (the "*Equity Election Cap*") and any amounts exceeding the Equity Election Cap as a result of such election will be paid in Cash;

(3) notwithstanding any election to receive New Equity instead of Cash by a Holder of a General Unsecured Claim, to the extent determined by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Committee, to be necessary to ensure that the total number of recipients of New Equity pursuant to the Plan does not cause the Reorganized Debtors to become subject to the Reporting Requirements, the Debtors or the Reorganized Debtors, as applicable, shall be permitted to make Cash distributions to Holders of General Unsecured Claims that elected to receive New Equity to the extent necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements, which Cash distribution shall start with the smallest Allowed General Unsecured Claim that elected to receive New Equity and will proceed in ascending size of Allowed General Unsecured Claims as necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements; and

(4) to the extent that a Holder is entitled to make an election of either Cash and/or New Equity and such Holders fails to timely return a Distribution Election Form or fails to make an election of New Equity or Cash on a Distribution Election Form that was timely submitted, the Holder shall be deemed to have elected Cash.

*C.      Withheld Apax Distribution*

The Withheld Apax Distribution will be $12.0 million in Cash (subject to increase by the amount of any Withheld Apax Distribution Gross-Up) and will be distributed to all non-Apax Holders of Allowed Second Lien Claims (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), Allowed Senior Notes Claims (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), Allowed General Unsecured Claims, and Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution as set forth in Article III.B hereof.

39

Apax agrees that, notwithstanding any transfer of an Other Unsecured Claim held by Apax, Apax shall cause the Withheld Apax Distribution to be $12.0 million in Cash plus the amount of any Withheld Apax Distribution Gross-Up (if any) to be paid in Cash, including, in each case to the extent necessary (or if Apax so elects), through the payment of Cash by Apax to the Debtors on or prior to the Effective Date.

For the avoidance of doubt, the applicability of the Equity Election Cap (as described in Article IV.B and including as to any election made by Apax) shall be determined based solely on the identity and holdings of the Holder that would be entitled to receive a distribution of New Equity and/or Cash in respect of such election as of the Distribution Record Date and, so long as such Holder is not Apax (or an Affiliate thereof), such determination shall be made without any regard to Apax's holdings at any time.

D.    *PIK Notes Settlement*

As described in Article IV.I and Article VIII.A hereof, the Plan reflects a global settlement of certain Claims and Causes of Action.  The PIK Notes Settlement Total Amount reflects the settlement of certain Claims and Causes of Action asserted or that could be asserted by CL Holdco or by the PIK Notes Indenture Trustee for the benefit of the Holders of the PIK Notes Claims.  As part of the global settlement reflected by the Plan, to the extent that the Class of Holders of PIK Notes Claims votes to accept the Plan and the PIK Notes Indenture Trustee does not take any action on or after the PIK Settlement Date in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement, the Holders of PIK Notes Claims will receive the PIK Notes Settlement Recovery Amount and Apax will receive the Apax Share Amount (provided that, for the avoidance of doubt, Apax shall receive the Apax Share Amount directly from the Debtors and not subject to any Charging Lien).  To the extent that the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) hereof, however, the PIK Notes Settlement Total Amount will be distributed to Holders of Senior Notes Claims and General Unsecured Claims, as set forth in Article III.B hereof.

E.    *Exit Revolver Facility*

The Confirmation Order shall include approval of the Exit Revolver Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Revolver Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein), the granting of any liens and security interests in favor of the lenders under the Exit Revolver Facility securing such obligations, and authorization for the Reorganized Debtors to enter into and execute the Exit Revolver Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Revolver Facility pursuant to the Exit Revolver Facility Documents, including any and all documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the Exit Revolver Facility and any liens and security interests in favor of the lenders under the Exit Revolver Facility securing such obligations. The Reorganized Debtors may use the Exit Revolver Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

Upon the Confirmation Date, (1) the Reorganized Debtors are authorized to execute and deliver the Exit Revolver Facility Documents and any and all security agreements, guarantees, mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the Exit Revolver Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the Exit Revolver Facility and any liens and security interests in favor of the lenders under the Exit Revolver Facility securing such obligations, and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (2) subject to the occurrence of the Effective Date, the Exit Revolver Facility Documents and any and all security agreements, guarantees, mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the Exit Revolver Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the Exit Revolver Facility and any liens and security interests in favor of the lenders under the Exit Revolver Facility securing such obligation, shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

*F.*      *New Debt Facility*

The Confirmation Order shall include approval of the New Debt Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the New Debt Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein), the granting of any liens and security interests in favor of the lenders under New Debt Facility securing such obligations, and authorization for the Reorganized Debtors to enter into and execute the New Debt Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the New Debt Facility pursuant to the New Debt Facility Documents, including any and all documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the New Debt Facility and any liens and security interests in favor of the lenders under the New Debt Facility securing such obligations.  The Reorganized Debtors may use the New Debt Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

Upon the Confirmation Date, (1) the Reorganized Debtors are authorized to execute and deliver the New Debt Facility Documents and any and all security agreements, guarantees,  mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the New Debt Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the New Debt Facility and any liens and security interests in favor of the lenders under the New Debt Facility securing such obligations, and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (2) subject to the occurrence of the Effective Date, the New Debt Facility Documents and any and all security agreements, guarantees,  mortgages or extensions of mortgages, certificates, control agreements, insurance documents, opinions, and other instruments, agreements, assignments, and documents contemplated or required by the New Debt Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the New Debt Facility and any liens and security interests in favor of the lenders under the New Debt Facility securing such obligations, shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

*G.*      *Total Enterprise Value and Issuance of New Equity*

For all purposes under the Plan (including the Management Incentive Plan), the New Equity shall be ascribed a value equal to the implied value of the New Equity given a total enterprise value of the Debtors of $3.6 billion.

Cengage Interests shall be cancelled and Reorganized Cengage shall issue the New Equity for distribution to Holders of Claims entitled to receive the New Equity pursuant to the Plan.  New Equity shall also be reserved for the Management Incentive Plan in accordance with Article IV.Y hereof.

Each share of the New Equity issued and distributed pursuant to the Plan shall be duly authorized, validly issued, and fully paid and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, and which shall be in form and substance acceptable to the Required Consenting Lenders and consistent with the terms of the Plan Support Agreement, which terms and conditions shall bind each Entity receiving such distribution or issuance.

*H.*      *New Corporate Governance Documents and New Shareholders Agreement*

On the Effective Date, Reorganized Cengage and the Reorganized Debtors, as applicable, shall enter into the New Corporate Governance Documents.  The New Corporate Governance Documents, other than the New Shareholders Agreement and the New Registration Rights Agreement, shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Equity shall be deemed to be bound thereby, in

each case without the need for execution by any party thereto other than Reorganized Cengage, and such other Reorganized Debtors as applicable.

On the Effective Date, Reorganized Cengage shall enter into and deliver the New Shareholders Agreement and the New Registration Rights Agreement in substantially the forms included in the Plan Supplement. The New Shareholders Agreement and the New Registration Rights Agreement each shall be deemed to be valid, binding, and enforceable in accordance with its terms on those parties set forth in each such agreement filed with the Plan Supplement.

The New Shareholders Agreement shall provide that any shareholder protections in the New Shareholders Agreement shall apply to all minority Holders of New Equity on an equal basis; provided, however, that the foregoing does not mean that all minority shareholders will have the same protections regardless of percentage holdings. The New Shareholders Agreement and the other New Corporate Governance Documents shall be reasonably acceptable to the Required Consenting Lenders and shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity. Notwithstanding anything to the contrary in the Equity Term Sheet, preemptive rights will be governed by the New Shareholders Agreement.

The New Shareholders Agreement shall expressly identify Apax as the "15%" holder entitled to nominate and have elected one director and one board observer on the Effective Date, so long as Apax is entitled to at least 15% of the New Equity on account of its First Lien Claims as of the Effective Date.

I.      Global Settlement and General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates and implements a compromise and settlement of numerous inter-Debtor, Debtor-creditor, and intercreditor issues and disputes designed to achieve an economic settlement of Claims against the Debtors and an effective resolution of the Chapter 11 Cases. Except as otherwise expressly set forth herein, this global settlement constitutes a settlement of potential litigation of all issues and Claims against the Debtors including in each case with respect to substantive consolidation, treatment of Secured Claims against multiple Debtors, the validity and enforceability of Intercompany Claims, the allocation of asset values, which assets are encumbered and unencumbered, the voidability of liens, the validity and enforceability of subordination and turnover provisions in intercreditor agreements, claims and causes of action related to intercreditor agreements, and also constitutes a settlement of all claims against Apax in connection with the Chapter 11 Cases.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan. Distributions made to Holders of Allowed Claims are intended to be indefeasible.

J.      Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New Equity, shall be subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New Corporate Governance Documents, and (4) applicable regulatory approval, if any.

K.    *Listing of New Equity*

On the Effective Date, none of the New Equity will be listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Securities Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date; provided, that notwithstanding anything to the contrary contained herein, each of the Reorganized Debtors shall provide to the U.S. Trustee a calculation of their disbursements on a quarterly basis until the entry of a final decree pursuant to Bankruptcy Rule 3022 to close the chapter 11 case of such Reorganized Debtor.  In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Corporate Governance Documents may impose certain trading restrictions, and the New Equity will be subject to certain transfer and other restrictions pursuant to the New Corporate Governance Documents designed to maintain the Reorganized Debtors as private, non-reporting companies.

L.    *Reporting Obligations*

The Reorganized Debtors shall publicly post annual and quarterly financial statements (with management discussion and analysis being posted at least annually, and with any other management discussion and analysis provided to any lender or other Entity being posted as well), provided, however, that the Reorganized Debtors shall be entitled to withhold commercially sensitive information in their reasonable discretion (provided that the deletion of the withheld information from the financial statements does not make the redacted statement not compliant with Generally Accepted Accounting Principles.  Other reporting obligations will be as set forth in the New Corporate Governance Documents and filed as part of the Plan Supplement.

M.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns. The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Secured Party.

N.    *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Indentures and any other certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or profits interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest (except the Intercompany Interests, Allowed Intercompany Claims, and such other certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors to the extent specifically Reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; (2) the obligations of the Debtors under the First Lien Credit Facility Documents shall be fully released, settled, and compromised as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (3) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised except as expressly provided herein; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim against or Interest in a Debtor shall continue in effect solely for purposes of allowing such

43

Holders to receive distributions under the Plan as provided herein; <u>provided</u>, <u>further</u>, that notwithstanding the foregoing and anything else contained in the Plan:

1.    Except as set forth in Article XII.D.3 hereof, the First Lien Credit Facility Documents shall continue in effect against the Debtors solely for the purpose of (a) allowing Holders of First Lien Credit Facility Claims to receive the treatment as provided herein, (b) allowing the First Lien Credit Facility Administrative Agent to receive distributions from the Debtors and to make further distributions, as set forth in the Plan, to the Holders of First Lien Credit Facility Claims and perform such other functions as set forth in this Plan or as the First Lien Credit Facility Administrative Agent shall deem necessary or appropriate consistent with the terms of the First Lien Credit Facility Documents and the Plan, (c) preserving all rights of the First Lien Credit Facility Agents and the First Lien Credit Facility Issuing Bank, in each case, against any person other than the Debtors, (d) preserving all rights against, and obligations of, parties other than the Debtors, including with respect to indemnification or contribution from the First Lien Credit Facility Lenders under the First Lien Credit Facility Documents but in each case (i) solely to the extent so provided in the First Lien Credit Facility Documents, and (ii) other than those rights of a Releasing Party with respect to a Releasee that are subject to the release provisions in Article VIII of the Plan, and (e) permitting the First Lien Credit Facility Administrative Agent to maintain or assert any right it may have under the First Lien Credit Facility Documents against distributions pursuant to the terms of the Plan to recover fees and expenses (including the fees and expenses of counsel, agents, and advisors) of the First Lien Credit Facility Administrative Agent.

2.    Except as set forth in Article XII.D.3 hereof, the First Lien Notes Documents shall continue in effect against the Debtors solely for the purpose of (a) allowing Holders of First Lien Notes Claims to receive the treatment as provided herein; (b) allowing the First Lien Indenture Trustee to receive distributions from the Debtors and to make further distributions to the Holders of First Lien Notes Claims on account of such Claims, as set forth in Article VI hereof; (c) allowing the First Lien Indenture Trustee to perform such other functions as set forth in this Plan or as the First Lien Indenture Trustee shall deem necessary or appropriate consistent with the terms of the First Lien Notes Documents and the Plan; (d) the payment of the reasonable and documented fees and expenses incurred by the First Lien Indenture Trustee as set forth in Article XII.D hereof; (e) preserving all rights and obligations of parties (including the First Lien Indenture Trustee) other than against the Debtors, including with respect to indemnification or contribution from the Holders of First Lien Notes Claims under the First Lien Notes Documents, and other than those rights of a Releasing Party with respect to a Releasee that are subject to the release provisions in Article VIII of the Plan, but in each case solely to the extent so provided in the First Lien Notes Documents; and (f) permitting the First Lien Indenture Trustee to maintain or assert any right or Charging Lien it may have against distributions pursuant to the terms of the Plan to recover unpaid fees and expenses (including the fees and expenses of counsel, agents, and advisors) of the First Lien Indenture Trustee.

3.    Except with respect to the First Lien Notes Indenture and except as set forth in Article XII.D hereof, the Prepetition Indentures shall continue in effect against the Debtors solely for the purposes of (a) allowing Holders of Claims to receive the treatment as provided herein and for the Prepetition Indenture Trustees; (b) preserving any rights of the Prepetition Indenture Trustees to indemnification or contribution from Holders of Prepetition Notes under the Prepetition Indentures or any direction provided by Holders of the Prepetition Notes under any of the Prepetition Indentures, each as applicable; (c) permitting each of the Prepetition Indenture Trustees to maintain or assert any right or Charging Lien it may have against distributions pursuant to the terms of the Prepetition Indentures to recover unpaid fees and expenses (including the fees and expenses of their respective counsel, agents, and advisors) of the Prepetition Indenture Trustees; (d) enforcing any rights and remedies as between Holders of Prepetition Notes thereunder or as between any Holder of Prepetition Notes and the applicable Prepetition Indenture Trustee; (e) the payment of reasonable and documented fees and expenses incurred by the Prepetition Indenture Trustees to the extent set forth in Article XII.D.2; and (f) preserving all rights and obligations of parties, other than against the Debtors and other than those rights of a Releasing Party with respect to a Releasee that are subject to the release provisions in Article VIII of the Plan and those claims or causes of action otherwise released pursuant to the Plan, but in each case solely to the extent so provided in the applicable Prepetition Indentures; <u>provided</u>, <u>however</u>, that nothing in the preceding proviso or in Article VIII hereof shall be deemed to extinguish or otherwise affect the rights of Prepetition Indenture Trustees that are expressly preserved pursuant to subsections (b) and (d) of this paragraph.

44

4.      Except as set forth in Article XII.D.3, the First Lien Intercreditor Agreement shall continue in effect (a) against the Debtors to the extent necessary to give effect to the treatment to the Holders of Allowed Claims as provided for herein, (b) against the Debtors to the extent necessary to give effect to any waiver of any claim in the First Lien Intercreditor Agreement, and (c) as to all rights and obligations of parties other than against the Debtors and other than those rights of a Releasing Party with respect to a Releasee that are subject to the release provisions in Article VIII of the Plan and those claims or causes of action otherwise released pursuant to the Plan.

5.      Except as set forth in Article XII.D, the Second Lien Intercreditor Agreement shall continue in effect (a) against the Debtors to the extent necessary to give effect to the treatment to the Holders of Allowed Claims as provided for herein, (b)  against the Debtors to the extent necessary to give effect to any waiver of any claim in the Second Lien Intercreditor Agreement, and (c)  as to all rights and obligations of parties other than against the Debtors and other than those rights of a Releasing Party with respect to a Releasee that are subject to the release provisions in Article VIII of the Plan and those claims or causes of action otherwise released pursuant to the Plan.

Nothing in this Article IV.N is intended to affect the rights and obligations of parties under securities and agreements against parties other than the Debtors other than those rights of a Releasing Party with respect to a Releasee that are subject to the release provisions in Article VIII of the Plan and those claims or causes of action otherwise released pursuant to the Plan.

On and after the Effective Date, all duties and responsibilities of the Prepetition Indenture Trustees under the applicable Prepetition Indentures and all duties and responsibilities of the First Lien Credit Facility Administrative Agent arising under or related to the First Lien Credit Facility shall be discharged except to the extent required in order to effectuate the Plan.

On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including the Prepetition Indentures, shall be deemed to be canceled with respect to the Debtors, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released, settled, and compromised.

On and after the Effective Date, to the extent not satisfied under the Plan, Allowed Intercompany Claims shall be Reinstated or cancelled at the election of the Debtors; provided that no distribution shall be made on account of Allowed Intercompany Claims; provided further that such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the Holders of First Lien Claims, Second Lien Claims, Senior Notes Claims, PIK Notes Claims, Subordinated Notes Claims, or General Unsecured Claims, and any such cancellation or Reinstatement that has such an adverse effect shall be null and void ab initio.

For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall in any way limit or affect the standing of any of the Prepetition Indenture Trustees or First Lien Credit Facility Administrative Agent to appear and be heard in the Chapter 11 Cases on and after the Effective Date.

O.      *First Lien Credit Facility Existing Letters of Credit.*

The First Lien Credit Facility Existing Letters of Credit shall be replaced within 60 days of the Effective Date by letters of credit issued under the Exit Revolver Facility; provided that on the Effective Date, the First Lien Credit Facility Existing Letters of Credit shall be collateralized with Cash in an amount equal to 105% of the face amount of such First Lien Credit Facility Existing Letters of Credit or receive such other treatment as agreed by the affected First Lien Credit Facility Lenders, in each case until such time as the First Lien Credit Facility Existing Letters of Credit are replaced by the Reorganized Debtors.

P.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtors, consistent with the terms of the Plan Support Agreement and reasonably acceptable to the Supporting Parties may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein shall constitute a change of control under any agreement, contract or document of the Debtors.

The restructuring may be structured as an acquisition of substantially all of the assets of Cengage (other than the Retained Assets) by one or more Purchasers on the terms set forth in the Description of Transaction Steps, which acquisition may be structured as a taxable transaction for United States federal income tax purposes and deemed consummated on the Effective Date.

Q.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity or Person, including:   (1) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (2) selection of the managers and officers for the Reorganized Debtors; (3) the execution of and entry into the Exit Revolver Facility Documents; (4) the execution of and entry into the New Debt Facility Agreement and the other New Debt Facility Documents; (5) entry into the New Corporate Governance Documents; (6) the issuance and distribution of the New Equity as provided herein; (7) adoption of the Management Incentive Plan; and (8) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers, or authorized persons of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors including (1) the Exit Revolver Facility Agreement and the other Exit Revolver Facility Documents, (2) the New Corporate Governance Documents, and (3) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.Q shall be effective notwithstanding any requirements under non-bankruptcy law.

R.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the managers, officers, authorized persons and members of the boards of managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit Revolver Facility Agreement, the New Debt Facility Agreement, the New Corporate Governance Documents, and any securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

S.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto or the Exit Revolver Facility Documents shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption shall apply to the fullest extent permitted by law, but includes, without limitation, to (1) the creation of any mortgage, deed of trust, Lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution,

46

and/or sale of any of the New Equity and any other securities of the Debtors or the Reorganized Debtors; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

T.      *Corporate Existence*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

U.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

V.      *Assumption of Directors and Officers Insurance Policies*

The Debtors do not believe that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute Executory Contracts. To the extent that such insurance policies or agreements are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations solely to the extent necessary to effectuate any provision of the D&O Liability Insurance Policies.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

W.      *Indemnification Provisions in New Corporate Governance Documents*

As of the Effective Date, the Indemnification Provisions shall be assumed and irrevocable and shall survive the effectiveness of the Plan and the New Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted as set forth in the Indemnification Provisions and for acts taken after the Effective Date by the Reorganized Debtors' directors, officers, employees, or agents (solely in their respective capacities as such), and none of the Reorganized Debtors shall amend and/or restate the New Corporate Governance Documents before or after the Effective Date to terminate

47

or materially adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights set forth in the Indemnification Provisions.

X.      *Directors and Officers of Reorganized Cengage and the Other Reorganized Debtors*

On the Effective Date, all managers, directors, and other members of the existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the applicable New Board.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement.

1.      The New Board

The New Board of Reorganized Cengage shall be determined in accordance with the New Shareholders Agreement.

2.      Senior Management and Management Employment Agreements

The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the applicable New Board to remove or replace them in accordance with the New Corporate Governance Documents and any applicable employment agreements that are assumed, or assumed as amended, by the Reorganized Debtors pursuant to the Plan consistent with the Term Sheets in all respects.

Y.      *Management Incentive Plan*

On or as soon as practicable following the Effective Date, the New Board of Reorganized Cengage shall adopt the Management Incentive Plan.

Z.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan (including, without limitation, pursuant to Article IV.BB, Article IV.CC, Article VIII.C, Article VIII.A, and Article VIII.E hereof), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors (and for the avoidance of doubt, all Avoidance Actions are waived and released pursuant to the Plan).

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against each of them.  Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan or released by the Plan.  Unless a Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Debtors or the Reorganized Debtors expressly reserve such Cause of Action for later adjudication.

AA.     *Post-Effective Date Role of the Committee*

On the thirtieth (30th) day after the Effective Date, except with respect to (a) fee applications and Non-Estate Fees; (b) appealing and taking any action concerning an appeal in any court that is pending as of the

Effective Date; (c) any pending litigation or contested matters to which the Committee is a party (excluding any such litigation or contested matter as to any Causes of Action released by the Plan); (d) interpretation, enforcement, or implementation of the Amended Plan, in each case to the extent there is a dispute, disagreement, controversy or issue, including, but not limited to, a contested matter or adversary proceeding or other litigation and as it relates to or otherwise affects the Other Unsecured Creditor Distributions or the classification or treatment of Second Lien Claims, Senior Notes Claims, PIK Notes Claims, Subordinated Notes Claims, and General Unsecured Claims or otherwise relates to or affects unsecured creditors of the Debtors; and (e) consulting with the Debtors or Reorganized Debtors with respect to the reconciliation of claims and the adjudication, objection, settlement and resolution of General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims, the Committee shall dissolve for purposes of these Chapter 11 Cases.

The Reorganized Debtors shall promptly pay the reasonable and documented post-Effective Date fees and expenses of the Committee's professionals; provided, however, the Reorganized Debtors' obligation to pay the fees and expenses of the professionals of the Committee, including but not limited to the Committee's attorneys and financial advisors, with respect to (e) above, shall not exceed $250,000, and thereafter such fees and expenses otherwise will be satisfied and paid from the Post-Effective Date Committee Reserve Account.

The Reorganized Debtors shall consult with the Committee and its professionals after the Effective Date regarding the reconciliation, resolution, objection to, and settlement of, General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims; provided further that the Committee's consent is required, which consent shall not be unreasonably withheld, to compromise, settle, or otherwise resolve Claims that are (i) filed or scheduled or asserted in excess of $1 million or (ii) proposed to be compromised, settled, or resolved by the Debtors or Reorganized Debtors by allowing such Claim as a General Unsecured Claim in excess of $1 million.  On the Effective Date the Committee will use its best efforts to form a subcommittee consisting of not less than two members and not more than three members.  The Committee will use its best efforts to first permit trade or other non-funded debt committee members, and for the avoidance of doubt, excluding indenture trustees, to serve on such subcommittee.  The subcommittee shall be delegated the responsibility and authority with respect to those matters set forth in (e) above.

On the Effective Date, the Post-Effective Date Committee Reserve Account will be funded with Cash in the amount of $150,000 from the Apax Withheld Distribution portion of the GUC Distribution.  For the avoidance of doubt, the GUC Distribution shall not include distributions to the Holders of Second Lien Claims, Senior Notes Claims, or PIK Notes Claims.  The Post-Effective Date Committee Reserve Account shall be maintained in trust solely for the post-Effective Date fees and expenses of the Committee and sub-committee with respect to clause (e) above.  Such funds shall not be considered property of the Debtors' Estates or of the Reorganized Debtors.

All funds in the Post-Effective Date Committee Reserve Account will be released and distributed to Holders of General Unsecured Claims pursuant to Article III.B with the consent of the Committee or upon the resolution of all Disputed Claims.

BB.     *Release of 2007 LBO Claims*

All Causes of Action, including any derivative Claims asserted or which could be asserted on behalf of the Debtors and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert based on or relating to, or in any manner arising from, in whole or in part, the 2007 acquisition of the Debtors by Apax and OMERS shall be released and extinguished pursuant to the Plan.

CC.     *Release of Avoidance Actions*

All Avoidance Actions shall be released and extinguished pursuant to the Plan as of the Effective Date.

DD.     *Disallowance of Certain Claims Held by Apax*

49

Upon the Effective Date, Apax's proofs of claim for unpaid management fees and other obligations [Claim Nos. 3312-3324] shall, to the extent not otherwise withdrawn, be disallowed in their entirety.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, as of the Effective Date, all Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases will be deemed:  (1) assumed by the applicable Debtor in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; and (2) if so indicated on the Schedule of Assumed Executory Contracts and Unexpired Leases, assigned to the other party identified as the assignee for each assumed Executory Contract and Unexpired Lease.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to section 365 and 1123 of the Bankruptcy Code.

B.    *Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement, or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease: (1) was previously rejected; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to reject filed on or before the Confirmation Date; or (4) is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.  For the avoidance of doubt, any Executory Contract or Unexpired Lease which does not appear on the Schedule of Rejected Executory Contracts and Unexpired Leases and which is not subject to one of the four conditions for assumption of Executory Contracts and Unexpired Leases listed in this paragraph shall be deemed assumed.

The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions and assignments or rejections described above as of the Effective Date.  Unless otherwise indicated, all assumptions and assignments or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed and assigned pursuant to the Plan or by Bankruptcy Court order shall vest in and be fully enforceable by the applicable assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Notwithstanding the foregoing paragraph or anything to the contrary herein, the Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases prior to the Effective Date or such other date as determined by the Bankruptcy Court (such date to be in no event earlier than the date of the entry of the Confirmation Order).

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, solely by payment of the Cure Cost or by an agreed-upon waiver or discharge of the Cure Cost on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Debtors and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

K&E 27168105

On or prior to the deadline for filing the Plan Supplement, the Debtors shall file the Schedule of Assumed Executory Contracts and serve upon counterparties to Executory Contracts and Unexpired Leases proposed for assumption, a notice that will list the proposed Cure Cost (if any), describe the procedures for filing objections to a proposed assumption or Cure Costs; and explain the process by which related disputes will be resolved by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and the Cure Cost (including a Cure Cost of $0.00) listed by the Debtors on any notice of assumption. Any objection to the assumption of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court on or before the Voting Deadline. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing after which such objection is timely filed. In the event of a dispute regarding (1) the amount of any Cure Cost, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed or assumed and assigned, and/or (3) any other matter pertaining to assumption and/or assignment, then such Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon by the Debtors or the Reorganized Debtors and the counterparty to such Executory Contract or Unexpired Lease <u>provided</u>, that prior to the Effective Date, the Debtors, in consultation with the advisors to the Required Consenting Lenders, the First Lien Credit Facility Administrative Agent, and the Committee, or after the Effective Date, the Reorganized Debtors, may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that notwithstanding anything to the contrary herein, the Debtors reserve the right, in consultation with the advisors to the Required Consenting Lenders, the First Lien Credit Facility Administrative Agent, and the Committee, to either reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after the entry of a Final Order resolving an objection to assumption, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption and assignment of any Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment.

D.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based upon the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice, Claims, and Solicitation Agent no later than the later of (1) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (2) the Claims Bar Date established in these Chapter 11 Cases.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as General Unsecured Claims and may be objected to in accordance with the provisions of Article VII hereof and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Any Holder of a Claim arising from the rejection of an Executory Contract or Unexpired Lease for which a Proof of Claim was not timely Filed as set forth in the paragraph above shall not (1) be treated as a Holder of a Claim hereunder, (2) be permitted to vote to accept or reject the Plan, or (3) participate in any distribution in these Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled, and compromised, and be subject to the permanent injunction set forth in Article VIII.F hereof, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

K&E 27168105

E.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

The Debtors reserve their right to assert that rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. Notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan or the Plan Supplement, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Initial Distribution Date (or if all or a portion of a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Disbursing Agent. The Disbursing Agent shall make subsequent distributions to Holders of Allowed Claims on a quarterly basis to the extent that material distributions exist to be made. Until such time that the Chapter 11 Cases are closed, the Reorganized Debtors shall file quarterly public reports containing the status of the Claims reconciliation process.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Holders of Allowed Claims shall be entitled to all dividends, accruals, and any other distributions on, and proceeds of, the distributions provided for herein, from and after the Effective Date, regardless of whether such distributions (or the proceeds thereof) are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim payable in accordance with the Plan. New Equity shall be deemed to be issued as of the Effective

Date to the Holders of Claims entitled to receive the New Equity hereunder without the need for further action by any Disbursing Agent, Reorganized Debtors (including Reorganized Cengage), or any other Debtor, including without limitation the issuance and/or delivery of any certificate evidencing any such shares, units, or interests, as applicable.

B.      *Distributions Generally; Disbursing Agent*

All distributions under the Plan that are to be made on or after the Effective Date shall be made by the Debtors as Disbursing Agent or any other duly appointed Disbursing Agent, unless otherwise specified herein. No Disbursing Agent nor any other person or Entity authorized to make distributions under the Plan shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court or incur any liability to any third party for making distributions in accordance with the Plan.

Except as otherwise set forth in the Plan, all distributions under the Plan shall be made subject to and in accordance with the applicable provisions of the First Lien Intercreditor Agreement.

C.      *Rights and Powers of Disbursing Agent*

1.      <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under, and in accordance with, the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to, and in accordance with, the Plan and, solely to the extent consistent with the Plan, the First Lien Credit Facility Documents or the applicable Prepetition Indenture, as the case may be, or otherwise as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be made on a quarterly basis (to the extent that material distributions exist to be made) and deemed to have been made on the Effective Date; <u>provided</u> <u>that, for the avoidance of doubt,</u> Holders of Disputed Administrative Claims and Disputed Priority Tax Claims that later become Allowed Claims shall be entitled to interest on such Allowed Claims to the extent provided for by the Bankruptcy Code.

2.      <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision to the contrary in the Plan, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until the Disputed Claim has become an Allowed Claim in its entirety or has otherwise been resolved by settlement or Final Order.

E.       *Disputed General Unsecured Claims Reserve*

From and after the Effective Date, and until such time as all Disputed General Unsecured Claims have been compromised and settled or determined by order of the Bankruptcy Court, for the benefit of each Holder of a Disputed General Unsecured Claim, an amount of GUC Distribution, in the form of Cash only, shall be reserved in an amount equal to the distributions which would have been made to the Holder of such Disputed General Unsecured Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed General Unsecured Claim, (b) the amount in which the Disputed General Unsecured Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code in accordance with Article VII.A.3 hereof, for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim, (c) such other amount as may be agreed upon by the Holder of such Disputed General Unsecured Claim and the Reorganized Debtors, after consultation with the Committee, subject to and in accordance with Article IV.AA, or (d) such other amounts set forth in a Final Order.  Any amount of GUC Distribution reserved and held for the benefit of a Holder of a Disputed General Unsecured Claim shall be treated as a payment and reduction on account of such Disputed General Unsecured Claim for purposes of computing any additional amounts to be paid of GUC Distribution in the event the Disputed General Unsecured Claim ultimately becomes an Allowed Claim.  Such amount of GUC Distribution shall be reserved for the benefit of Holders pending determination of their entitlement thereto under the terms of the Plan.  To the extent that a Holder of an Allowed General Unsecured Claims becomes entitled to a distribution out of the reserve established pursuant to this Article VI.E and such distribution is to be made in New Equity pursuant to a Distribution Election, Cash in an amount of the value of such distribution shall be transferred from such reserve to the Reorganized Debtors in exchange for newly issued shares of New Equity at a share price equal to the price per share set forth in Exhibit O to the Plan Supplement to be distributed to the Holder of the Allowed General Unsecured Claim in accordance with the Plan and the Holder of the Allowed General Unsecured Claim shall receive such New Equity in accordance with the Plan.   No payments or distributions shall be made with respect to all or any portion of any Disputed General Unsecured Claim pending the entire resolution thereof by Final Order.

At such time as a Disputed General Unsecured Claim becomes an Allowed Claim, distributions to the Holder of such Claim shall be made in an amount that such Holder is then entitled under the Plan; provided that such distribution, if any, shall be made as soon as practicable after an order or judgment of the Bankruptcy Court allowing such Disputed General Unsecured Claim is entered and becomes a Final Order.

Any amount remaining in the reserve being held for the benefit of Disputed General Unsecured Claims after reconciliation of all General Unsecured Claims asserted against the Debtors shall be distributed to Holders of Allowed General Unsecured Claims in accordance with the provisions of the Plan.

F.       *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.       <u>Record Date for Distributions</u>

On the Distribution Record Date, the Claims Register shall be closed and when making distributions on or after the Effective Date, the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.       <u>Delivery of Distributions in General</u>

Except as otherwise provided herein (or, where a Prepetition Indenture Trustee is the Disbursing Agent, in the applicable Prepetition Indenture), the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

K&E 27168105

Upon the Filing of a notice with the Bankruptcy Court, the First Lien Credit Facility Administrative Agent and the Prepetition Indenture Trustees may, in their respective sole discretion, limit the further assignment of Claims under their respective documents to allow for the accurate recording of the Holders of such Claims as of the Distribution Record Date.

Subject to the terms and conditions of this Article VI.F.2, the First Lien Credit Facility Administrative Agent will be the Disbursing Agent for the distributions to Holders of First Lien Credit Facility Claims.  The Debtors' obligations to effect distributions to Holders of First Lien Credit Facility Claims shall be deemed completed when transmitted to the Disbursing Agent for the benefit of Holders of First Lien Credit Facility Claims for distribution to Holders in accordance with the Plan and the First Lien Credit Facility Documents.

Distributions to Holders of First Lien Notes Claims shall (a) be made by the Disbursing Agent to the First Lien Indenture Trustee for the benefit of Holders of First Lien Notes Claims and (b) the Debtors' obligations to effect such distributions shall be deemed completed when made by the Disbursing Agent to the First Lien Indenture Trustee for the benefit of Holders of First Lien Notes Claims.

Subject to the terms and conditions of this Article VI.F.2, the Second Lien Indenture Trustee will be the Disbursing Agent for the distributions to Holders of Second Lien Claims.  The Debtors' obligations to effect distributions to Holders of Second Lien Claims shall be deemed completed when transmitted to the Disbursing Agent for the benefit of Holders of Second Lien Claims for distribution to Holders in accordance with the Plan and the Second Lien Notes Documents.

Subject to the terms and conditions of this Article VI.F.2, the Senior Notes Indenture Trustee will be the Disbursing Agent for the distributions to Holders of Senior Notes Claims.  The Debtors' obligations to effect distributions to Holders of Senior Notes Claims shall be deemed completed when transmitted to the Disbursing Agent for the benefit of Holders of Senior Notes Claims for distribution to Holders in accordance with the Plan and the Senior Notes Documents.

Subject to the terms and conditions of this Article VI.F.2, the PIK Notes Indenture Trustee will be the Disbursing Agent for the distributions to Holders of PIK Notes Claims.  The Debtors' obligations to effect distributions to Holders of PIK Notes Claims shall be deemed completed when transmitted to the Disbursing Agent for the benefit of Holders of PIK Notes Claims for distribution to Holders in accordance with the Plan and the PIK Notes Documents.

Prior to the distribution of New Equity hereunder, the recipient of such New Equity shall furnish to the transfer agent identified by the Debtors such identification and other information as may be required by the Debtors.

Notwithstanding anything in this Article VI, in the event the New Equity is not book entry and Depository Trust Company eligible, then the Prepetition Indenture Trustees shall not serve as Disbursing Agent for such New Equity, and the Disbursing Agent for such New Equity shall not distribute any consideration in the form of stock without the express consent of the applicable Prepetition Indenture Trustee, which consent shall not be unreasonably withheld, and without first providing such Prepetition Indenture Trustee the opportunity to exercise its Charging Lien against such New Equity, as provided for under the applicable Prepetition Indenture, which Charging Lien shall be deemed, until the Disbursing Agent has disbursed the New Equity, to exist against such New Equity in the same manner as if such New Equity were in possession of the applicable Prepetition Indenture Trustee.

Notwithstanding anything in this Article VI, the First Lien Credit Facility Administrative Agent, at its election, may appoint the Debtors' transfer agent as the Disbursing Agent for purposes of distributing some or all of the New Equity to Holders of First Lien Credit Facility Claims.

3.      De Minimis; Minimum Distributions

The Disbursing Agent shall not be required to make partial distributions or payments of fractions of New Equity and such fractions shall be deemed to be zero.

No New Equity distribution or Cash payment valued at less than $50.00, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

4.　　　Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, subject to Article VI.F.3, all unclaimed property with respect to General Unsecured Claims shall be redistributed to Holders of General Unsecured Claims as provided under the Plan and all other unclaimed property or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

5.　　　Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

G.　　*Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.　　*Claims Paid or Payable by Third Parties*

1.　　　Claims Paid by Third Parties

No Holder of a Claim shall be entitled to recover more than 100% of its Claim. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from a third-party and under the Plan exceeds the Allowed amount of such Claim against such Debtor as of the date of any such distribution under the Plan.

2.　　　Claims Payable by Third Party Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided, that if the Debtors believe a Holder of an Allowed Claim has recourse to an insurance policy and intend to withhold a distribution pursuant to this Article VI.H.2, the Debtors shall cause the Disbursing Agent to provide written notice to such Holder as to what the Debtors believe to be the nature and scope of applicable insurance coverage.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers'

56

agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

     3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any cause of action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.     *Resolution of Disputed Claims*

     1.     <u>Allowance of Claims</u>

On or after the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in these Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in these Chapter 11 Cases allowing such Claim.

     2.     <u>Prosecution of Objections to Claims</u>

The Reorganized Debtors after the Effective Date, subject to Article IV.AA hereof, shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment objections to any and all Claims. From and after the Effective Date, the Reorganized Debtors, subject to Article IV.AA hereof, may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

     3.     <u>Claims Estimation</u>

Prior to and on the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, subject to Article IV.AA hereof, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue additional objection to the ultimate distribution on

account of such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.   All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.   Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.  Notwithstanding anything to the contrary in this paragraph, nothing in this paragraph shall derogate in any way the rights under applicable law, independent of this paragraph, of the Holder of a Disputed Claim with respect to estimation and allowance of, and allocation and holding of any reserves in respect of, the Disputed Claim.

4.      Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Reorganized Debtors in both cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the Reorganized Debtors shall update the Claims register regularly to reflect any such changes.

5.      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

B.      Disallowance of Claims

Except as otherwise Allowed by the Plan, all Claims of any Entity from which property (other than any Disputed Assets) is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTORS AND SUBJECT TO ARTICLE IV.AA HEREOF, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

C.      Amendments to Claims

On or after the Effective Date, a Claim may not be amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such unauthorized new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.  *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all debt (as such term is defined in section 101 of the Bankruptcy Code) that arose before the Confirmation Date, any debts of any kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, and the rights and Interests of any Holders of Interests whether or not:  (1) a Proof of Claim based on such debt or Interest is Filed; (2) a Claim or Interest based upon such debt is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and equity Interests subject to the Effective Date occurring, except as provided for under section 1141(d)(6) of the Bankruptcy Code.

Pursuant to the Confirmation Order and pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, controversies, inter-creditor and inter-debtor issues and disputes (including those described in the Disclosure Statement), or issues relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise or settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.   In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

Upon the Effective Date of the Plan, all ongoing litigation, including any adversary proceedings and contested matters in the Chapter 11 Cases (and related motions) pending as of the Confirmation Date shall be deemed dismissed with prejudice.  For the avoidance of doubt and, except as expressly set forth in the Plan, any and all inter-creditor disputes that either have been asserted or could have been asserted by any person or Entity with respect to the Debtors or the Chapter 11 Cases prior to the Effective Date, including those arising in connection with or otherwise related to the Second Lien Intercreditor Agreement, shall be waived and released by each such person or entity and the pending adversary proceeding relating thereto shall be dismissed with prejudice in the Confirmation Order, effective on the Effective Date of the Plan; provided that the foregoing shall not be deemed to waive or release any intercreditor disputes not related to the Debtors or the Chapter 11 Cases or as otherwise set forth in Article VIII.D or Article VIII.E hereof; provided, further, that, notwithstanding anything to the contrary in the Plan, the distributions and other consideration received by Holders of First Lien Claims and Holders of Second Lien Claims under the Plan shall be deemed sufficient under Bankruptcy Rule 9019 to support the binding waivers and releases of any and all claims and causes of action that have been asserted or could have been asserted prior to the Effective Date with respect to any disputes arising in connection with or otherwise related to the Second Lien Intercreditor Agreement:  (a) against the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims by the First Lien Credit Facility Agents, First Lien Indenture Trustee, and each Holder of First Lien Claims (and for each of the foregoing, their respective successors or assigns); or (b) against the First Lien Credit Facility Agents, First Lien Indenture Trustee, and/or any Holder of First Lien Claims by the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims (and for each of the foregoing, their respective successors or assigns).

B.  *Subordinated Claims*

Subject to entry of the Confirmation Order and Article VIII.A, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any

contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, except as specifically provided for under the Plan. Notwithstanding anything herein to the contrary, and as provided in Article III of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

C.      *Debtor Release*

**Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, the adequacy of which is hereby confirmed, each of the Debtors, the Reorganized Debtors, and the Debtors' Estates conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release and shall be deemed to have provided a full discharge and release to each Releasee (and each such Releasee so released shall be deemed fully released and discharged by the Debtors, the Reorganized Debtors, and the Debtors' Estates) and their respective property from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of the Debtors and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement (and the term sheets attached thereto), the Plan Support Agreement (and the term sheets attached thereto), the Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; <u>provided</u>, that the foregoing "Debtor Release" shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages remedies, Causes of Action, and liabilities of any Debtor: (1) arising under the Exit Revolver Facility Documents or any other agreements entered into pursuant to the Plan, or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents; <u>provided further</u>, that the foregoing "Debtor Release" shall be deemed to include any and all pre-Effective Date Claims and Causes of Action which may be asserted against Apax or any other Releasee and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, <u>and further</u>, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

D.      *Third-Party Release*

**Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, each Releasing Party shall, to the maximum extent permitted by applicable law, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each Entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Releasees and**

their respective property from any and all Claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement (and the term sheets attached thereto), the Plan Support Agreement (and the term sheets attached thereto), the Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; <u>provided</u>, that the foregoing "Third-Party Release" shall not operate to waive or Release any Claims, obligations, debts, rights, suits, damages, remedies, causes of action, and liabilities of any Releasing Party:  (1) against a Releasee arising under the Exit Revolver Facility Agreement or any other agreements entered into pursuant to the Plan; (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents; (3) with respect to Professionals' final fee applications or Accrued Professional Compensation Claims in these Chapter 11 Cases; or (4) solely arising out of or relating to acts or omissions occurring after the Confirmation Date other than for acts or omissions in connection with distributions made consistent with the terms of the Plan by the Disbursing Agent or another party authorized by this Plan to make distributions; <u>provided further</u>, that any Holder of a Claim that is entitled to vote on the Plan and elects to opt out of the Third-Party Release or does not vote on the Plan shall not receive the benefit of or be deemed to have granted the Third-Party Release; <u>provided further</u>, that the foregoing "Third Party Release" shall be deemed to include any and all pre-Effective Date Claims and Causes of Action which may be asserted against Apax or any other Releasee and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, <u>and</u>, <u>further</u>, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

E.     *Exculpation*

Notwithstanding anything contained herein to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, implementing , or consummating the Plan, the transactions contemplated by the Restructuring Support Agreement (and the term sheets attached thereto), the Plan Support Agreement (and the term sheets attached thereto), the Term Sheets, the Disclosure Statement, the New Corporate Governance Documents, the Restructuring Transactions, the issuance, distribution, and/or sale of any shares of the New Equity or any other security offered, issued, or distributed in connection with the Plan, these Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; <u>provided</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; <u>provided</u>, <u>further</u>, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; <u>provided</u>,

further, that the foregoing "Exculpation" shall have no effect on the liability of any Entity for acts or omissions occurring after the Effective Date other than acts or omissions in connection with distributions made consistent with the Plan by the Disbursing Agent or another party authorized by the Plan to make distributions; provided, further, that the foregoing "Exculpation" shall be deemed to include any and all Claims and Causes of Action arising before the Effective Date which may be asserted against Apax or any other Exculpated Party or their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of (1) any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct and (2) the Professionals to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. Tit. 22 § 1200.8, Rule 1.8(h)(1)(2009); provided, further, that any party seeking to bring such a claim against any of the Professionals must first seek relief, on proper notice, from this Court.

Notwithstanding anything to the contrary herein, the Plan, including without limitation the "Debtor Release," "Third Party Release," or "Exculpation," shall not have any effect on the liability of any Entity that results from any act or omission taken in connection with or related to the Plan Support Agreement, the Plan Term Sheet, or the Plan that is determined by Final Order to have constituted fraud, gross negligence, or willful misconduct.

F.      *Injunction*

**Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, Interests, causes of action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to Article VIII.C hereof; (3) have been released pursuant to Article VIII.D hereof; (4) are subject to Exculpation pursuant to Article VIII.E hereof (but only to the extent of the Exculpation provided in Article VIII.E); or (5) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner any action or other proceeding, including on account of any Claims, Interests, causes of action, or liabilities that have been compromised or settled against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, causes of action, or liabilities.**

G.      *Setoffs*

Except as otherwise provided herein and subject to applicable law, the Debtors may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, set off against any Allowed Claim or Interest (which setoff shall be made against the Allowed Claim or Interest, not against any distributions to be made under the Plan with respect to such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a Holder is entitled under the Plan shall be made on account of the Claim or Interest, as reduced after application of the setoff described above.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors unless such Holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors and a Holder of a Claim or Interest; provided, that, where there is no written agreement between the Debtors and a Holder of a claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the Debtors' rights to assert that any Holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

H.      *Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications*

For the avoidance of doubt, the foregoing Debtor Release and Third-Party Release shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Accrued Professional Compensation Claim or final fee application Filed by any Professional in these Chapter 11 Cases.

I.      *Special Provision Regarding the PIK Notes Indenture Trustee and the Subordinated Notes Indenture Trustee*

Notwithstanding anything to the contrary, whether in the Plan or otherwise, if the PIK Notes Indenture Trustee is directed by Holders of PIK Notes Claims to take action (and does take such action) in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement, the PIK Notes Indenture Trustee shall be deemed not to be an Exculpated Party, a Releasee, or a Releasing Party under Articles VIII.C, VIII.D, and VIII.E hereof.

Notwithstanding anything to the contrary, whether in the Plan or otherwise, if the Subordinated Notes Indenture Trustee objects to or challenges confirmation of the Plan or seeks to delay confirmation of the Plan, the Subordinated Notes Indenture Trustee shall be deemed not to be an Exculpated Party, a Releasee, or a Releasing Party under Articles VIII.C, VIII.D, and VIII.E hereof.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Consummation of the Plan*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      The Confirmation Order shall have been duly entered and shall be a Final Order;

2.      The Exit Revolver Facility Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the Exit Revolver Facility shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Revolver Facility shall have occurred;

3.      The New Debt Facility Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the New Debt Facility shall have been waived or satisfied in accordance with the terms thereof and the closing of the New Debt Facility shall have occurred;

4.      All governmental and material third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained and shall be in full force and effect (which, in the case of an order of judgment of any Court, shall mean a Final Order), and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

5.      All documents and agreements necessary to implement the Plan and all actions to be taken thereunder shall have (a) been authorized by the Bankruptcy Court pursuant to the Confirmation Order, (b) been tendered for delivery, and (c) been effected or executed by all Entities party thereto, or will be deemed executed and delivered by virtue of the effectiveness of the Plan as expressly set forth herein, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

B. *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived only by the Debtors with the consent of each of the Supporting Parties, which consent shall not be unreasonably withheld.

C. *Effective Date*

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A hereof have been satisfied or waived. "Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D. *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification and Amendments*

Consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors expressly reserve their rights to alter, amend, or modify the Plan with respect to the Debtors, one or more times, after solicitation or Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan but may only materially alter, amend, or modify the Plan in accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all subject to the terms of the Plan Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

B. *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of the Plan*

Subject to the terms of the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

# ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date the Bankruptcy Court shall retain such jurisdiction over these Chapter 11 Cases and all matters, arising out of, or related to, these Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or causes of action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes, or causes of action with respect to the settlements, compromises, releases, injunctions, Exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or causes of action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 hereof;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Restructuring Support Agreement (and the term sheets attached thereto), the Plan Support Agreement (and the term sheets attached thereto), the Term Sheets, the Disclosure Statement, or the Confirmation Order;

15.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of all releases set forth herein, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     hear any other matter not inconsistent with the Bankruptcy Code;

23.     enter an order concluding or closing these Chapter 11 Cases; and

24.     enforce the injunction, release, and Exculpation provisions set forth in Article VIII hereof;

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

66

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Consultation with the First Lien Credit Facility Administrative Agent, the First Lien Indenture Trustee, and the Supporting Parties*

Subject to the terms of the Plan Support Agreement, the Debtors shall consult with the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee with respect to the drafting, amendment, modification and implementation of any of the documents referred to in Article I.C and/or Article XII.B hereof and any and all determinations that affect the treatment of or distributions to the First Lien Credit Facility Lenders or the Holders of First Lien Notes Claims, respectively.

Subject to the terms of the Plan Support Agreement, the Debtors shall consult with the Supporting Parties with respect to the drafting, amendment, modification, and implementation of any of the documents referred to in Article I.C and/or Article XII.B hereof and any and all determinations that affect the treatment of or distributions to the Holders of Other Unsecured Claims and PIK Notes Claims.

D.      *Payment of Certain Fees*

1.      <u>First Lien Fees</u>

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors shall pay and shall continue to pay post-Effective Date, when due and payable, all (a) reasonable and documented fees and expenses incurred by the Ad Hoc First Lien Group related to the Debtors, the Reorganized Debtors, or the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses incurred by Milbank Tweed, Hadley & McCloy LLP, as counsel to the Ad Hoc First Lien Group, and Houlihan Lokey Capital, Inc., as financial advisors to the Ad Hoc First Lien Group, (b) reasonable and documented fees and expenses incurred by the First Lien Credit Facility Administrative Agent related to the Debtors, the Reorganized Debtors, or the Chapter 11 Cases, including counsel to the First Lien Credit Facility Administrative Agent, Davis Polk & Wardwell LLP and the financial advisor to the First Lien Credit Facility Administrative Agent, Blackstone Advisory Partners, L.P., and (c) reasonable and documented fees and expenses of the First Lien Indenture Trustee related to the Debtors, the Reorganized Debtors, or the Chapter 11 Cases, including counsel to the First Lien Indenture Trustee, Katten Muchin Rosenman LLP. Any pre-Effective Date fees and expenses of the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee shall be paid pursuant to the Cash Collateral Order. Any fees and expenses paid by the Debtors pursuant to the Cash Collateral Order prior to the Effective Date shall be subject to challenge solely to the extent set forth in the Cash Collateral Order but shall not be subject to recharacterization or reallocation pursuant to section 506(b) of the Bankruptcy Code.

2.      <u>Other Fees</u>

The Debtors shall pay in full all of the Non-Estate Fees, collectively up to an amount of $5,192,669.48 in the aggregate (the "*Non-Estate Professional Fee Cap*"); <u>provided</u> that such Non-Estate Professional Fee Cap shall be allocated up to $2,942,669.48 (which is the result of reducing the $15 million Non-Estate Professional Fee Cap for the distributions being made to Holders of Second Lien Claims on account of the reasonable and documented fees and expenses of the Second Lien Indenture Trustee as set forth in Article III.B.23 and Article III.B.31 hereof) to the fees incurred by the Consenting Second Lien Noteholders and up to $2,250,000 (which is the result of reducing the $5 million Non-Estate Professional Fee Cap for the distributions being made to Holders of Senior Notes Claims and PIK Notes Claims on account of the reasonable and documented fees and expenses of such parties as set forth in Articles III.B.16, III.B.24, and III.B. 32 hereof) in the aggregate to the Subordinated Notes Trustee and

Centerbridge; provided further that the Subordinated Notes Indenture Trustee shall not be entitled to any payment of fees and expenses from the Non-Estate Professional Fee Cap if the Subordinated Notes Indenture Trustee objects to or challenges confirmation of the Plan or seeks to delay confirmation of the Plan.  For the avoidance of doubt, to the extent the Non-Estate Fees are less than $5,192,669.48, the Reorganized Debtors shall retain such difference.  To the extent that Non-Estate Fees of the Consenting Second Lien Noteholders will exceed the $2,942,669.48 portion of the Non-Estate Professional Fee Cap, the Debtors or the Reorganized Debtors, as applicable, will make reasonable efforts to ensure that, subject to the Non-Estate Professional Fee Cap, accrued and unpaid Non-Estate Fees of the Consenting Second Lien Noteholders will share Pro Rata from the applicable $2,942,669.48 portion of the Non-Estate Professional Fee Cap, based on the reasonable and documented fees and expenses requested pursuant to this Article XII.D.2.  To the extent that Non-Estate Fees of the Subordinated Notes Trustee and Centerbridge will exceed the  $2,250,000 portion of the Non-Estate Professional Fee Cap, the Debtors or the Reorganized Debtors, as applicable, will make reasonable efforts to ensure that, subject to the Non-Estate Professional Fee Cap, accrued and unpaid Non-Estate Fees of the Subordinated Notes Trustee and Centerbridge will share Pro Rata from the applicable $2,250,000 portion of the Non-Estate Professional Fee Cap, based on the reasonable and documented fees and expenses requested pursuant to this Article XII.D.2.

Non-Estate Fees shall be paid (a) on the later of (i) the Effective Date of the Plan or (ii) ten days after receipt by the Debtors or the Reorganized Debtors, as applicable, of invoices for such amounts; and (b) with respect to any reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases after the Effective Date in connection with supporting the Plan in any appeal of confirmation that continued after the Effective Date or with respect to performance of any of such parties' obligations under the Plan, within ten days after the receipt by the Reorganized Debtors of invoices for such amounts; provided, however, that the Bankruptcy Court shall retain jurisdiction over any disputes regarding the reasonableness of the Non-Estate Fees.  If the Debtors or the Reorganized Debtors dispute any requested Non-Estate Fees, the Debtor or the Reorganized Debtors shall (i) timely pay the undisputed portion of the Non-Estate Fees and (ii) notify the Subordinated Notes Indenture Trustee or such other party requesting payment of Non-Estate Fees of such dispute within ten days after presentation of the invoices by the Subordinated Notes Indenture Trustee or other party, and upon such notification, the party requesting payment may submit such dispute for resolution to the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a reasonableness determination as provided under the Prepetition Indentures or applicable law.  Nothing herein shall be deemed to impair, waive, discharge, or negatively affect the Charging Lien of the Prepetition Indenture Trustees.

3. _Apax Fees and Release_

On the Effective Date, the Debtors shall pay Apax $8 million in Cash in respect of its Claim for accrued fees and expenses in full and final satisfaction of all of Apax's Claims against the Debtors for accrued fees and expenses.  Subject to and in exchange for the foregoing, the treatment under the Plan contemplated of the Allowed Apax Debt Claims and Apax's other treatment under the Plan, on the Effective Date, Apax shall irrevocably waive any and all other Claims against the Debtors, including without limitation any Claims against the Debtors for fees, expenses or indemnification under the First Lien Documents, including under Section 11.04 or 11.05 of the First Lien First Lien Credit Facility Agreement, the First Lien Intercreditor Agreement, the First Lien Indenture or the Second Lien Intercreditor Agreement.

In addition, subject to and in exchange for the treatment of the Apax Debt Claims under the Plan, Apax shall not be entitled to, and shall be deemed to have waived on the Effective Date of the Plan, any distribution, recovery, reimbursement, claim, or other payment (i) under Sections 2.12 and 2.13 of the First Lien Credit Facility Agreement for any pre-Effective Date actions, (ii) under clause "Second" of Section 8.04 of the First Lien Credit Facility Agreement, (iii) under Section 6.06 or 6.13 of the First Lien Indenture for any pre-Effective Date actions, or (iv) from or related to any pre-Effective Date breach or alleged breach of the First Lien Intercreditor Agreement, including, without limitation, Sections 2.01, 2.02(d), 2.03(a) and 2.03(b) of the First Lien Intercreditor Agreement, or the Second Lien Intercreditor Agreement, and in each case Apax shall irrevocably release, on the Effective Date, the First Lien Credit Facility Agents, the First Lien Trustee and each Holder of a First Lien Claim in connection with any (a) pre-Effective Date claim or cause of action solely with respect to clauses (i), (iii) and (iv) and (b) any claim or cause of action solely with respect to clause (ii); provided that the foregoing release and waiver (1) shall not apply to any payments or distributions from the Debtors to or for the benefit of a Holder of a First Lien Claim made prior to the Effective Date that are not provided for in the Cash Collateral Order (as amended to date and hereafter solely

for the purposes described in Section 4.01(c) of the Plan Support Agreement) and (2) shall not apply to Apax's rights to share in any excess payments solely of principal or interest (but in no case to recover any portion of the Withheld Apax Distribution) under Section 2.13 of the First Lien Credit Facility Agreement or any similar sharing provision in any other agreement, all of which rights are and shall be fully preserved.

E.        Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.        Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.        Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served on:

> Cengage Learning, Inc.
> 200 First Stamford Place, 4th Floor
> Stamford, Connecticut  06902
> Attention:  Kenneth Carson, General Counsel
>
> with copies to:
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York  10022
> Attention:  Jonathan S. Henes, Christopher J. Marcus, and
>                      Christopher T. Greco
>
> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois  60654
> Attention:  James H.M. Sprayregen and Ross M. Kwasteniet

if to the Committee:

> Arent Fox LLP
> 1675 Broadway
> New York, New York 10019
> Attention:  Andrew I. Silfen and Mark Joachim

H.        Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the

69

Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan on the Effective Date.  To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.

J.      *Severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

70

Respectfully submitted, as of the date first set forth above,

Cengage Learning, Inc. (for itself and all Debtors)

By:      */s/ Dean D. Durbin*
Name:    Dean D. Durbin
Title:     Chief Financial Officer
            Cengage Learning Holdings II L.P.

**Exhibit A**

**Management Incentive Plan**

**Cengage Learning**

**Summary of Post-Emergence Compensation**

| | Key MIP Terms |
|---|---|
| % of Equity Reserved | ■ 5.6% |
| Allocation | ■ 80% allocated at emergence, 50% of which is allocated to CEO (i.e., 40% of the total 100% pool) and which includes an equity grant for the CFO.<br>■ 20% reserved for future awards to current execs, new hires and Board members |
| LTI Vehicles Used | ■ 60% incentive stock options (ISOs) with an exercise price equal to the per share Plan Equity Value assuming a $3.6 billion total enterprise value for the Reorganized Debtors less the amount of the New Debt Facility (which shall be in an amount between $1.5 billion and $1.75 billion as set forth in the Plan) plus Available Cash[2] less Distributable Cash[3]<br>■ 40% RSUs |
| Vesting Schedule | ■ ISOs – 4 year ratable vesting (7 year exercise term)<br>■ RSUs – 5 year ratable time vesting |
| Vesting – Change-Of-Control (CoC) | ■ ISOs and RSUs will vest unless awards are assumed in full |
| Vesting – Termination without Cause or For Good Reason | ■ ISOs and RSUs vest in full<br>■ Change of Control: exercise period reduced to lesser of (i) the remaining option term or (ii) the greater of (X) 1 year following termination or (Y) 3 years following the date of a change in control which occurs within 18 months of emergence<br>■ All Other Cases: exercise period reduce to lesser of (i) 1 year post-termination or (ii) the remaining option term |
| Vesting – Death / Disability | ■ ISOs and RSUs vest in full<br>■ Exercise period reduced to lesser of 1 year or the remaining term |
| Vesting – Voluntary Resignation | ■ Unvested equity is forfeited<br>■ Exercise period reduced to 30 days |
| Vesting – Termination for Cause | ■ Unvested equity and unexercised options are forfeited |
| Dividends | ■ Unvested RSUs accrue dividends<br>■ Vested RSUs and exercised options receive a proportionate share of dividends paid with respect to common shares<br>■ Unexercised options do not accrue nor receive dividends<br>  • Customary anti-dilutive clause to be negotiated with regards to special dividends |
| Monetization | ■ Termination Without Cause or For Good Reason or due to death or disability: cashless exercise & ability to pay taxes through share withholding<br>■ Otherwise: no cashless exercise |

---

[2] "**Available Cash**" means any Cash remaining on any of the Debtors' balance sheets as of the Effective Date after funding all payments and reserves required under the Plan (other than distributions on account of principal and interest to the Holders of First Lien Claims), including the Other Unsecured Creditor Distribution (for the avoidance of doubt, any cash not distributed to the Holders of Other Unsecured Claims should be included in Available Cash).

[3] "**Distributable Cash**" means Available Cash less an amount agreed to by the Debtors and the Required Consenting Lenders, which amount agreed to by the Debtors and the Required Consenting Lenders shall be between $50 million and $175 million and shall be set forth in the Plan Supplement.

| Stockholders' Agreement | ■ Equity participants required to enter into a Stockholders' Agreement (containing transfer restrictions, call rights, tag along rights, registration rights, drag-along rights, etc.) as a condition to receiving any equity award or stock thereunder; provided that in the event a change in control occurs within 18 months of emergence, the call right cannot be exercised within 3 years of the change in control |
|---|---|
| Restrictive Covenants | ■ Equity participants will continue to be bound by current restrictive covenants in existing employment agreements |

## Key Annual Incentive Plan (AIP) Terms

| Terms | ■ The AIP will be structured to focus on the achievement of annual performance objectives, especially revenue and EBITDA growth and expense control<br>■ Annual performance measures, goals and funding formulas will be set by the Board of Directors reasonably and in good faith in consultation with management (including FY 2014 performance measures)<br> • Actual bonuses may range from 0% to 200% of target bonus levels depending on performance achievement<br> • While funding formulas will be set each year, it is anticipated that the threshold at which bonuses will begin to be funded will be set at least at 85% of goal(s), at which level 50% of the target bonus amounts would be earned |
|---|---|
| Performance Award Type | ■ Cash |

## Key Employee Contract Terms

| CEO | ■ Term: 4 years with annual 1 year extensions beginning on 4th anniversary<br>■ Base Salary: unchanged<br>■ Target Bonus: 100% of Base Salary (per terms in AIP)<br>■ Incentive Equity: 40% of MIP<br>■ Severance: If terminated without Cause, for Good Reason or failure of Cengage to extend Employee Agreement, CEO to receive:<br> • Pro-rata Target Bonus<br> • Cash payment equal to 3x (Base Salary + Target Bonus) paid in 12 monthly installments with remaining balance paid in lump sum thereafter<br>■ Current restrictive covenants<br>■ Definition of Cause (as defined below) will not include cure for breach of non-compete / non-solicitation<br>■ No 280G Gross up |
|---|---|
| All Other Key Employees | ■ Cash compensation levels, severance and restrictive covenants unchanged from current agreements; provided that the nine members of Executive Team, excluding the CEO, will receive 2x severance if (i) a change in control occurs within 18 months of emergence and (ii) the Executive is terminated without Cause or with Good Reason within 6 months after the change in control<br>■ Any executive not currently subject to restrictive covenant agreement will enter into one on substantially same terms as other non-CEO executives<br>■ Definition of Cause (as defined below) – those employees who currently have agreements would adopt the Cause definition in this term sheet; definition will not include cure for breach of non-compete / non-solicitation<br>■ No 280G Gross up<br>■ Definition of Good Reason (as defined below) – only those employees who currently have Good Reason in their employment agreement will retain Good Reason in their employment agreement |

74

| | |
|---|---|
| Definitions | ■ "Cause" – Defined as (i) willful failure to perform substantial job functions that continues after written notice from Cengage, (ii) material fraud or material dishonesty in performance of duties, (iii) conviction or plea or guilty or *nolo contendere* to a felony, (iv) willful malfeasance or willful misconduct in performance of duties or any willful act or omission (other than in the good faith performance of duties) that is materially injurious to the financial condition or business reputation of Cengage, (v) a material breach of confidentiality that is not cured within 15 days following notice, (vi) a material breach of non-disparagement that is not cured within 15 days following notice, or (vii) a material breach of non-compete, non-solicitation <br><br> ■ "Good Reason" – Defined as (i) material reduction in base pay or target bonus, (ii) material reduction in title, duties or responsibilities, (iii) an adverse change in reporting requirements, (iv) with respect to the CEO and CSMO only, relocation of more than 50 miles or (v) material breach of a material agreement, that, in any case, is not cured within 30 days of written notice from the executive <br><br>     • Only those employees who currently have Good Reason in their employment agreements will retain Good Reason in their employment agreement, provided that only for the 6 month period following a change in control occurring within 18 months of emergence, "Good Reason" will be included for all executives. |

K&E 27168105

**Exhibit B**

**Equity Term Sheet**

# Cengage Learning – Equity Term Sheet

THIS TERM SHEET IS NON-BINDING AND DOES NOT CREATE LEGALLY BINDING OBLIGATIONS AMONG THE PARTIES. THE TERMS CONTEMPLATED HEREIN ARE SUBJECT TO, AMONG OTHER THINGS, DEFINITIVE DOCUMENTATION AND ARE FOR DISCUSSION PURPOSES ONLY. CAPITALIZED TERMS NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE RESTRUCTURING SUPPORT AGREEMENT.

| | |
|---|---|
| **Private Company Status** | The reorganized Debtors (the "<u>Reorganized Debtors</u>") shall not be required to file reports under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"). |
| **Classes of Equity** | Upon consummation of the Agreed Restructuring, there shall be one class of common stock (the "<u>Common Stock</u>") of the reorganized Company, a Delaware corporation (the "<u>Reorganized Company</u>") issued on account of claims under the Agreed Restructuring.  The Common Stock shall be uncertificated and shall be issued in electronic format only. |
| **Transferability** | Subject to the requirements of the Securities Act of 1933, as amended, the Common Stock shall not be subject to rights of first refusal, rights of first offer, or any other restrictions on transfer; <u>provided</u> <u>however</u> that the Common Stock may contain reasonable and customary restrictions designed to maintain the Reorganized Company as a private company. |
| **Tag-Along Rights** | The stockholders agreement shall contain tag-along rights that are customary in transactions of this type. |
| **Drag-Along Rights** | The stockholders agreement shall contain drag-along rights that are customary in transactions of this type. |
| **Preemptive Rights** | Each holder of the Reorganized Company's Common Stock who has voted in favor of the Agreed Restructuring Plan shall be entitled to reasonable and customary preemptive rights, subject to customary exceptions. Any proposed elimination of preemptive rights shall require the consent of each affected holder of Common Stock. |
| **Information Rights** | At all times prior to the Reorganized Company completing a Qualified Public Offering (as defined below), the  Reorganized Debtors shall provide to the shareholders and any prospective investor (who is not a direct competitor of the Debtors) that has entered into a confidentiality agreement on customary terms and for purposes of evaluating the investment ("<u>Qualified Prospective Investor</u>"), on a reputable password-protected online data system, such as Intralinks,  annual reports, quarterly reports, proxy statements and other periodic reports that would |

| | be required to be filed pursuant to Section 13 or 15(d) of the Exchange Act, prepared as if the Reorganized Debtors were a reporting company under the Exchange Act.  The Reorganized Debtors shall hold live quarterly conference calls (with a question and answer period) for shareholders and Qualified Prospective Investors, with dates and dial-in information announced on the password-protected online data system utilized by the Reorganized Debtors at least three (3) days prior to such quarterly calls. |
|---|---|
| **Governance Rights** | Except as otherwise set forth below for the election of directors, each share of Common Stock shall be entitled to one vote and shall be entitled to vote for all such matters that are put to the stockholders for approval under Reorganized Company's governing documents and applicable law.  Notwithstanding the foregoing, management and governance of the Reorganized Debtor shall be determined by the Board of Directors (as defined below) for all matters except those that require shareholder approval under applicable law.

The number of directors on the board of directors of the Reorganized Company (the "Board of Directors") shall be established at seven (7) directors.

The Board of Directors shall be determined for the first two (2) years following the Plan Effective Date (the "Initial Board Term") as follows:

   (i)   One (1) director shall be the Chief Executive Officer of the Reorganized Company (the "CEO");

   (ii)   each holder of 15% or more of the outstanding Common Stock of the Reorganized Company, shall be entitled to nominate and have elected one (1) director on the Board of Directors; and

   (iii)   the ad hoc committee of Consenting Lenders shall be entitled to elect the remaining directors; provided that no institution shall be entitled to nominate and have elected more than one director on the Board of Directors at any time; provided further, that the Consenting Lenders will consult with the CEO to the extent that any board nominee of the Consenting Lenders is not employed by or otherwise directly affiliated with a Consenting Lender.

At the end of the Initial Board Term, the Board of Directors shall be redetermined by shareholder vote (which vote shall occur annually) on the same basis set forth for the Initial Board Term above, until such time as the Reorganized Company has completed a Qualified Public Offering.  After the Reorganized Company has completed a Qualified Public Offering, the Board of Directors will be elected by holders of its equity securities entitled to vote in the election therefor. |

| | At all times prior to the Reorganized Company completing a Qualified Public Offering, each holder of 15% or more of the outstanding Common Stock of the Reorganized Company, in addition to the foregoing director rights, shall be entitled to appoint one (1) observer that is a representative or otherwise affiliated with shareholder of the Reorganized Company to the Board of Directors, subject to customary confidentiality obligations; provided that no observer shall be entitled to compensation for their services as an observer to the Board of Directors. |
|---|---|
| **Equity Incentives** | Any equity incentives granted or issued to management or employees of the Reorganized Company or its subsidiaries, or to any providers of services to the Reorganized Company or its subsidiaries, shall dilute each holder of Common Stock equally and ratably, regardless of the time of issue of such incentive or approval of any plan for such issuance. |
| **Termination of Equity Rights** | The shareholder rights set forth herein other than Registration Rights shall terminate upon an underwritten public offering of the Common Stock so long as the Common Stock, in connection with such offering, will be listed on a national securities exchange (a "Qualified Public Offering"). |
| **Registration Rights** | Holders of Common Stock shall have (i) demand registration rights (including the right to demand the Reorganized Company complete an initial public offering of its Common Stock) exercisable at any time after the second (2nd) anniversary (but prior to the third (3rd) anniversary) of the Plan Effective Date, by holders of more than 50% of Common Stock, and at any time on or after the third (3rd) anniversary of the Plan Effective Date, by holders of 33⅓% of Common Stock, subject to the registration rights or similar agreement setting forth the registration rights herein, and (ii) reasonable and customary piggy back registration rights exercisable at any time after the Reorganized Company has consummated a public offering of its Common Stock. |

**Exhibit C**

**Plan Term Sheet**

**CENGAGE LEARNING HOLDINGS II L.P., ET AL.**

**PLAN TERM SHEET**

**February 1, 2014**

THIS TERM SHEET (THE "**TERM SHEET**") DESCRIBES THE PRINCIPAL TERMS AGREED TO BY AND AMONG (I) CENGAGE LEARNING HOLDINGS II, L.P. ("**CL HOLDINGS**"); CENGAGE LEARNING HOLDCO, INC. ("**CL HOLDCO**"); CENGAGE LEARNING ACQUISITIONS, INC. ("**CLAI**"); AND CENGAGE LEARNING, INC. ("**CLI**"), AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, THE **DEBTORS**") IN THE CHAPTER 11 CASES PENDING IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK (THE "**BANKRUPTCY COURT**") CAPTIONED *IN RE CENGAGE LEARNING, INC., ET AL., CASE NO. 13-44106 (ESS)* (BANKR. E.D.N.Y. 2013) (THE "**CHAPTER 11 CASES**") AND (II) THE SUPPORTING PARTIES (AS DEFINED IN THE PLAN SUPPORT AGREEMENT) MODIFYING THE *DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 780] (THE "**EXISTING PLAN**").[1]

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET CONTAINS A SERIES OF ASSUMPTIONS, COMPROMISES AND SETTLEMENTS OF ISSUES AND DISPUTES THAT WILL BE RESOLVED IN CONNECTION WITH CONFIRMATION OF A CHAPTER 11 PLAN. IN THE EVENT THE CHAPTER 11 PLAN CONTEMPLATED UNDER THIS TERM SHEET IS NOT CONFIRMED OR DOES NOT BECOME EFFECTIVE, NOTHING HEREIN SHALL BE CONSTRUED AS AN ADMISSION OF OR THE POSITIONS OF THE PARTIES WITH RESPECT TO THESE ISSUES OR DISPUTES. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE, THE ABSOLUTE MEDIATION PRIVILEGE, AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROHIBITING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Existing Plan.

| **OVERVIEW** | |
|---|---|
| **Summary** | Certain Holders of Claims (including certain Holders of economic interests or economic rights with respect to such Claims), representatives of Holders of certain Claims, the First Lien Credit Facility Administrative Agent, the Second Lien Indenture Trustee, the Senior Notes Indenture Trustee, the PIK Notes Indenture Trustee, Apax (all provisions hereof applicable to "Apax" in a given capacity shall also be deemed binding on, applicable to, and/or for the benefit of, the successors of, transferees of, and assigns of Apax in such capacity), the Debtors, and the Committee shall have executed the plan support agreement to which this Term Sheet is attached (the "**Global PSA**") pursuant to which (a) the parties to the Global PSA have agreed to a good faith compromise and settlement of various issues and disputes, including the Disputed Issues, and (b) the Debtors will modify and amend the Existing Plan to implement the terms contained herein and implement a restructuring process consistent with the Existing Plan, except as modified to be consistent with this Term Sheet, including to remove the Disputed Unsecured Escrow, in order to consummate a plan of reorganization (the "**Amended Plan**") that the Debtors will seek to have confirmed pursuant to sections 1123 and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019.<br><br>This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are contained in the Existing Plan and to be contained in the Amended Plan and the documents necessary to give effect to the terms of the Amended Plan, including without limitation, the documents of the Plan Supplement (the "**Definitive Documents**"). The Definitive Documents, including the supplement to the Disclosure Statement, all Plan Supplement documents, all motions, and related orders and the plan solicitation documents shall satisfy the requirements of the Bankruptcy Code and be consistent in all respects with the Existing Plan except as modified to be consistent with the Global PSA and this Term Sheet. Consent and consultation rights with respect to the Definitive Documents shall be as set forth in the Global PSA and to the extent inconsistent with the Existing Plan shall be deemed to modify the Existing Plan. |
| **Total Enterprise Value** | $3.6 billion for all purposes. |
| **Treatment of Second Lien Claims, Senior Notes Claims, and General Unsecured** | Holders of Allowed Second Lien Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims (other than Intercompany Claims as set forth herein) shall receive in full and final satisfaction of their Claims the following (the "**Other** |

| Claims | **Unsecured Creditor Distribution**"): |
|---|---|
| | (1) On the Effective Date, New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election of each Holder, which election shall be made pursuant to an amended Ballot) in an aggregate amount of $225 million, subject to the following terms: |
| | (a) the calculation of the value of New Equity for the purpose of such distribution shall be based on a $3.6 billion total enterprise value for the Reorganized Debtors less the amount of the New Debt Facility (which shall be in an amount between $1.5 billion and $1.75 billion as set forth in the Existing Plan) plus Available Cash[2] less Distributable Cash;[3] |
| | (b) an election of New Equity shall only be permitted if after giving effect to the election such Holder (on the Effective Date) would not have more than 14.9% of the New Equity first taking into account other New Equity such Holder would receive under the Plan (the "Equity Election Cap") and any amounts exceeding the Equity Election Cap as a result of such election will be paid in Cash); and |
| | (c) notwithstanding any election to receive New Equity instead of Cash by a Holder of a General Unsecured Claim, to the extent determined by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Committee, to be necessary to ensure that the total number of recipients of New Equity pursuant to the Plan does not cause the Reorganized Debtors to become subject to the reporting requirements of the Securities Exchange Act of 1934 (the "**Reporting Requirements**"), the Debtors or the Reorganized Debtors, as applicable, shall be permitted to make Cash distributions to Holders of General Unsecured Claims that elected to receive New Equity to the extent necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements, which Cash distribution shall start with the smallest Allowed |

---

[2] "**Available Cash**" means any Cash remaining on any of the Debtors' balance sheets as of the Effective Date after funding all payments and reserves required under the Plan (other than distributions on account of principal and interest to the Holders of First Lien Claims), including the Other Unsecured Creditor Distribution (for the avoidance of doubt, any cash not distributed to the Holders of Other Unsecured Claims should be included in Available Cash).

[3] "**Distributable Cash**" means Available Cash less an amount agreed to by the Debtors and the Required Consenting Lenders, in consultation with the Supporting Parties, which amount agreed to by the Debtors and the Required Consenting Lenders, in consultation with the Supporting Parties, shall be between $50 million and $175 million and shall be set forth in the Plan Supplement.

General Unsecured Claim that elected to receive New Equity and will proceed in ascending size of Allowed General Unsecured Claims as necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements.

and

(2) an aggregate of $12.0 million of Cash from the first Cash distributions that would be received by Apax in its capacity as a Holder of Allowed Second Lien Claims and Allowed Senior Notes Claims shall be withheld from Apax by the Debtors (the "**Withheld Apax Distribution**") and instead distributed to all non-Apax Holders of Allowed Second Lien Claims, Allowed Senior Notes Claims, Allowed General Unsecured Claims, and Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution consistent with the Other Unsecured Creditor Distribution Allocation (as defined herein).  Apax will be deemed to elect to receive at least $12 million of its Other Unsecured Creditor Distribution in Cash to ensure that the Withheld Apax Distribution will be $12.0 million in Cash and the Withheld Apax Distribution, to the extent reasonably practicable, will be comprised 62.5% from Cash that would have been distributed on account of Apax's Allowed Second Lien Claims and 37.5% from Cash that would have been distributed on account of Apax's Allowed Senior Notes Claims.

The Other Unsecured Creditor Distribution shall be allocated as follows (the "**Other Unsecured Creditor Distribution Allocation**"):

(a) 62.5% of the Other Unsecured Creditor Distribution shall be distributed to the Holders of Second Lien Claims, including Apax (the "**Second Lien Distribution**"); provided that the portion of the Second Lien Distribution consisting solely of the Withheld Apax Distribution shall be shared Pro Rata amongst Holders of Second Lien Claims other than Apax;

(b) (i) 37.5% of the Other Unsecured Creditor Distribution (excluding the Withheld Apax Distribution) shall be distributed to Holders of Senior Notes Claims (for the avoidance of doubt, including Apax), General Unsecured Claims, and Holders of PIK Notes Claims, which shall be allocated as follows: (w) $72.14 million to Holders of Senior Notes Claims (including Apax), (x) $11.22 million (in the aggregate) to both Holders of General Unsecured Claims against CLAI and Holders of General Unsecured Claims against CLI, (y) $801,944.09 to Holders of the PIK Notes Claims on account of PIK Notes Claims (the "**First PIK Notes Distribution**"),and (z) $218,055.91 to Apax (the "**Apax Share**," and

| | together with the First PIK Notes Distribution, the "**Settlement Share**") and (ii) 37.5% of the Withheld Apax Distribution, which shall be allocated as follows:  (x) $3.85 million to Holders of Senior Notes Claims, (y) $0.60 million (in the aggregate) to Holders of General Unsecured Claims against CLAI and Holders of General Unsecured Claims against CLI and (z) $0.05 million to Holders of PIK Notes Claims (the "**Second PIK Notes Distribution**," and together with the First PIK Notes Distribution, the "**PIK Notes Distribution**"); provided that to the extent that recoveries to Holders of Allowed General Unsecured Claims against CLAI would exceed 7.2%, any such excess in distributions shall be instead distributed Pro Rata amongst Holders of General Unsecured Claims against CLI; provided further that the portion of distributions consisting solely of the Withheld Apax Distribution shall not be distributed to Apax as Holders of Senior Notes Claims, and instead shall be shared Pro Rata amongst Holders of Senior Notes Claims other than Apax. |
|---|---|
| | (3) For the avoidance of doubt, other Classes of Claims, including, but not limited to, Holders of First Lien Deficiency Claims, Intercompany Claims, Section 510(b) Claims, and Other Priority Claims shall not be entitled to any recovery from the Other Unsecured Creditor Distribution. |
| | First Lien Claims, Second Lien Claims,[4] Senior Notes Claims,[5] PIK Notes Claims, and Subordinated Notes Claims shall be permanently Allowed under the Amended Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims. |
| | For the avoidance of doubt, the Second Lien Distribution shall not be subject to any subordination or turnover under the Second Lien Intercreditor Agreement and the Other Unsecured Creditor Distribution shall not be subject to any subordination or turnover to the Holders of First Lien Claims. |
| | For the avoidance of doubt, the Other Unsecured Creditor Distribution Allocation gives effect to the subordination and turnover rights of the Holders of Second Lien Claims and Senior Notes Claims against Holders of Subordinated Notes Claims, except as modified and/or waived under this Term Sheet. |
| **Treatment of PIK Notes** | To the extent that the Class of Holders of PIK Notes Claims votes to |

---

[4]    The amount of the Allowed Second Lien Claims shall be $753,103,855.

[5]    The amount of the Allowed Senior Notes Claims shall be $306,331,899.

| Claims | accept the Plan and the PIK Notes Indenture Trustee does not take any action in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA, Holders of PIK Notes Claims shall receive the PIK Notes Distribution, which PIK Notes Distribution shall be shared amongst all the Holders of PIK Notes Claims in accordance with and subject to the terms of the PIK Notes Indenture and shall not be subject to any subordination right or obligation, and Apax shall receive the Apax Share.  To the extent that the Class of Holders of PIK Notes Claims does not vote to accept the Plan and/or the PIK Notes Indenture Trustee takes any action in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA, (i) the Settlement Share shall be distributed to Holders of Senior Notes (including Apax) and Holders of General Unsecured Claims pursuant to the terms of this Term Sheet and in accordance with the ratios utilized herein and (ii) the Second PIK Notes Distribution shall be distributed to Holders of Senior Notes Claims (excluding Apax) and Holders of General Unsecured Claims pursuant to the terms of this Term Sheet and in accordance with the ratios utilized herein. |
|---|---|
| **Classification and Treatment of Intercompany Claims** | Intercompany Claims shall be separately classified and removed from the definition of General Unsecured Claims. <br><br> No distribution shall be made on account of Intercompany Claims and such Intercompany Claims shall be Reinstated or cancelled as of the Effective Date at the election of the Debtors; <u>provided</u> <u>that</u> such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the Holders of First Lien Claims or Holders of Second Lien Claims, Senior Notes Claims, Subordinated Notes Claims or General Unsecured Claims, and any such cancellation or reinstatement that has such an adverse effect shall be null and void *ab initio*. |
| **Treatment of First Lien Claims** | Holders of First Lien Claims,[6] including Apax, shall receive in full and final satisfaction of their Claims the following (the "**First Lien Claim Distribution**"): <br><br> (a) 100% of the New Equity, reduced by the New Equity distributed as part of the Other Unsecured Creditor Distribution, and subject to |

---

[6]  The amount of the Allowed First Lien Claims shall be not less than $3,901,878,598.78 on account of the obligations under the First Lien Credit Agreement Facility and $742,832,986.11 on account of obligations under the First Lien Notes Indenture.  A breakdown between allowed principal, interest, and swap claims will be set forth in the Amended Plan.

| | dilution for the Management Incentive Plan; |
| | (b) the New Debt Facility Consideration; and |
| | (c) the Distributable Cash. |
| **Disputed Unsecured Escrow** | The Disputed Unsecured Escrow as defined in the Existing Plan, and all related provisions, shall be eliminated under the Amended Plan. |
| **Apax Claims** | The First Lien Claims, the Second Lien Claims, the Senior Notes Claims, and the Subordinated Notes Claims, in each case in respect of principal and interest, held by Apax (the "**Apax Claims**") and the Apax Fees (as defined herein) shall be permanently Allowed under the Amended Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims and the Holders of such Claims shall receive their distribution consistent with Article VI of the Existing Plan on the Initial Distribution Date, and to the extent applicable, thereafter (in the case of the Apax Claims) or on the Effective Date (in the case of the Apax Fees), as applicable, and shall otherwise receive the applicable treatment provided for such Allowed Claims under the Amended Plan in accordance with, and subject to the terms hereof, in full and final satisfaction of all Claims held by Apax against the Debtors. |
| | Apax's proofs of claim for unpaid management fees and other obligations [Claim Nos. 3312-3324] shall be withdrawn prior to the Effective Date. |
| | Article XII.D of the Existing Plan shall be amended to provide for the payment, on the Effective Date, by the Debtors to Apax of $8 million in Cash in respect of its Claim for accrued fees and expenses (the "**Apax Fees**") in full and final satisfaction of all of Apax's Claims against the Debtors for accrued fees and expenses. Subject to and in exchange for the foregoing, the treatment under the Amended Plan contemplated under this Term Sheet of the Allowed Apax Claims and Apax's other treatment under the Amended Plan, on the Effective Date, Apax shall irrevocably waive any and all other Claims against the Debtors, including without limitation any Claims against the Debtors for fees, expenses or indemnification under the First Lien Documents, including under Section 11.04 or 11.05 of the First Lien Credit Facility Agreement, the First Lien Intercreditor Agreement, the First Lien Indenture or the Second Lien Intercreditor Agreement. |
| | In addition, subject to and in exchange for the treatment of the Apax Claims under the Amended Plan as contemplated under this Term Sheet, Apax shall not be entitled to, and shall be deemed to have |

| | waived on the Effective Date of the Amended Plan, any distribution, recovery, reimbursement, claim or other payment (i) under Sections 2.12 and 2.13 of the First Lien Credit Facility Agreement for any pre-Effective Date actions, (ii) under clause "Second" of Section 8.04 of the First Lien Credit Facility Agreement, (iii) under Section 6.06 or 6.13 of the First Lien Indenture for any pre-Effective date actions, or (iv) from or related to any pre-Effective Date breach or alleged breach of the First Lien Intercreditor Agreement, including, without limitation, Sections 2.01, 2.02(d), 2.03(a) and 2.03(b) of the First Lien Intercreditor Agreement, or the Second Lien Intercreditor Agreement, and in each case Apax shall irrevocably release, on the Effective Date, the First Lien Credit Facility Agents, the First Lien Trustee and each Holder of a First Lien Claim in connection with any (a) pre-Effective Date claim or cause of action solely with respect to clauses (i), (iii) and (iv) and (b) any claim or cause of action solely with respect to clause (ii); _provided_ that the foregoing release and waiver (1) shall not apply to any payments or distributions from the Debtors to or for the benefit of a Holder of a First Lien Claim made after the date hereof and prior to the Effective Date that are not provided for in the Final Cash Collateral Order (as amended to date and hereafter solely for the purposes described in Section 4.01(c) of the Global PSA) and (2) shall not apply to Apax's rights to share in any excess payments solely of principal or interest (but in no case to recover any portion of the Withheld Apax Distribution) under Section 2.13 of the First Lien Credit Facility Agreement or any similar sharing provision in any other agreement, all of which rights are and shall be fully preserved. |
|---|---|
| **Releases** | The Second Lien Indenture Trustee, the Consenting Second Lien Holders, the Senior Notes Indenture Trustee, the Subordinated Notes Trustee, the PIK Notes Indenture Trustee, Centerbridge and such entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, shall be added to the definition of Releasee, Releasing Parties, and Exculpated Parties; _provided_ that the PIK Notes Indenture Trustee shall be removed from the definition of Releasee, Releasing Parties, and Exculpated Parties if the PIK Notes Trustee is directed by Holders of PIK Notes Claims to take action (and does take such action) in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA; _provided further_ that the Subordinated Notes Trustee shall be removed from the definition of Releasee, Releasing Parties and Exculpated Parties if the Subordinated Notes Trustee objects to or challenges |

| | confirmation of the Amended Plan or seeks to delay confirmation of the Amended Plan. |
|---|---|
| | For the avoidance of doubt, the existing Release and Exculpation provisions and definitions in the Existing Plan in favor of Apax, and the Apax related parties more fully described in the Existing Plan, shall remain in place and become effective on the Effective Date. Without limiting the foregoing, such Release provisions shall be deemed to include any and all pre-Effective Date Claims and Causes of Action which may be asserted against Apax and such related parties at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax. |
| **Adversary Proceedings** | Upon the Effective Date of the Plan, all pending adversary proceedings in the Chapter 11 Cases shall be deemed dismissed with prejudice. For the avoidance of doubt, all inter-creditor disputes, including those arising in connection with the Second Lien Intercreditor Agreement, shall be waived and released and the pending adversary proceeding relating thereto shall be dismissed with prejudice in the Confirmation Order, effective on the Effective Date of the Amended Plan. |
| **Payment of Certain Professional and Indenture Trustee Fees** | Article XII.D of the Plan shall be amended to provide for the payment in full by the Debtors of all of the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases, through the Effective Date (and for any reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases on or after the Effective Date in connection with supporting the Amended Plan in any appeal of confirmation that continued after the Effective Date or with respect to performance of any of such parties' obligations under the Amended Plan) by the Second Lien Indenture Trustee, the Consenting Second Lien Holders (solely with respect to such Holders' professional fees and expenses), the Senior Notes Indenture Trustee, the Subordinated Notes Indenture Trustee, the PIK Notes Indenture Trustee, and Centerbridge (solely with respect to such Holders' professional fees and expenses) (the "**Non-Estate Fees**"), collectively up to an amount of $20 million in the aggregate; (the "**Non-Estate Professional Fee Cap**"); provided that such Non-Estate Professional Fee Cap shall be allocated up to $15 million in the aggregate to the fees incurred by the Second Lien Indenture Trustee and the Consenting Second Lien Holders and up to $5 million in the aggregate to the Senior Notes Indenture Trustee, the Subordinated Notes Trustee, the PIK Notes Indenture Trustee and Centerbridge; provided further that the PIK Notes Indenture |

Trustee shall not be entitled to any payment of fees and expenses from the Non-Estate Professional Fee Cap if the PIK Notes Trustee is directed by Holders PIK Notes Claims to take action (and does take such action) in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA; provided further that the Subordinated Notes Trustee shall not be entitled to any payment of fees and expenses from the Non-Estate Professional Fee Cap if the Subordinated Notes Trustee objects to or challenges confirmation of the Amended Plan or seeks to delay confirmation of the Amended Plan. For the avoidance of doubt, to the extent the Non-Estate Fees are less than $20 million, the Reorganized Debtors shall retain such difference.

Prior to entry of the Approval Order, an indenture trustee may elect out of this provision, and in such event (a) the Non-Estate Professional Fee Cap will be reduced by the reasonable and documented fees of such indenture trustee as acceptable to the Relevant Parties (as defined below) (it being understood that such reduction will be applied to the portion of the Non-Estate Professional Fee Cap allocable to the relevant indenture trustee), (b) such indenture trustee will be removed as a beneficiary of this provision for all purposes, and (c) a new additional distribution of Cash will be provided to the holders of claims under such indenture trustee's indenture in the amount of the reduction of the Non-Estate Professional Fee Cap; provided for the avoidance of doubt that such additional distribution shall be subject to the charging lien of such indenture trustee; provided further that if the reasonable and documented fees of the relevant indenture trustee are not acceptable to the Relevant Parties, then such indenture trustee shall not be permitted to elect out of this provision. "Relevant Parties" means (i) with respect to an election by the Second Lien Indenture Trustee, the Debtors, the Consenting Second Lien Holders, the First Lien Credit Facility Administrative Agent, and the Ad Hoc First Lien Group and (ii) with respect to an election by any other indenture trustee, the Debtors, the First Lien Credit Facility Administrative Agent, the Ad Hoc First Lien Group, the Senior Notes Indenture Trustee, the PIK Notes Indenture Trustee and Centerbridge.

Non-Estate Fees shall be paid (a) on the Effective Date of the Plan (subject to the receipt by the Debtors of invoices for such amounts at least ten days prior to the Effective Date) and (b) with respect to any reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases after the Effective Date in connection with supporting the Amended Plan in any appeal of confirmation that continued after the Effective Date or with respect to performance of any of such parties' obligations under the Amended

| | Plan, within ten days after the receipt by the Reorganized Debtors of invoices for such amounts. |
| --- | --- |
| | Payment of the fees and expenses of the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee shall be paid pursuant to the Cash Collateral Order and the Existing Plan. |
| **Release of Avoidance Actions** | Section IV.BB of the Existing Plan shall be expanded to provide that Avoidance Actions against any parties shall be released and extinguished pursuant to the Amended Plan. |
| **Shareholders Agreement and Minority Protections** | The Shareholders Agreement and the other New Corporate Governance Documents shall be reasonably acceptable to the "Required Consenting Lenders" (as such term is defined in the Existing Plan) and shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity. The Shareholders Agreement shall expressly identify Apax as the "15%" holder entitled to nominate and have elected one director and one board observer on the Effective Date, so long as Apax is entitled to at least 15% of the New Equity on account of its First Lien Claims as of the Effective Date. |
| | Any minority shareholder protections in the New Shareholders Agreement shall apply to all minority Holders of New Equity on an equal basis; provided, however, the foregoing does not mean that all minority shareholders will have the same protections regardless of percentage of holdings. Any pre-Effective Date disputes over the Shareholders Agreement, minority protections, or the other New Corporate Governance Documents shall be resolved by Judge Drain. |
| **Other Amended Plan Provisions** | The Amended Plan shall provide for (a) the compromise and settlement of inter-creditor and inter-debtor issues and disputes as set forth in this Term Sheet and (b) the payment of professional fees of the Debtors and the Committee and the establishment of the professional fee escrow by the Debtors, notwithstanding anything contrary in the Cash Collateral Order, for the purpose of paying Allowed professional fee claims incurred through the Effective Date. |
| | On the thirtieth (30th) day after the Effective Date, except with respect to (a) fee applications and Non-Estate Fees; (b) appealing and taking any action concerning an appeal in any court that is pending as of the Effective Date; (c) any pending litigation or contested matters to which the Committee is a party (excluding any such litigation or contested matter as to any Causes of Action released by the Plan); (d) interpretation, enforcement or implementation of the Amended Plan, in each case to the extent |

there is a dispute, disagreement, controversy or issue, including, but not limited to, a contested matter or adversary proceeding or other litigation and as it relates to or otherwise affects the Other Unsecured Creditor Distributions or the classification or treatment of Second Lien Claims, Senior Notes Claims, PIK Notes Claims, Subordinated Notes Claims and General Unsecured Claims or otherwise relates to or affects unsecured creditors of the Debtors; and (e) consulting with the Debtors or Reorganized Debtors with respect to the reconciliation of claims and the adjudication, objection, settlement and resolution of General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims, the Committee shall dissolve for purposes of these Chapter 11 Cases.  The Reorganized Debtors shall promptly pay the reasonable and documented post-Effective Date fees and expenses of the Committee's professionals; provided, however, the Reorganized Debtors' obligation to pay the fees and expenses of the professionals of the Committee, including but not limited to the Committee's attorneys and financial advisors, with respect to (e) above, shall not exceed $250,000, and thereafter such fees and expenses will be otherwise satisfied and paid from the Other Unsecured Creditor Distributions allocated to General Unsecured Creditors.  For the avoidance of doubt, for purposes of this paragraph, Other Unsecured Creditor Distributions shall not include distributions to the Holders of Second Lien Claims, Senior Notes or PIK Notes.  The Debtors or Reorganized Debtors will reserve and escrow $150,000 of the Other Unsecured Creditor Distribution allocated to Holders of General Unsecured Claims for the benefit of the professionals of the Committee as provided above. The Reorganized Debtors shall consult with the Committee and its professionals after the Effective Date regarding the reconciliation, resolution, objection to, and settlement of, General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims; provided further that the Committee's consent is required, which consent shall not be unreasonably withheld, to compromise, settle or otherwise resolve Claims that are (i) filed or scheduled or asserted in excess of $1 million or (ii) proposed to be compromised, settled or resolved by the Debtors or Reorganized Debtors by allowing such claim as a General Unsecured Claim in excess of $1 million.  On the Effective Date the Committee will use its best efforts to form a subcommittee consisting of not less than two members and not more than three members.  The Committee will use its best efforts to first permit trade or other non-funded debt committee members, and for the avoidance of doubt, excluding indenture trustees, to serve on such subcommittee.  The subcommittee shall be delegated the responsibility and authority with respect to those matters set forth in (e) above.

|  | The Reorganized Debtor will agree to post annual and quarterly financial statements (with MD&A being posted at least annually, and with any other MD&A provided to any lender or other entity being posted as well) with a carve out that the company can withhold commercially sensitive information in its reasonable discretion (provided that the deletion of the withheld information from the financial statements does not make the redacted statements not compliant with GAAP). |
|  | In the event the New Equity is not book entry and Depository Trust Company eligible, then the Prepetition Indentures Trustees shall not serve as Disbursing Agent for such New Equity, and the Disbursing Agent for such New Equity shall not distribute any consideration in the form of stock without the express consent of the applicable Prepetition Indenture Trustee, which consent shall not be unreasonably withheld, and without first providing such Prepetition Indenture Trustee the opportunity to exercise its Charging Lien against such New Equity, as provided for under the applicable Prepetition Indenture, which Charging Lien shall be deemed, until the Disbursing Agent has disbursed the New Equity, to exist against such New Equity in the same manner as if such New Equity were in possession of the applicable Prepetition Indenture Trustee. |
| **Plan Supplement** | The deadline for filing and serving notice of, to the extent known, the identity of members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code shall be extended to seven days prior to the Confirmation Hearing. |
| **Management Incentive Plan** | See Amended MIP Term Sheet, attached hereto as <u>Exhibit 1</u>. |

**<u>Exhibit D</u>**

**Rollover Facility Term Sheet**

**SENIOR SECURED ROLLOVER EXIT TERM LOAN FACILITY**
**SUMMARY OF PROPOSED TERMS AND CONDITIONS**

**CONFIDENTIAL; FOR DISCUSSION PURPOSES ONLY**
**NOT A COMMITMENT TO LEND**

THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF THE CONSENTING LENDERS (AS DEFINED IN THAT CERTAIN RESTRUCTURING SUPPORT AGREEMENT, DATED AS OF [_____], 2013 AMONG THE LOAN PARTIES (AS DEFINED BELOW), THE LENDERS AND NOTEHOLDERS SIGNATORY THERETO, [JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT AND THE BANK OF NEW YORK MELLON, AS TRUSTEE AND COLLATERAL AGENT] (AS IT MAY BE AMENDED, THE "RESTRUCTURING SUPPORT AGREEMENT")).

THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW BY THE CONSENTING LENDERS AND THEIR PROFESSIONALS, IS SUBJECT TO MATERIAL CHANGE AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY. THIS IS NOT A COMMITMENT TO LEND. THIS TERM SHEET IS NON-BINDING AND THE PROPOSALS CONTAINED HEREIN ARE SUBJECT TO, AMONG OTHER THINGS, DUE DILIGENCE, CREDIT APPROVAL AND THE NEGOTIATION, DOCUMENTATION AND EXECUTION OF DEFINITIVE DOCUMENTATION. ONLY EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION RELATING TO THE TRANSACTIONS SHALL RESULT IN ANY BINDING OR ENFORCEABLE OBLIGATIONS OF ANY PARTY RELATING TO THE TRANSACTIONS.

UNLESS OTHERWISE SPECIFICALLY DEFINED HEREIN, EACH CAPITALIZED TERM USED IN THIS TERM SHEET THAT IS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT SHALL HAVE THE MEANING ASSIGNED TO SUCH TERM IN THE RESTRUCTURING SUPPORT AGREEMENT.

| | |
|---|---|
| Borrower: | Cengage Learning Acquisitions, Inc., a Delaware corporation (the "Borrower"). |
| Holdings: | Cengage Learning Holdco, Inc., a Delaware corporation ("Holdings").[1] |
| Lenders: | Initially, holders of First Lien Claims (the "Lenders"). |
| Agents: | An administrative agent (in such capacity, the "Administrative Agent") and collateral agent (in such capacity, the "Collateral Agent" and together with the Administrative Agent, collectively, the "Agents") to be selected by the Borrower and approved by the Consenting Lenders. |
| Term Loan Facility: | A senior secured term loan facility (the "Term Loan Facility"; the loans thereunder, the "Term Loans") in an aggregate principal amount of $1.5 billion. The Term |

---

[1] Ownership structure to be collapsed to dissolve Cengage Learning Holdings II, L.P. if no material adverse tax consequences of doing so (as determined by the Consenting Lenders).

Loans will be distributed to the Lenders as partial satisfaction of their respective First Lien Claims.

Closing Date:

The Term Loan Facility shall close and become effective on the date (the "<u>Closing Date</u>") of (i) the execution and delivery of the Financing Documentation (as defined below) by the Borrower, the Guarantors (as defined below), the Agents and the respective Lenders party thereto, (ii) the satisfaction of the conditions precedent to effectiveness of the Term Loan Facility specified in the credit agreement, including those described herein and (iii) the effectiveness of the Agreed Restructuring Plan (pursuant to the Confirmation Order).

Ratings:

At the sole cost and expense of the Borrower, the Borrower shall use commercially reasonable efforts to obtain, and use commercially reasonable efforts to maintain, a public corporate level rating, a public family level rating, a public facility level rating and a public recovery rating from each of Standard & Poor's and Moody's.

Amortization:

1.0% of the initial principal amount of the Term Loans on an annualized basis payable in quarterly installments, beginning on the last business day of the first full fiscal quarter following the Closing Date. Any remaining principal shall be due on the Maturity Date unless earlier payment is required from mandatory prepayments or following an event of default.

Documentation:

Usual and customary for facilities and transactions of this type, to include, among others, a credit agreement, guarantees and appropriate pledge agreements, security agreements, mortgages, control agreements, intercreditor agreements and other collateral documents (collectively, the "<u>Financing Documentation</u>").

Guarantors:

The obligations of the Borrower under the Term Loan Facility will be unconditionally guaranteed, on a joint and several basis, by Holdings and each existing and subsequently acquired or formed direct and indirect domestic subsidiary other than any domestic subsidiaries of foreign subsidiaries (each a "<u>Guarantor</u>"; and such guarantee being referred to herein as a "<u>Guarantee</u>"). All Guarantees shall be guarantees of payment and not of collection. The Borrower and the Guarantors are herein referred to as the "<u>Loan Parties</u>" and, individually, as a "<u>Loan Party</u>."

Security:

The Term Loan Facility shall be secured by a perfected first priority (subject to certain exceptions (including

liens securing the New Revolving Credit Facility, which New Revolving Credit Facility shall be on terms reasonably acceptable to the Consenting Lenders) to be set forth in the Financing Documentation) security interest in all of the present and future tangible and intangible assets of the Loan Parties (including, without limitation, cash, deposit and securities accounts, accounts receivable, inventory, intellectual property, material owned real property, 100% of the capital stock of the Borrower and the Guarantors and 100% of the non-voting capital stock, and 65% of the voting stock, of each first-tier foreign subsidiary of the Borrower) (the "<u>Collateral</u>").

Maturity Date:

The final maturity of the Term Loan Facility will occur on the sixth anniversary of the Closing Date (the "<u>Maturity Date</u>").

Interest Rate:

The Consenting Lenders will consult with the Borrower to determine a mutually acceptable interest rate for the Term Loan based on each party's good faith judgment of the rate that would allow the initial secondary market price to be equal to par.

After the occurrence and during the continuance of an Event of Default, interest on all amounts then outstanding will accrue at a rate equal to 2.00% per annum above the interest rate then in effect and will be payable on demand.

Interest Payments:

Except as set forth below, on the last day of selected interest periods (which may be one, two, three or six months) for Term Loans (except, in the case of interest periods of longer than three months, at the end of every three months); and upon prepayment, in each case payable in arrears and computed on the basis of a 360-day year.

Mandatory Prepayments:

Mandatory prepayments will be required with respect to excess cash flow, asset sales (subject to customary reinvestment provisions), insurance proceeds and incurrence of non-permitted indebtedness (subject to certain exceptions and basket amounts to be negotiated in the definitive Financing Documentation).

Optional Prepayments:

Term Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts and in multiples to be agreed upon.

| Prepayment Premium: | If the Term Loans are prepaid or accelerated at any time (excluding certain mandatory prepayments agreed to by the Lenders), the Borrower shall, in addition to such prepayment of the principal of, and interest on, the Term Loans, pay to the Lenders the Prepayment Premium. |

"Prepayment Premium" means a percentage of the principal prepaid or accelerated in the following months after the Closing Date:

| Months | Prepayment Premium |
|--------|--------------------|
| 1-6 | 0% |
| 7-18 | 1.0% |
| 19 and thereafter | 0% |

| Conditions to Closing: | The availability of the Term Loan Facility shall be conditioned upon the satisfaction of the conditions precedent set forth in the Conditions Annex attached hereto as Annex A hereto. |

| Representations and Warranties: | The Loan Parties will make representations and warranties usual and customary for transactions of this type and other terms deemed appropriate by the Lenders, including, without limitation: (i) material accuracy of disclosure and absence of undisclosed liabilities as of the Closing Date, (ii) corporate existence, (iii) compliance with law, (iv) corporate power and authority, (v) enforceability of Financing Documentation, (vi) no conflict with law or contractual obligations, (vii) no material litigation, (viii) no default, (ix) ownership of property, (x) liens, (xi) intellectual property, (xii) no burdensome restrictions, (xiii) taxes, (xiv) Federal Reserve margin regulations, (xv) ERISA, (xvi) Investment Company Act, (xvii) subsidiaries, (xviii) collateral, (xix) environmental matters, (xx) labor matters, (xxi) significant authors and the status of contracts therewith, and (xxii) compliance with all applicable "know your customer" and anti-money laundering rules and regulations (including, without limitation, the Patriot Act). |

| Affirmative Covenants: | The Loan Parties will comply with affirmative covenants customary for transactions of this type and other terms deemed appropriate by the Lenders, including, without limitation: (i) compliance with laws and material contractual obligations, (ii) payment of taxes and other material obligations, (iii) maintenance of insurance, (iv) conduct of business, (v) preservation of corporate existence, (vi) keeping of books and records, (vii) maintenance of properties, (viii) transactions with affiliates, (ix) reporting requirements (including, without |

limitation, as detailed below under the heading "Information Rights"), (x) additional guarantors, (xi) right of Lenders to inspect property and books and records, (xii) notices of defaults, litigation and other material events, (xiii) compliance with environmental laws and (xiv) further assurances.

Negative Covenants:

The Loan Parties will comply with negative covenants customary for transactions of this type and other terms deemed appropriate by the Lenders, including, without limitation, but subject to baskets, limits and incurrence tests to be agreed upon on: (i) indebtedness (including guarantee obligations), (ii) liens, (iii) payment restrictions affecting subsidiaries, (iv) restricted payments, (v) material changes in business, (vi) negative pledge, (vii) transactions with affiliates, (vii) changes in fiscal year, (ix) sale of all or substantially all assets, (x) investments and (xi) prepayment of junior debt classes.

Financial Covenants:

Customary for a covenant lite loan transaction of this type. Notwithstanding the foregoing, the Financing Documentation may include a maximum leverage or minimum Consolidated EBITDA covenant.

Information Rights:

The Loan Parties shall provide to the Lenders, and any prospective lender (who is not a direct competitor of the Loan Parties) that has entered into a confidentiality agreement on customary terms and for purposes of evaluating the investment ("Qualified Prospective Investor") on a reputable password-protected online data system, such as Intralinks, annual reports, quarterly reports, proxy statements and other periodic reports that would be required to be filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), prepared as if the Loan Parties were reporting companies under the Exchange Act. The Loan Parties shall hold live quarterly conference calls (with a question and answer period) for the Lenders and Qualified Prospective Investors, with dates and dial-in information announced on the password-protected online data system utilized by the Loan Parties at least three (3) days prior to such quarterly calls.

Events of Default:

The following will constitute Events of Default, subject to customary exceptions, materiality qualifications and notice periods to be agreed upon and, where applicable (other than clause (i) below), cure and grace periods to be determined: (i) nonpayment of principal when due and nonpayment of interest, fees or other amounts after a grace period to be determined, (ii) material inaccuracy of

representations or warranties, (iii) failure to perform or observe negative and certain affirmative covenants set forth in the Financing Documentation, (iv) bankruptcy and insolvency defaults of any Loan Party or any of their material subsidiaries, (v) change of control (the definition of which is to be agreed upon), (vi) customary ERISA defaults, (vii) any Guarantee ceases to be in full force and effect, (viii) material judgments, and (ix) other Events of Default to be determined.

**Defaulting Lender Provisions, Yield Protection and Increased Costs:**

Customary for transactions of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, illegality, unavailability, increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and payments free and clear of withholding or other taxes.

**Assignments and Participations:**

Lenders will be permitted to make assignments in a minimum amount to be agreed (unless such assignment is of a Lender's entire interest in the Term Loan Facility) to any person or entity (other than a natural person and other entities to be agreed), acceptable to Agents and, so long as no default or event of default has occurred and is continuing, Borrower, which acceptances shall not be unreasonably withheld or delayed; provided, however, that the approval of the Borrower shall not be required in connection with assignments to other Lenders (or to affiliates or approved funds of Lenders).

Without the consent of the Borrower or the Agents, each Lender may sell participations in all or a portion of its loans and commitments, subject to customary restrictions on the participants' voting rights.

**Amendments and Waivers:**

Amendments and waivers of the provisions of the Financing Documentation will require the approval of Lenders holding Term Loans representing more than 50% of the aggregate amount of the Term Loans (the "***Required Lenders***"), except that in certain customary circumstances the consent of a greater percentage (or of all) the Lenders may be required.

**Indemnification:**

Customary indemnification provisions for the benefit of the Lenders and their related parties shall apply.

**Governing Law and Forum:**

New York.  The Borrower will waive any right to trial by jury.

*Exhibit C*

**SUMMARY OF CONDITIONS PRECEDENT TO EFFECTIVENESS OF
THE TERM LOAN FACILITY**

Closing and the availability of the Term Loan Facility will be subject to the satisfaction of the following conditions precedent:

(a)     <u>Financing Documentation and Customary Closing Documentation.</u>  (i) Financing Documentation reflecting and consistent with the terms and conditions set forth herein and otherwise reasonably satisfactory to the Consenting Lenders, will have been executed and delivered, (ii) the Agents will have received such customary legal opinions (including, without limitation, opinions of special counsel and local counsel as may be reasonably requested by the Consenting Lenders), documents and other instruments as are customary for transactions of this type, (iii) all documents, instruments, reports and policies required to perfect or evidence the Collateral Agent's security interest (with the relevant priority) in, and liens on, the Collateral (including, without limitation, all certificates evidencing pledged capital stock or membership or partnership interests, as applicable, with accompanying executed stock powers, all UCC financing statements to be filed in the applicable government UCC filing offices, all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and all deposit account control agreements) will have been executed and/or delivered and, to the extent applicable, be in proper form for filing (including UCC and other lien searches, intellectual property searches, insurance policies, access letters (if material) and environmental reports on owned real property), (iv) all governmental and third party consents and all equityholder and board of directors (or comparable entity management body) authorizations shall have been obtained and shall be in full force and effect, (v) other than the Chapter 11 Cases, there shall not be any material pending or threatened litigation, bankruptcy or other proceeding, and (vi) all fees and expenses then due.

(b)     <u>Confirmation of Plan of Reorganization</u>.  The Agreed Restructuring Plan shall have been consummated in accordance with the terms of the Support Agreement.

(c)     <u>Information Required by Regulatory Authorities</u>.  The Loan Parties will have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(d)     <u>Representations and Warranties</u>. All representations and warranties made by the Loan Parties shall be true and correct in all material respects (unless already qualified by materiality or material adverse effect in which case they shall be true and correct in all respects).

(e)     <u>New Revolving Credit Facility</u> .  The definitive documentation for the New Revolving Credit Facility shall be in form and substance satisfactory to the Consenting Lenders.

(f)     <u>Minimum EBITDA</u>.  Holdings and its subsidiaries shall have minimum Consolidated EBITDA on a twelve trailing month basis of $540,000,000.

As used herein, the term "<u>Consolidated EBITDA</u>" shall be defined as the Consolidated Net Income (to be defined in the Financing Documentation) of Holdings and its

subsidiaries increased (without duplication) by the following, in each case to the extent deducted in determining Consolidated Net Income for such period:

(i)      provision for taxes based on income or profits or capital, including, without limitation, state, franchise and similar taxes and foreign withholding taxes paid or accrued during such period; plus

(ii)      Consolidated Interest Expense (to be defined in the Financing Documentation) for such period (including (x) net losses or any obligations under any Swap Contracts (to be defined in the Financing Documentation) or other derivative instruments entered into for the purpose of hedging interest rate risk, (y) bank fees and (z) costs of surety bonds in connection with financing activities, plus certain agreed amounts excluded from Consolidated Interest Expense); plus

(iii)      Consolidated Depreciation and Amortization Expense (to be defined in the Financing Documentation) for such period and all original issue discount relating to any loan agreements or credit facilities of the Loan Parties deducted in such period; plus

(iv)      (a) fees, costs, charges, commissions, operating losses, write-downs and expenses paid or reimbursed to any legal counsel or professional advisor to the Loan Parties and the other Debtors in connection with the negotiation, execution and ongoing performance of the Financing Documentation (and the transactions contemplated thereby and of the New Revolving Credit Facility and the transactions contemplated thereby) incurred during such period in connection with the Financing Documentation, the financing documentation under the New Revolving Credit Facility, the Chapter 11 Cases, the chapter 11 plan of reorganization and the transactions contemplated by any of the foregoing, and (b) costs and expenses incurred in connection with the Debtors' operational restructuring as contemplated in the management business plan; provided that such amounts set forth in this subclause (iv) shall not exceed $107,000,000 in the aggregate when added to all amounts added back to the calculation of Consolidated EBITDA under subclause (v) below; plus

(v)      the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the Sponsor to the extent such payment was permitted in the Borrower's existing credit agreement; provided that such amounts set forth in this subclause (v) shall not exceed $107,000,000 in the aggregate when added to all amounts added back to the calculation of Consolidated EBITDA under subclause (iv)  above; plus

(vi)      non-cash charges (other than (1) amortization of a prepaid cash item that was paid and not expensed in a prior period and (2) write down of current assets), including (a) write-downs of property, plant and equipment and other assets, (b) impairment of intangible assets, (c) losses resulting from cumulative effect of change in accounting principles, and (d) unrealized losses from foreign currency transaction costs; provided that if such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent; minus

(vii)      without duplication and to the extent included in Consolidated Net Income for such period, the sum of (i) interest income (except to the extent deducted in determining Consolidated Interest Expense), (ii) other non-cash gains increasing

2

Consolidated Net Income for such period (excluding any such non-cash gain to the extent it represents a reversal of an accrual or reserve for potential cash gain in any prior period) (*provided*, that any cash received with respect to any non-cash items of income (other than extraordinary gains) for any prior period shall be added to the computation of Consolidated EBITDA, and (iii) any other non-cash income arising from the cumulative effect of changes in accounting principles.

3

**Exhibit E**

**Restructuring Term Sheet**

## CENGAGE LEARNING HOLDINGS II L.P., ET AL.

## RESTRUCTURING TERM SHEET

### July 2, 2013

THIS TERM SHEET (THIS "**TERM SHEET**") DESCRIBES THE MATERIAL TERMS OF A PROPOSED RESTRUCTURING (THE "**RESTRUCTURING**") PURSUANT TO WHICH CENGAGE LEARNING HOLDINGS II L.P. (THE "**COMPANY**") AND CERTAIN OF THE COMPANY'S DOMESTIC SUBSIDIARIES (TOGETHER WITH THE COMPANY, THE "**DEBTORS**")[1] WILL RESTRUCTURE THEIR CAPITAL STRUCTURE THROUGH A JOINT PLAN OF REORGANIZATION FILED IN CONNECTION WITH VOLUNTARY CASES (THE "**CHAPTER 11 CASES**") COMMENCED UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "**BANKRUPTCY CODE**") IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK (THE "**BANKRUPTCY COURT**").

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS NOT A COMMITMENT TO LEND OR TO AGREE TO THE TERMS OF ANY RESTRUCTURING. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.

> THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW AND APPROVAL BY ALL PARTIES AND IS NOT BINDING, IS SUBJECT TO MATERIAL CHANGE, AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | Prior to the date of commencement of the Chapter 11 Cases (the "**Petition Date**"), those holders of First Lien Claims (as defined herein) who are signatories hereto shall have executed the restructuring support agreement to which this Term Sheet is attached |

---

[1]  The Debtors are Cengage Learning Holdings II, L.P. ("**CL Holdings**"); Cengage Learning Holdco, Inc. (**CL Holdco**"); Cengage Learning Acquisitions, Inc. ("**CLAI**"); and Cengage Learning, Inc. ("**CLI**").

| | (the "**RSA**") pursuant to which the Debtors will agree to pursue and implement a restructuring process consistent with this Term Sheet in order to consummate a plan of reorganization (the "**Plan**"). |
|---|---|
| | This Term Sheet outlines the terms of a balance-sheet restructuring of the Debtors and is premised on the Company's estimated total enterprise value at emergence of $2.8 billion. The Plan, as outlined in this Term Sheet and subject to the terms of the RSA, shall provide for the holders of the First Lien Claims (as defined below) to receive in satisfaction of their secured claims their pro rata share of 100% of the equity in the Debtors as reorganized under the Plan (the "**Reorganized Debtors**"), Excess Cash (as defined herein), and, subject to the RSA and the Rollover Facility Term Sheet attached to the RSA, new debt or cash on account of new debt. The Unsecured Creditor Assets (as defined herein), or the value thereof, shall be reserved for the benefit of the holders of Unsecured Claims (as defined below), including the First Lien Deficiency Claims (as defined below). |
| | This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the related definitive documentation governing the Restructuring identified in the RSA (which shall be in form and substance acceptable to the Debtors and the Required Consenting Lenders, the "**Definitive Documents**"). The Definitive Documents, all motions, and related orders and the plan solicitation documents shall satisfy the requirements of the Bankruptcy Code and be consistent with the RSA and this Term Sheet. |
| **Debt to be Restructured** | Indebtedness that will be treated under the Plan includes, among other things, the following indebtedness and obligations (which amounts are not binding):[2] |
| | (1) approximately $3,880.7 million of obligations outstanding under that certain Credit Agreement, dated as of July 5, 2007, as amended by the Incremental Amendment, dated as of May 30, 2008, and the Amendment Agreement, dated as of April 10, 2012, by and among certain of the Debtors, JPMorgan Chase Bank, N.A. as administrative agent, and the other lenders party thereto (the "**First Lien Credit Facility Agreement**" and, together with all related agreements and documents executed by any of the Debtors in connection with the |

---

[2]    Amounts include accrued non-default interest through July 1, 2013, and is exclusive of other interest, fees and expenses.

Credit Agreement, the "**First Lien Credit Agreement Documents**"), consisting of (a) approximately $222.5 million of obligations under the Class A Revolving Credit Facility (as defined in the First Lien Credit Facility Agreement) (the "**Unextended Revolver Claims**"); (b) approximately $293.2 million of obligations under the Class B Revolving Credit Facility (as defined in the First Lien Credit Facility Agreement) (the "**Extended Revolver Claims**"); (c) approximately $1,522.7 million of obligations under the Original Term Loans (as defined in the First Lien Credit Facility Agreement) (the "**Unextended Term Loan Claims**"); (d) approximately $549.5 million of obligations under the Tranche 1 Incremental Term Loans (as defined in the First Lien Credit Facility Agreement) (the "**Incremental Term Loan Claims**"); and (e) approximately $1,292.8 million of obligations under the Tranche B Term Loans (as defined in the First Lien Credit Facility Agreement) (the "**Extended Term Loan Claims**," and together with the Unextended Revolver Claims, the Extended Revolver Claims, the Unextended Term Loan Claims, the Incremental Term Loan Claims, and all accrued and unpaid interest, fees, costs, expenses, indemnities and other charges thereunder, the "**First Lien Credit Facility Claims**");

(2) approximately $742.6 million of obligations outstanding under that certain Indenture, dated as of April 10, 2012, by and among Cengage Learning Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, providing for the issuance of 11.50% Senior Secured Notes due 2020 (such indenture, the "**First Lien Indenture**," and together with all related agreements and documents executed by any of the Debtors in connection with the First Lien Indenture, the "**First Lien Indenture Documents**"), and such obligations thereunder, the "**First Lien Notes Claims**");

(3) approximately $13.3 million of obligations outstanding under certain secured interest rate swap agreements (together with all related agreements and documents executed by any of the Debtors in connection with the First Lien Indenture, the "**First Lien Swap Documents**," and together with the First Lien Credit Agreement Documents and the First Lien Indenture Documents, the "**First Lien Documents**"), and such obligations thereunder, the "**First Lien Swap Claims**," and together with the First Lien Credit Facility Claims and the First Lien Notes Claims, the "**First Lien Claims**," a holder of the

3

First Lien Claims, a "**First Lien Claimant**," such amounts of First Lien Claims that are Secured,[3] the "**First Lien Secured Claims**," and such amounts of First Lien Claims that are not Secured, the "**First Lien Deficiency Claims**")

(4) approximately $752.7 million of obligations outstanding under that certain Indenture, dated as of July 5, 2012, among Cengage Learning Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, providing for the issuance of 12.00% Senior Secured Second Lien Notes due 2019 (together with all related agreements and documents executed by any of the Debtors in connection with the Second Lien Indenture, the "**Second Lien Indenture Documents**," and such obligations thereunder, the "**Second Lien Claims**")

(5) approximately $305.4 million of obligations outstanding under that certain Indenture, dated as of July 5, 2007, among TL Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuance of 10.50% Senior Notes due 2015 (and obligations arising under such indenture and all related agreements and documents executed by any of the Debtors in connection with such indenture, the "**Senior Notes Claims**");

(6) approximately $67.6 million of obligations outstanding under that certain Indenture, dated as of October 31, 2008, among Cengage Learning Holdco, Inc., Cengage Learning Holdings II L.P., as guarantor, and Wells Fargo Banks National Association, as trustee, providing for the issuance of 13.75% Senior PIK Notes due 2015 (and obligations arising under such indenture and all related agreements and documents executed by any of the Debtors in connection with such indenture, the "**PIK Notes Claims**");

(7) approximately $140.0 million of obligations outstanding under that certain Indenture, dated as of July 5, 2007, by and among TL Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuance of 13.25% Senior Subordinated Discount Notes due 2015 (and obligations arising under such indenture and all related agreements and documents executed by

---

[3] "**Secured**" shall mean when referring to a claim any claim that is secured by a lien on or security interest in property, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

| | |
|---|---|
| | any of the Debtors in connection with such indenture, the "**Subordinated Notes Claims**"); and |
| | (8) all other non-priority general unsecured claims against the Debtors (including allowed intercompany claims) that are not First Lien Deficiency Claims, Second Lien Claims, Senior Notes Claims, PIK Notes Claims, or Subordinated Notes Claims (the "**General Unsecured Claims**," and together with the First Lien Deficiency Claims, the Second Lien Claims, the Senior Notes Claims, the PIK Notes Claims, and the Subordinated Notes Claims, the "**Unsecured Claims**"). |
| | For the avoidance of doubt, all allowed intercompany claims shall participate in any distribution to the holders of Unsecured Claims. To the extent such intercompany claim is pledged as collateral under the First Lien Documents, such distribution shall be paid over to the holders of the First Lien Claims on account of their First Lien Secured Claims. |
| | Notwithstanding anything to the contrary herein, for purposes of the Plan, allowed amounts of claims shall reflect the impact (if any) of any final order of the Bankruptcy Court as of the Effective Date allowing, disallowing, recharacterizing, or subordinating any such claim. All distributions in respect of any indebtedness described above shall be made to the applicable administrative agent, indenture trustee, or other paying agent so designated under the applicable debt agreements to be applied and distributed to lenders and/or holders thereunder in accordance with the provisions of those agreements (including, but not limited to, any applicable waterfall provisions, subordination provisions, and provisions in intercreditor agreements). |
| **Exit Financing** | On the effective date of the Plan (the "**Effective Date**"), the Reorganized Debtors will use commercially reasonable efforts to enter into a new first-out revolving credit agreement of no less than $250 million and up to $400 million to be raised on market terms (the "**New Revolver**"), which new credit agreement shall be subject to the consent of the Consenting Lenders (such consent not to be unreasonably withheld); provided that without limiting the foregoing the Consenting Lenders agree that the New Revolver should be in an amount as large as possible but not to exceed $400 million provided it is raised on market terms. |
| | Other terms of the New Revolver will be set forth in the Definitive Documents, which shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders, and the Credit Agreement |

5

| | |
|---|---|
| | Agent. |
| **Plan Consideration** | The primary forms of consideration for distributions under the Plan will be the New Debt Facility, the New Equity, and the Excess Cash (each as defined herein) (collectively, the "**Plan Consideration**").<br><br>"**New Debt Facility Consideration**" shall mean, subject to the terms of the RSA and the Rollover Facility Term Sheet, either, (1) the Rollover Facility or (2) cash received from the Reorganized Debtors' entry, on the Effective Date, into the New Term Loan Facility in accordance with the provisions of section 3.01(a)(iii) of the RSA.<br><br>"**New Equity**" shall mean 100% (subject to dilution for the Management Incentive Plan (as defined herein) and as otherwise provided in the Plan) of the new equity interests issued by the Reorganized Debtors pursuant to the Plan (the "**New Equity**") following the cancellation of the existing equity interests on the Effective Date, and subject to the terms and conditions of the RSA and the Equity Term Sheet attached to the RSA.<br><br>"**Excess Cash**" shall mean any cash other than the Disputed Cash (as defined herein) remaining on the Company's balance sheet as of the Effective Date after funding all payments and reserves required under the Plan, less $50 million (subject to working capital adjustments to be negotiated). |
| **Unsecured Creditor Distribution** | "**Unsecured Creditor Distribution**" shall mean a recovery under the Plan on account of the following assets (the "**Unsecured Creditor Assets**") to the holders of Unsecured Claims, including the First Lien Deficiency Claims:<br><br>(1) cash, if any, that (A) the Required Consenting Lenders and the Debtors agree is not subject to any perfected unavoidable liens under the First Lien Documents or the Second Lien Documents or (B) is determined by a final order of the Bankruptcy Court to not be subject to any perfected unavoidable liens under the First Lien Documents or the Second Lien Documents (in either case, the "**Disputed Cash**")<br><br>(2) 35% of the equity interests in Cengage Learning Acquisitions C.V. ("**CLA C.V.**"), the Debtors' first-tier non-Debtor foreign subsidiary, or the value thereof (if any), after taking into account any valid intercompany claims owing by CLA C.V. or its subsidiaries to the Debtors (the "**CLA C.V. 35% Equity Value**");<br><br>(3) all copyrights that were registered by the Debtors with the United States Copyright Office after July 5, 2012 but prior to the Petition |

6

| | Date and (A) with respect to which copyrights no perfection recording was made with the United States Copyright Office for the benefit of either the First Lien Claimants or the Second Lien Claimants or (B) if they were perfected with the United States Copyright Office for the benefit of either the First Lien Claimants or the Second Lien Claimants, they were perfected with the United States Copyright Office within the 90 days prior to the Petition Date and such perfection has been avoided pursuant to a final order of the Bankruptcy Code  (the "**Disputed Copyrights**"); provided, however, the Debtors shall, to the extent requested by the Reorganized Debtors, grant the Reorganized Debtors a license with respect to the Disputed Copyrights for fair value;<br><br>(4) all equity interests owned by the Debtors in The Hampton Brown Company LLC and CourseSmart LLC (the "**Non-Wholly Owned Subsidiaries Interests**"); and<br><br>(5) the $8,883,986.42 of cash invested in a money market fund operated by Federated Investors, Inc. and traded under the ticker "TOIXX" (the "**Federated Fund**") to replace funds used from the Federated Fund to make an amortization payment on June 28, 2013, but solely to the extent the other funds in the Federated Fund are determined to constitute Disputed Cash (the "**Additional Disputed Cash**"). |
|---|---|
| **Convenience Class and Reporting Company Status** | The Reorganized Debtors intend to emerge from the Chapter 11 Cases as a company that is not subject to the reporting requirements of the Securities Exchange Act of 1934 (the "**Reporting Requirements**"). Accordingly, the Reorganized Debtors intend to set a dollar amount threshold (the "**Reporting Company Threshold**") applicable to General Unsecured Claims that in the Reorganized Debtors' estimate will result in fewer than 2,000 holders of New Equity and fewer than 500 holders of New Equity that are not "accredited investors." General Unsecured Claims in an amount less than the Reporting Company Threshold will be classified as "convenience class" general unsecured claims and will receive cash in a dollar amount equal to the value of the Plan Consideration that such holder would otherwise have received if such General Unsecured Claim were not less than the Reporting Company Threshold.  Subject to the terms and conditions of the Equity Term Sheet and the RSA, the Reorganized Debtors' organizational documents, in form and substance acceptable to the Required Consenting Lenders, will contain appropriate and customary restrictions on transfers of the New Equity for the purpose of maintaining the Reorganized Debtors' status as a company that is not |

| | subject to the Reporting Requirements. |
|---|---|
| **TREATMENT OF CLAIMS** | |
| **Administrative Claims**<br><br>**Priority Tax Claims**<br><br>**Other Priority Claims**<br><br>**Other Secured Claims**<br><br>**(Against All Debtors)** | Customary treatment provisions for each of these classes in order to render the holders of such claims unimpaired. |
| **First Lien Secured Claims** | Each holder of an Allowed First Lien Secured Claim shall receive its pro rata share of (1) 100% of the New Equity, (2) the New Debt Facility Consideration, and (3) the Excess Cash. |
| **Unsecured Claims Against CLI** | Each Holder of an Allowed Unsecured Claim against CLI (including First Lien Deficiency Claims against CLI) shall receive its pro rata share of the Unsecured Creditor Distribution that is attributable to the assets of CLI consisting of Non-Wholly Owned Subsidiaries Interests, and the Disputed Copyrights , which shall be allocated ratably to holders of claims in accordance with a priority waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements.<br><br>Notwithstanding anything herein to the contrary, the Second Lien Claims shall be separately classified in order to give effect to the intercreditor agreement between the holders of the First Lien Claims and the Second Lien Claims. The holders of Second Lien Claims shall be required to turnover their recoveries on account of the Disputed Copyrights and any other proceeds of the collateral securing the Second Lien Claims and the First Lien Claims to the holders of First Lien Deficiency Claims.<br><br>For the avoidance of doubt, the Subordinated Notes Claims shall not be entitled to any recovery under the Plan. |
| **Unsecured Claims Against CLAI** | Each Holder of an Allowed Unsecured Claim against CLAI (including First Lien Deficiency Claims against CLAI) shall receive its pro rata share of the Unsecured Creditor Distribution that is attributable to the assets of CLAI consisting of the Disputed Cash, the Additional Disputed Cash, and the CLA C.V. 35% Equity Value , which shall be allocated ratably to holders of claims in accordance with a priority |

8

| | waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements. |
|---|---|
| | Notwithstanding anything herein to the contrary, the Second Lien Claims shall be separately classified in order to give effect to the intercreditor agreement between the holders of the First Lien Claims and the Second Lien Claims. The holders of Second Lien Claims shall be required to turnover their recoveries on account any proceeds of the collateral securing the Second Lien Claims and the First Lien Claims to the holders of First Lien Deficiency Claims. |
| | For the avoidance of doubt, the Subordinated Notes Claims shall not be entitled to any recovery under the Plan. |
| **Unsecured Claims against CL Holdings and CL Holdco** | Holders of Unsecured Claims against CL Holdings and CL Holdco (including First Lien Deficiency Claims against CL Holdings and CL Holdco) will receive a pro rata distribution of any unencumbered assets, if any, of CL Holdings or CL Holdco, as applicable, on account of such claims, which shall be allocated to holders of Allowed Unsecured Claims against CL Holdings and CL Holdco, as applicable, in accordance with a priority waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and all other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements. |
| | For the avoidance of doubt, the Subordinated Notes Claims shall not be entitled to any recovery under the Plan. |
| **Section 510(b) Claim Against All Debtors** | "**Section 510(b) Claims**" means any claim against any of the Debtors that is described in section 510(b) of the Bankruptcy Code. |
| | Holders of Section 510(b) Claims will not receive any distribution on account of such claims, and Section 510(b) Claims shall be discharged, cancelled, released, and extinguished as of the Effective Date. |
| **Existing Equity Interests** | "**Equity Interests in the Company**" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in the Company, whether or not transferable, and any option, warrant, restricted stock unit, or right, contractual or otherwise, to acquire any such interest in the Company that existed immediately prior to the Effective Date. |
| | **Treatment.** Holders of Equity Interests in the Company will not receive any distribution on account of such interests, and Equity Interests in the Company shall be discharged, cancelled, released, and |

9

| | extinguished as of the Effective Date. |
|---|---|
| | "**Intercompany Interests**" shall include any share of common stock or other instrument evidencing an ownership interest in any of the Debtors other than the Company, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest in a Debtor other than the Company, which is held by another Debtor or an affiliate of a Debtor. |
| | Although Intercompany Interests shall not receive any distribution on account of such Intercompany Interests, solely to implement the Plan, Intercompany Interests shall be retained and not cancelled, and the legal, equitable, and contractual rights to which holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan. |
| <div align="center">**GENERAL PROVISIONS**</div> ||
| **Issuance of New Equity** | On the Effective Date, the New Equity distributed under the Plan shall be deemed fully paid and non-assessable. |
| **Corporate Governance** | Shall be subject to the terms and conditions set forth in the RSA and the Equity Term Sheet. |
| **Management Incentive Plan** | The Plan shall provide for a percentage of New Equity equal to $75 million as determined based on an assumed equity value of $1.3 billion to be allocated for the implementation of a market-level management and director equity incentive program to be developed in consultation with Towers Watson and the Required Consenting Lenders and/or their advisors (the "**Management Incentive Plan**"). The terms and conditions of the Management Incentive Plan will be agreed to by no later than the date set forth in the milestone set forth in section 3.02(b) of the RSA (including provisions as to granting, vesting, allocation, and amount and form of incentive awards (e.g., warrants, options, LTIP, RSUs, profit interests, etc.)). Awards so granted shall be dilutive of the New Equity interests. The terms and conditions of the Management Incentive Plan, when agreed, shall be deemed incorporated into the RSA and this Term Sheet by reference, and the Management Incentive Plan will be approved in connection with confirmation of the Plan. |
| **Management Employment Agreements** | The Plan shall provide for the assumption of the employment agreements of members of senior management, subject to a market analysis by Towers Watson and consultation with the Required Consenting Lenders and/or their advisors, and subject to any appropriate adjustments in response to such review and to otherwise |

<div align="center">10</div>

| | conform with the Management Incentive Plan, which adjustments (if any) and such other terms of the employment agreement shall be satisfactory to the Company, the applicable member of management, and the Required Consenting Lenders and/or their advisors, and be determined no later than the milestone date set forth in section 3.02(b) of the RSA. The terms of the employment agreements of members of senior management shall be deemed incorporated into the RSA and the Term Sheet by reference, and shall be assumed in connection with the Plan. |
|---|---|
| **Definitive Documents** | Any final agreement shall be subject to the Definitive Documents, which Definitive Documents shall be consistent with the terms of this Term Sheet and the RSA in all respect unless otherwise agreed to pursuant to the terms of the RSA. The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet. |
| **Tax Issues** | The Restructuring shall be structured to preserve favorable tax attributes to the extent practicable. |

11

**Exhibit F**

**Plan Support Agreement**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time, this "<u>Agreement</u>") is made and entered into as of February 1, 2014, by and among: (i) Cengage Learning Acquisitions, Inc., Cengage Learning Holdco, Inc., Cengage Learning Holdings II, L.P., and Cengage Learning, Inc. as debtors and debtors in possession (collectively, the "<u>Debtors</u>") in chapter 11 cases pending in the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>") captioned *In re Cengage Learning, Inc.*, Case No. 13-44106 (ESS) (Bankr. E.D.N.Y.) (collectively, the "<u>Chapter 11 Cases</u>"); (ii) the undersigned lenders pursuant to, and the holders of economic interest or economic rights relating to, (each in its capacity as such, together with their permitted successors and assigns, each, a "<u>Consenting Credit Agreement Lender</u>") that certain Credit Agreement, dated as of July 5, 2007, as subsequently amended by the Incremental Amendment, dated as of May 30, 2008 and the Amendment Agreement, dated as of April 10, 2012, and as further amended, modified, waived, or supplemented through the date hereof (as amended, the "<u>First Lien Credit Facility</u>"); (iii) JPMorgan Chase Bank, N.A., as successor administrative agent for the First Lien Credit Facility (in such capacity, and together with its permitted successors and assigns, each, a "<u>Consenting First Lien Agent</u>"); (iv) the undersigned noteholders pursuant to, and the holders of economic interest or economic rights relating to, (each in its capacity as such, together with their permitted successors and assigns, each, a "<u>Consenting First Lien Noteholder</u>") that certain Indenture, dated as of April 10, 2012, providing for the issuance of 11.5% Senior Secured Notes due 2020 (as further amended, modified, waived, or supplemented through the date hereof, the "<u>First Lien Indenture</u>"); (v) the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "<u>Committee</u>"); (vi) the undersigned noteholders (each in its capacity as such, together with their permitted successors and assigns, each, a "<u>Consenting Second Lien Noteholder</u>") pursuant to that certain Indenture dated July 5, 2012, providing for the issuance of 12.00% Senior Secured Second Lien Notes due 2019 (the "<u>Second Lien Indenture</u>"); (vii) CSC Trust Company of Delaware, as successor indenture trustee for the Second Lien Indenture (in such capacity, and together with its permitted successors and assigns, each, a "<u>Consenting Second Lien Trustee</u>"); (viii) the undersigned investment funds and accounts managed by Centerbridge Partners, L.P. ("<u>Centerbridge</u>") (together with its permitted successors and assigns, each, a "<u>Consenting Centerbridge Lender</u>"); (ix) the undersigned investment funds and accounts managed or advised by Apax Partners, L.P. ("<u>Apax</u>") (together with its permitted successors and assigns, each, a "<u>Consenting Apax Party</u>"), in their respective several (and not joint and several) capacities as holders of equity interests in the Debtors, lenders pursuant to the First Lien Credit Facility, noteholders pursuant to the First Lien Indenture, noteholders pursuant to the Second Lien Indenture, noteholders pursuant to the Senior Notes Indenture, and noteholders pursuant to that certain Indenture dated as of July 5, 2007, providing for the issuance of 13.25% Senior Subordinated Discount Notes due 2015, as applicable; (xi) Wilmington Trust, N.A., as successor trustee (in such capacity, and together with its permitted successors and assigns, the "<u>Consenting Senior Unsecured Notes Trustee</u>") pursuant to that certain indenture dated July 5, 2007, providing for the issuance of 10.50% Senior Notes due 2015 (the "<u>Senior Notes Indenture</u>"); and (x) Wells Fargo Bank National Association, as trustee (in such capacity, and together with its permitted successors and assigns, the "<u>Consenting PIK Notes Trustee</u>") pursuant to that certain indenture dated October 31, 2008, providing for the issuance of 13.75% Senior PIK Notes due 2015 (the "<u>PIK Notes Indenture</u>").  The Consenting Credit Agreement

Lenders, the Consenting First Lien Agent, the Consenting First Lien Noteholders, the Committee, the Consenting Second Lien Noteholders, the Consenting Second Lien Trustee, the Consenting Centerbridge Lenders, the Consenting Apax Parties, the Consenting Senior Unsecured Notes Trustee and the PIK Notes Trustee, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "Supporting Parties" and each a "Supporting Party." The Debtors and the Supporting Parties, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, are referred herein as the "Parties" and individually as a "Party."

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the plan term sheet attached hereto as Exhibit A, which term sheet and all annexes thereto are expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet, including all exhibits and annexes thereto, may be amended or modified in accordance with Section 7 hereof, the "Plan Term Sheet"), or if not defined therein, as defined in the Amended Plan.

## RECITALS

**WHEREAS**, subject to the terms hereof, the Parties have agreed to support a modified plan of reorganization that implements a settlement of various disputes, including, but not limited to, inter-creditor and inter-Debtor issues, in the Chapter 11 Cases pursuant to the terms and conditions set forth in accordance with this Agreement and in the Plan Term Sheet attached hereto as Exhibit A, which Plan Term Sheet is the product of extensive, arm's-length, good faith discussions between the Parties, including multiple mediation sessions held between and among the Parties and the Honorable Judge Robert D. Drain pursuant the *Order Appointing the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York to serve as Mediator in these Chapter 11 Cases* [Docket No. 518];

**WHEREAS**, prior to the Parties entering into this Agreement, the Debtors filed the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 780] (as amended, supplemented, or otherwise modified from time to time prior to the date of this Agreement, the "Existing Plan");

**WHEREAS**, on December 6, 2013, the Debtors distributed the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 782] (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement") to commence solicitation of votes on the Existing Plan;

**WHEREAS**, subject to the terms hereof, the Existing Plan will be modified to incorporate the terms provided in this Agreement and the Plan Term Sheet (the "Amended Plan");

**WHEREAS**, the modifications to the Existing Plan contemplated by the Plan Term Sheet and this Agreement will be implemented through the Amended Plan;

**WHEREAS**, the Debtors are prepared to perform their obligations hereunder subject to the terms and conditions hereof, including, among other things, seeking (a) Bankruptcy Court

approval of an order approving (i) the Debtors' entry into this Agreement and (ii) a modified Disclosure Statement pursuant to sections 1125 and 1126 of the Bankruptcy Code as soon as reasonably practicable (the "Approval Order") and (b) confirmation of the Amended Plan and approval of the settlements described therein in connection with the confirmation hearing (the "Confirmation Hearing");

WHEREAS, the Supporting Parties are prepared to perform their obligations hereunder subject to the terms and conditions of this Agreement, including, among other things, supporting the Amended Plan and working with the Debtors to obtain Bankruptcy Court approval of the Amended Plan and such settlements related thereto at the Confirmation Hearing;

WHEREAS, in expressing such support and commitment, the Supporting Parties recognize that certain undertakings contemplated by this Agreement are subject to the requirements of applicable bankruptcy law; and

WHEREAS, each Party has reviewed or has had the opportunity to review the Plan Term Sheet and each Supporting Party has agreed to support the Amended Plan pursuant to the terms set forth in the Plan Term Sheet and the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.     Agreement Effective Date; Conditions to Effectiveness.**

This Agreement shall be effective and binding (a) with respect to the Supporting Parties (other than the Committee) immediately upon obtaining the signatures from all Supporting Parties, and (b) with respect to each of the Debtors and the Committee, automatically upon entry of the Approval Order retroactively to the date of this Agreement; provided, however, that this Agreement shall be effective and binding upon each of the Debtors and/or the Committee to the extent permitted by applicable law immediately upon obtaining the signatures from all Parties (the "Effective Date"). The Debtors shall seek and obtain entry of the Approval Order pursuant to Sections 6.01(a) and 6.01(b) hereof. Upon the Effective Date of this Agreement, the Plan Term Sheet shall be deemed effective with respect to the respective Parties for the purposes of this Agreement, and thereafter the terms and conditions therein may only be amended, modified, waived, or otherwise supplemented as set forth in Section 7 herein.

**Section 2.     Plan Term Sheet.**

The Plan Term Sheet is expressly incorporated herein and is made part of this Agreement. The general terms and conditions of the modifications to the Existing Plan are set forth in the Plan Term Sheet; provided, however, the Plan Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the terms of

this Agreement and the Plan Term Sheet, the conflicting term of the Plan Term Sheet shall control and govern subject to the terms of Section 6.03.

## Section 3.    Amended Plan.

Each Party acknowledges and agrees that the terms and conditions expressly set forth in the Plan Term Sheet are acceptable in all respects. The Amended Plan and all other Definitive Documents (as defined herein) shall be on the terms set forth in the Existing Plan, subject to and as modified to be consistent with this Agreement and the Plan Term Sheet.

## Section 4.    Commitments Regarding the Amended Plan.

4.01.   <u>Agreement of the Supporting Parties</u>. Subject to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof by or as to a Supporting Party, each such Supporting Party, solely with respect to itself, as applicable, agrees to comply with the following covenants:

(a)   <u>Consummation of the Transaction</u>.

(i)   Each of the Supporting Parties hereby covenants and agrees to support confirmation of the Amended Plan pursuant to the terms set forth in the Existing Plan, subject to and as modified to be consistent with this Agreement and the Plan Term Sheet, including the solicitation, confirmation, and consummation of the Amended Plan, as may be applicable, and to the extent necessary, hereby directs and/or instructs any Prepetition Indenture Trustee, as applicable, to not take any actions inconsistent with this Agreement and/or the Plan Term Sheet;

(ii)   The Committee hereby covenants and agrees to (A) include in the supplemental solicitation package to be distributed upon entry of the Approval Order, a letter in support of confirmation, and (B) submit a statement to the Bankruptcy Court in support of confirmation;

(iii)   Each of the (A) Consenting Credit Agreement Lenders; (B) Consenting First Lien Noteholders; (C) Consenting Second Lien Noteholders; (D) Consenting Centerbridge Lenders; and (E) Consenting Apax Parties (collectively, the "<u>Consenting Holders</u>") hereby covenant and agree to (x) disclose in their respective signature pages attached hereto all claims, as such term is defined in section 101(5) of the Bankruptcy Code (including any subsequently acquired claims, each a "<u>Claim</u>" and collectively the "<u>Claims</u>") that it holds, controls, or has the ability to control, against the Debtors, which Claim amounts shall be redacted in any version of this Agreement distributed to the Supporting Parties, filed or otherwise made public and the Debtors shall keep such Claim amounts confidential, (y) subject to Section 4.01(b)(ii) hereof, timely vote or cause to be voted all such Claims that it holds, controls, or has the ability to control, to accept the Amended Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Amended Plan on a timely basis pursuant to the ongoing solicitation of votes in accordance with

4

sections 1125 and 1126 of the Bankruptcy Code; and (z) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that the vote of a Supporting Party shall be immediately revoked and deemed *void ab initio* upon termination of this Agreement as to such Supporting Party pursuant to the terms hereof; provided, further, however, that as used herein, Claims shall not include any Claim held in a fiduciary capacity or held by any other division, distinct business unit or trading desk of such Supporting Party (other than the division, business unit or trading desk expressly identified on the signature pages hereto) whose activities in connection with the administration of such Claim are separated from and not coordinated with such Supporting Parties' activities, unless and until such division, business unit or trading desk is or becomes a party to this Agreement;

(iv)     Each of the Supporting Parties hereby covenants and agrees (A) not to object to, or vote or cause to be voted (to the extent applicable) any of its Claims that it holds, controls, or has the ability to control, to reject the Amended Plan, or (B) otherwise commence any proceeding to oppose the Amended Plan or object to confirmation thereof;

(v)     Each of the Supporting Parties hereby covenants and agrees to not directly or indirectly (A) seek, solicit, support, encourage, or vote or cause to be voted (to the extent applicable) its Claims for, consent to, or encourage any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Debtors other than the Amended Plan, or (B) take any other action, including by directing or instructing any Prepetition Indenture Trustee, that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Amended Plan; and

(vi)     Each of the Supporting Parties hereby covenants and agrees that as of the Effective Date of this Agreement, it will take all actions necessary to effectuate the agreement among all Parties that (A) all pending investigation, discovery, litigation, and contested matters by and among the Supporting Parties and/or by and among any of the Supporting Parties and the Debtors, including any pending adversary proceedings and contested matters and, subject to Section 4.01(c)(c)(ii) herein, the investigation deadlines set forth in paragraph 3 of the *Order Amending Final Order Authorizing the Use of Cash Collateral and Granting Adequate Protection to Prepetition Secured Parties* [Docket No. 591] (as further amended, the "Cash Collateral Amendment Order"), shall be stayed and all deadlines with respect to the foregoing, shall be tolled for all purposes pending the earlier of (i) the termination of this Agreement in accordance with the provisions hereof and/or (ii) the consummation of the Amended Plan; and (B) all ongoing litigation, including any pending adversary proceedings, by and among the Supporting Parties and/or by and among any of the Supporting Parties and the Debtors related to the Existing Plan, the Amended Plan, and/or the Debtors and the Chapter 11 Cases shall be dismissed with prejudice upon the effective date of

the Amended Plan (the "Plan Effective Date"); provided, however, that nothing in this Section 4.01(a)(iv) shall apply to pending litigation between any Party and any non-Party and pending discovery in connection therewith.

provided, however, that, this Agreement, including the foregoing provisions of this Section 4.01(a) will not (A) limit the rights of the Supporting Parties to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, the Plan Term Sheet, or the terms of the proposed Amended Plan, and, other than as a result of actions or omissions any such Supporting Party takes or does not take in good faith to enforce its rights under this Agreement, the Plan Term Sheet, or the terms of the proposed Amended Plan, do not hinder, delay or prevent consummation of the proposed Amended Plan; (B) prohibit the Supporting Parties from appearing in proceedings for the purpose of contesting whether any matter or fact is or results in a breach of, or is inconsistent with, this Agreement (so long as such appearance is not for the purpose of hindering or intending to hinder, the Amended Plan) or for the purpose of taking such action as may be necessary in the discretion of such Supporting Party to protect such Supporting Party's interests upon such breach; provided, further that the Parties hereby reserve their rights to oppose such relief; provided, further that except as expressly provided herein, this Agreement and all communications and negotiations among the Supporting Parties with respect hereto or any of the transactions contemplated hereunder are without waiver or prejudice to the Supporting Parties' rights and remedies and the Supporting Parties hereby reserve all claims, defenses and positions that they may have with respect to each other and/or the Debtors in the event the Amended Plan is not consummated or this Agreement terminates; and (C) limit the ability of a Supporting Party to sell or enter into any transactions in connection with the Claims or any other claims against or interests in the Debtors, subject to the terms of Section 4.01(b) hereof.

Notwithstanding the foregoing, nothing in this Agreement shall prevent the Committee from taking or failing to take any action that it is obligated to take in the performance of its statutory or fiduciary duties or as otherwise required by the Bankruptcy Code or applicable law; provided, however that it is agreed any such actions that result in a Termination Event shall be subject to the provisions of Sections 6.01 and 6.03 hereof. The Committee represents to each Supporting Party (without giving consideration or effect to the immediately preceding sentence) that as of the Effective Date of this Agreement, the Committee's entry into this Agreement is consistent with the Committee's fiduciary duties based upon the facts and circumstances actually known by the Committee as of the Effective Date of this Agreement.

Notwithstanding anything to the contrary contained herein or the Plan Term Sheet, if the respective noteholders direct either the Consenting Second Lien Trustee, Consenting Senior Unsecured Notes Trustee or the Consenting PIK Notes Trustee to take other action in these Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with such Trustees' agreement hereunder, then the Consenting Second Lien Trustee, the Consenting Senior Unsecured Notes Trustee or the Consenting PIK Notes Trustee, as the case may be, shall be entitled (but not required), upon the giving of prompt notice to the

other Parties hereto (a "Direction Notice"), to follow the direction of such noteholders, and, upon the provision of a Direction Notice by any Trustee, such Trustee (i) shall no longer be bound by the terms of this Agreement and the Plan Term Sheet, (ii) shall no longer be entitled to the benefits thereunder, including the provisions regarding (x) "Payment of Certain Non-Estate Professional Fees" and (y) Release, Exculpation and Indemnification, (iii) solely with respect to the holders of PIK Notes Claims, the provision of a Direction Notice shall be deemed a waiver of any distribution under the Amended Plan, and (iv) shall be entitled to object to and otherwise oppose the Amended Plan and take any other action in these Chapter 11 Cases as if they had not entered into this Agreement; provided, that, notwithstanding the foregoing, to the extent any such actions taken by the Consenting Second Lien Trustee, Consenting Senior Unsecured Notes Trustee, or the PIK Notes Trustee would have resulted in a Termination Event to the extent such Party were still a party to this Agreement, such actions shall be deemed a Termination Event hereunder pursuant to Section 6.01 hereof.  For the avoidance of doubt, notwithstanding the foregoing, the Consenting Second Lien Trustee, the Consenting Senior Unsecured Notes Trustee, or the Consenting PIK Notes Trustee shall retain all rights to assert their charging lien under the applicable trust documents.

(b)     Transfers of Securities and Interests.

(i)     Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Supporting Party (to the extent applicable) to sell, use, assign, transfer, encumber, pledge or otherwise dispose of ("Transfer") any of its Claims; provided, however, that for the period commencing as of the date such Supporting Party executes this Agreement until termination of this Agreement, no Supporting Party shall Transfer any Claims or rights with respect to its Claims and any purported Transfer of any Claims or rights with respect to such Claims shall be void and without effect, unless (A) the transferee is a Supporting Party or (B) if the transferee is not a Supporting Party, at or prior to closing of the Transfer, such transferee delivers to the Debtors, at or prior to the time of the proposed Transfer, an executed copy of a transfer and joinder agreement substantially in the form of Exhibit B  attached hereto (the "Transfer and Joinder Agreement") pursuant to which such transferee shall assume and agree to comply with all obligations of a Supporting Party hereunder (such transferee, if any, to also become a Supporting Party hereunder).  For the avoidance of doubt, all Claims held or controlled by any Supporting Party, regardless of whether acquired before or after the date of this Agreement shall be subject to, and shall be treated in accordance with, the terms of this Agreement. Any Transfer that does not comply with the foregoing shall be deemed void ab initio.  This Agreement shall in no way be construed to preclude the Supporting Parties from acquiring additional Claims; provided, that such additional Claims are required to be treated in accordance with the terms of this Agreement.  The Consenting First Lien Agent shall have no obligation to track whether any First Lien Claims (as defined in the Existing Plan) are subject to the terms hereof.

(ii)     Notwithstanding anything herein to the contrary, (A) any Supporting Party may transfer (by purchase, sale, assignment, participation or

otherwise) any right, title or interest in such Claims against the Debtors to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become a Supporting Party, provided that the Qualified Marketmaker subsequently transfers (by purchase, sale, assignment, participation or otherwise) the right, title or interest in such Claims against the Debtors to a transferee that is or becomes a Supporting Party by executing a Transfer and Joinder Agreement to the extent required by Section 4.01(b)(i), and (B) to the extent that a Supporting Party is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in such Claims against the Debtors that the Qualified Marketmaker acquires from a holder of the Claims who is not a Supporting Party without the requirement that the transferee be or become a Supporting Party. To the extent a Supporting Party transfers its rights, title, or interest in Claims to an entity that it believes, in good faith, is a Qualified Marketmaker, and such Qualified Marketmaker subsequently transfers the right title or interest in such Claims to a transferee that is not and does not become a Supporting Party, the Supporting Party that transferred its rights, title, or interest in Claims to the Qualified Marketmaker shall not be held liable for any claims or causes of action or subject to any remedies arising under this Agreement (including pursuant to Section 9.15 herein) relating to such transfer, provided that such Supporting Party requests that such Claims shall be transferred in accordance with this Section 4.01(b)(ii).

(iii)    For these purposes, a "Qualified Marketmaker" means an entity that (A) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (B) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)    Extension of Plan Exclusivity and Use of Cash Collateral.

(i)    Unless this Agreement is terminated pursuant to the terms hereof, to the extent necessary to consummate the Amended Plan, the Supporting Parties covenant and agree, severally and not jointly, to not directly or indirectly (A) challenge the Debtors' request for an extension of (x) the exclusive periods to solicit votes on and confirm a plan of reorganization, or (y) the periods set forth in paragraphs 1 and 2 of the Cash Collateral Amendment Order; or (B) take any other action that would interfere with the Debtors' exclusivity or consensual use of cash collateral on the same terms and conditions set forth in the *Final Order Authorizing the Use of Cash Collateral and Granting Adequate Protection to Prepetition Secured Parties* [Docket No. 303] (the "Cash Collateral Order"), as amended by the Cash Collateral Amendment Order, such that it would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Amended Plan.

(ii) To the extent necessary to consummate the Amended Plan, the Supporting Parties covenant and agree that (A) that the dates set forth in paragraphs 1 and 2 of the Collateral Amendment Order shall be hereby extended until the earlier of (x) five (5) days after receipt by the Parties of notice of a Termination Event and (y) the Plan Effective Date, and (B) that the investigation termination deadlines as set forth in paragraph 3 of the Cash Collateral Amendment Order shall be extended as follows: (x) deadline to seek standing to assert certain challenges or claims to the date that is twenty-one (21) days after receipt by the Parties of notice of a Termination Event; (y) deadline by which the Committee must have been granted standing to the date that is forty (40) days after receipt by the Parties of notice of a Termination Event; and (z) the Investigation Termination Date (as defined in the Cash Collateral Order) to the date that is two (2) days after entry of an order regarding standing; provided however, that nothing in the Agreement shall restrict or limit or be deemed to restrict or limit the Committee's ability to seek additional extensions as provided under the Cash Collateral Order and the Cash Collateral Amendment Order.

4.02. Obligations of the Debtors.

(a) Affirmative Covenants. Subject to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Debtors covenant and agree to:

(i) Complete the revisions and preparation, of the Amended Plan and any related documents, distribute such documents concurrently to the Supporting Parties, and afford reasonable opportunity to comment and review to the respective legal and financial advisors for the Supporting Parties in advance of any filing thereof;

(ii) (A) Support and take all actions reasonably necessary or requested by the Supporting Parties to facilitate the solicitation, confirmation, and consummation of the Amended Plan; (B) not take any action or commence or continue any proceeding that is inconsistent with, or that would delay or impede the solicitation, confirmation, or consummation of the Amended Plan; and (C) support the payment, release, exculpation, and injunction provisions set forth in the Plan Term Sheet and the Amended Plan;

(iii) Operate its business in the ordinary course, including, but not limited to, maintaining its accounting methods, using its commercially reasonable efforts to preserve its assets and its business relationships, continuing to operate its billing and collection procedures, using its commercially reasonable efforts to retain key employees, and maintaining its business records in accordance with its past practices;

(iv) Timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers to operate the Debtors'

businesses pursuant to section 1104 of the Bankruptcy Code or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases; or (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(v)     As of the date of this Agreement, take all actions necessary to effectuate the agreement among all Parties that (A) all pending investigations, discovery, and litigation, including any pending adversary proceedings and contested matters, by and among the Supporting Parties and/or by and among any of the Supporting Parties and the Debtors, shall be stayed and all deadlines, including, subject to Section 4.01(c)(ii) herein, all investigation termination deadlines set forth in paragraph 3 of the Cash Collateral Amendment Order, with respect to the foregoing, shall be tolled for all purposes pending the earlier of the termination of this Agreement in accordance with the provisions hereof and the consummation of the Amended Plan; and (B) all ongoing litigation, including any pending adversary proceedings, by and among the Supporting Parties and/or by and among any of the Supporting Parties and the Debtors related to the Existing Plan, the Amended Plan, and/or the Debtors and the Chapter 11 Cases shall be dismissed with prejudice upon the Plan Effective Date; provided, however, that nothing in this Section 4.02(a)(v) shall apply to pending litigation between a Party and a non-Party and pending discovery in connection therewith;

(vi)     If the Debtors know or should know of a breach by any Debtor in any respect of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Supporting Parties; and

(vii)     Promptly reconcile, challenge, object or otherwise resolve material, disputed or contingent General Unsecured Claims or General Unsecured Claims in excess of $1 million and not settle or compromise any such General Unsecured Claims without the consent of the Committee, which consent will not be unreasonably withheld.

(b)     Negative Covenants.  Subject to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Debtors shall not, directly or indirectly, permit to occur any of the following:

(i)     Modify the Amended Plan, in whole or in part, in a manner that is materially inconsistent with the Exiting Plan, subject to and as modified to be consistent with this Agreement or the Plan Term Sheet;

(ii)     Take any action that is materially inconsistent with this Agreement or the Plan Term Sheet, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Revised Plan;

(iii)    Withdraw or revoke the Amended Plan or publicly announce its intention not to pursue the Amended Plan;

(iv)    Split, combine, or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property, or otherwise with respect to any of its equity interests;

(v)    Redeem, purchase, or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests, or partnership interests; or

(vi)    Acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets, or otherwise) (A) any corporation, partnership, limited liability company, joint venture, or other business organization or division or (B) the Debtors' assets other than in the ordinary course of business.

Notwithstanding anything in this Section 4.02, nothing in this Agreement shall prevent any of the Debtors from taking or failing to take any action that it is obligated to take (or not take, as the case may be) in the performance of any fiduciary duty or as otherwise required by applicable law which such Debtor owes to any other person or entity under applicable law, provided, that it is agreed that any such action that results in a Termination Event hereunder shall be subject to the provisions set forth in Sections 6.01 and 6.03 hereto.  Each of the Debtors represents to the Supporting Parties (without giving consideration or effect to the immediately preceding sentence) that as of the Effective Date of this Agreement, based on the facts and circumstances actually known by the Debtors as of the Effective Date of this Agreement, the Debtors' entry into this Agreement is consistent with all of the fiduciary duties of each of the Debtors.

4.03.    <u>Definitive Documents</u>.

Each Party hereby covenants and agrees, severally and not jointly, to (A) negotiate in good faith each of the documents implementing, achieving and relating to the Amended Plan, including without limitation, (x) the Amended Plan, any amended disclosure statement and solicitation materials related thereto, and the Approval Order (y) the Plan Supplement, and (z) the proposed order approving and confirming the Amended Plan, including the settlements described therein (the "<u>Confirmation Order</u>") (x) through (z), (collectively, the "<u>Definitive Documents</u>"), which Definitive Documents shall contain terms and conditions consistent in all respects with the Existing Plan, subject to and as modified to be consistent with the Plan Term Sheet and this Agreement, and (B) execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents.  All Parties shall have the right to review and comment on the Definitive Documents, and such Definitive Documents shall be reasonably acceptable to the Parties in form and substance prior to filing with the Bankruptcy Court or otherwise approved by the Bankruptcy Court after filing if any Party shall have unreasonably withheld its acceptance; provided, however, that notwithstanding the foregoing, the (a) the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code, (b) the form

of the Exit Revolver Facility Documents, (c) the form of the New Debt Facility Documents, (d) the New Corporate Governance Documents, (e) the management employment agreements, as amended, and (f) the Management Incentive Plan, need only be reasonably acceptable to the Debtors and the "Required Consenting Lenders" (as such term is defined in the Existing Plan); provided, however, that the Shareholders Agreement and the other New Corporate Governance Documents shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity.

In no event shall the Amended Plan or the Definitive Documents decrease directly, or indirectly, the Other Unsecured Creditor Distribution or the economic treatment of the Second Lien Notes, Senior Notes, the PIK Notes or Holders of General Unsecured Claims provided for under the Plan Term Sheet.

4.04.    Investment Manager Limitation.

The obligations of any Consenting Credit Agreement Lender, Consenting First Lien Noteholder, Consenting Second Lien Noteholder, Consenting Centerbridge Lender and/or Consenting Apax Party in this Agreement are limited to, in the case of investment advisors, the Claims controlled by such investment manager in the funds or accounts it manages.

## Section 5.    Representations and Warranties.

5.01.    Mutual Representations and Warranties. Subject to Section 4.04 hereof, each of the Parties, severally (and not jointly), represents, warrants, and covenants to each other Party (to the extent applicable), as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

(a)    It is validly existing and in good standing under the laws of the state or other jurisdiction of its organization or under the Bankruptcy Code, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws;

(b)    Except as expressly provided in this Agreement, it has all requisite direct or indirect power and authority to enter into this Agreement and to carry out the Amended Plan contemplated by, and perform its respective obligations under, this Agreement;

(c)    The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part and no consent, approval or action of, filing with or notice to any governmental or regulatory authority is required in connection with the execution, delivery and performance of this Agreement; and

(d)    It has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof.

**Section 6.**         **Termination Events.**

      6.01.   <u>Supporting Party Termination Events</u>.   Any Supporting Party may terminate its obligations and liabilities under this Agreement upon three (3) business days prior written notice delivered to the Parties identified in Section 9.11 and in accordance with Section 9.11 hereof, upon the occurrence and continuation of any of the following events (each, a "<u>Supporting Party Termination Event</u>"):

          (a)    the Debtors do not file a motion with Bankruptcy Court seeking entry of approval of the Approval Order in accordance with the terms of Section 4.03, on or before February 7, 2014;

          (b)    the Bankruptcy Court fails to enter an order approving the Approval Order on or before February 21, 2014, which shall provide for a 25 calendar day solicitation period;

          (c)    the Debtors do not file the Amended Plan in accordance with the terms of Section 4.03, on or before February 7, 2014;

          (d)    the Bankruptcy Court (i) enters an order denying confirmation of the Amended Plan, or (ii) fails to enter the Confirmation Order in accordance with the terms of Section 4.03, approving the Amended Plan on or before March 14, 2014;

          (e)    the Plan Effective Date shall not have occurred by March 31, 2014;

          (f)    the breach or noncompliance in any respect by any of the Debtors or Supporting Parties of (or failure to satisfy) any of the obligations, representations, warranties, or covenants of such Party set forth in this Agreement (including, without limitation, in Sections 4.01, 4.02, and 4.03 hereto) that remains uncured for five (5) business days after the receipt by the breaching Party of written notice of such breach, but solely to the extent such breach or noncompliance is materially adverse to such Supporting Party or materially affects the ability of the Debtors or the Supporting Parties from consummating the transactions contemplated herein;

          (g)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Amended Plan in a way that cannot be reasonably remedied by the Debtors or would have a material adverse effect on consummation of the Amended Plan;

          (h)    the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases;

          (i)    the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

          (j)    exercise by any of the Debtors of its "fiduciary out" as debtors-in-possession as provided for in Section 4.02 and 9.10 of this Agreement; and

(k)     exercise by the Committee of their "fiduciary out" as provided for in Section 4.01 and Section 9.10 hereof.

6.02.   <u>Debtors Termination Events</u>.  The Debtors may terminate their obligations and liabilities under this Agreement upon three (3) business days prior written notice delivered to the Parties identified in Section 9.11 in accordance with Section 9.11 hereof, upon the occurrence of any of the following events (each, a "<u>Debtor Termination Event</u>" and together with the Supporting Party Termination Events, the "<u>Termination Events</u>," and each a "<u>Termination Event</u>"):

(a)     the material breach by any of the Supporting Parties of any of the obligations, representations, warranties, or covenants of such Supporting Parties set forth in this Agreement that would have a material adverse impact on the consummation of the Amended Plan (taken as a whole) that remains uncured for a period of five business days after the receipt by the breaching Supporting Parties of written notice of such breach from the Debtors;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would have a material adverse impact on the consummation of the Amended Plan (taken as a whole); or

(c)     any one or more of the Debtors' determination that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of their fiduciary duties.

6.03.   <u>Effect of Termination</u>.

(a)     Upon any termination of this Agreement by any Party under Section 6.01 or 6.02, (i) this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and the Plan Term Sheet, including without limitation, any obligation of the terminating Supporting Party, to support, consent, vote for, agree to or not object to any provision in the Plan Term Sheet or the Amended Plan, to waive, release, or limit any of such Supporting Party's Claims against the Debtors, the Reorganized Debtors, or any other entity or person, and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Amended Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement, and any tolling pursuant to Section 4.01(a)(vi) and Section 4.02(a)(v) shall cease, and (ii) any and all consents and ballots tendered by the Supporting Parties prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Amended Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Debtors allowing such change or resubmission); <u>provided</u>, <u>however</u>, that the agreements and obligations of the Parties in Sections 9.10 and 9.22 of this Agreement shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.  Notwithstanding the foregoing, any claim for breach of this Agreement that accrued

prior to the date of a Party's termination or termination of this Agreement (as the case may be) and all rights and remedies of the Parties hereto shall not be prejudiced as a result of termination.

(b)     Notwithstanding any provision in this Agreement to the contrary, no Party shall terminate this Agreement if such party (in any capacity that is Party to this Agreement) is in breach of any provision hereof.

(c)     Notwithstanding any provision in this Agreement to the contrary, the non-breaching Supporting Parties and the Debtors may each agree to continue to be bound by the terms of this Agreement notwithstanding such breach.  The Debtors reserve all of their rights to seek to designate the vote of any breaching Supporting Party.

6.04.   <u>Termination Upon Consummation of the Amended Plan</u>. This Agreement shall terminate automatically without any further required action or notice upon the consummation of the Amended Plan.

## Section 7.     Amendments.

This Agreement, the Amended Plan, the Definitive Documents and the Plan Term Sheet or any annexes thereto may not be modified, amended, or supplemented, nor may any terms and conditions hereof or thereof be waived, without the prior written agreement signed by each of the Debtors and each of the Supporting Parties.

## Section 8.     No Solicitation.

Notwithstanding anything to the contrary herein, this Agreement is not and shall not be deemed to be (a) a solicitation of consents to the Amended Plan or any chapter 11 plan or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act and the Securities Exchange Act of 1934, as amended.

## Section 9.     Miscellaneous.

9.01.   Resolution of Disputes.  Any pre-Effective Date (as such term is defined in the Existing Plan) disputes in any way relating to this Agreement, the Amended Plan, the Definitive Documents and/or the Plan Term Sheet or any annexes thereto shall be resolved by Judge Drain.

9.02.   <u>Further Assurances</u>. Subject to the other terms hereof, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Amended Plan in a manner consistent with the terms set forth in the Plan Term Sheet, as applicable, and in accordance with this Agreement, including Section 4.03 hereof.

9.03.   <u>Complete Agreement</u>.  This Agreement, exhibits and the annexes hereto, including the Plan Term Sheet, represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between the Parties with respect thereto.  No claim of waiver, consent, or acquiescence with respect to any provision of this Agreement, exhibits and annexes hereto, including the Plan Term Sheet,  shall be made

against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

9.04.  Parties.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 4.01(b) hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

9.05.  Headings.  The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

9.06.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court, and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court, and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto. Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

9.07.  Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

9.08.  Interpretation.  This Agreement is the product of negotiations between the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

9.09.  Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

9.10.  Acknowledgements.  Notwithstanding anything herein to the contrary, (a) this Agreement shall not be construed to limit the Debtors or any member of the Debtors' boards of directors' exercise (in their sole discretion) of their fiduciary duties to any person or entities, including but not limited to those arising from the Debtors' status as a debtor or debtor in

possession under the Bankruptcy Code or under other applicable law; (b) this Agreement shall not be construed to limit the Committee's and each of its member's exercise (in their sole discretion) of their fiduciary duties to any person or entities arising from their service on the Committee; and (c) none of the Consenting Credit Agreement Lenders, Consenting First Lien Noteholders, Consenting Second Lien Noteholders, Consenting Centerbridge Lenders, or Consenting Apax Parties shall (i) have any fiduciary duty or (ii) other duties or responsibilities to each other, the Debtors or any of the Debtors' creditors or other stakeholders, except as expressly provided herein or in the Plan Term Sheet.

9.11.   _Notices_. All notices hereunder shall be deemed given if in writing and delivered, if sent by hand delivery, electronic mail, courier, or overnight delivery (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)   if to the Debtors, to:

Cengage Learning
200 First Stamford Place, 4th Floor
Stamford, Connecticut 06902
Attention:  Kenneth A. Carson, General Counsel

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Jonathan S. Henes, Christopher J. Marcus,
          and Christopher T. Greco
E-mail addresses: jonathan.henes@kirkland.com,
              christopher.marcus@kirkland.com,
              christopher.greco@kirkland.com
-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Ross M. Kwasteniet and William A. Guerrieri
E-mail addresses: ross.kwasteniet@kirkland.com,
              will.guerrieri@kirkland.com

(b)   if to a Consenting Credit Agreement Lender, Consenting First Lien Noteholder, or a transferee thereof, the address set forth below following the Consenting Credit Agreement Lender and Consenting First Lien Noteholder's signature (or as directed by any transferee thereof), as the case may be.

with copies to:

Milbank, Tweed, Hadley & McCloy LLP

One Chase Manhattan Plaza
New York, New York 10005
Attention: Gregory A. Bray
        Dennis Dunne
        Mark Shinderman
        Lauren Doyle
E-mail address: gbray@milbank.com,
        ddunne@milbank.com,
        mshinderman@milbank.com,
        ldoyle@milbank.com

(c)     if to the Consenting First Lien Agent, or a transferee thereof, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10024
Attn: Damian S. Schaible
Darren S. Klein
E-mail address: damian.schaible@davispolk.com,
        darren.klein@davispolk.com

(d)     if to the Committee, to:

Arent Fox LLP
1675 Broadway
New York, New York 10019
Attention: Andrew I. Silfen
        Mark Joachim
E-mail address: andrew.silfen@arentfox.com
        mark.joachim@arentfox.com

(e)     if to a Consenting Second Lien Noteholder, or a transferee thereof, the address set forth below following the Consenting Second Lien Noteholder's signature (or as directed by any transferee thereof), as the case may be:

with copies to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Ira Dizengoff
        Philip Dublin
E-mail address: idizengoff@akingump.com
        pdublin@akingump.com

(f)     if to the Consenting Second Lien Trustee, or a transferee thereof, to:

        Ropes & Gray LLP
        1211 Avenue of the Americas
        New York, New York 10036
        Attention: Mark R. Somerstein
        E-mail address: mark.somerstein@ropesgray.com

        -and-

        Akin Gump Strauss Hauer & Feld LLP
        One Bryant Park
        New York, New York 10036
        Attention: Ira Dizengoff
                Philip Dublin
        E-mail address: idizengoff@akingump.com
                pdublin@akingump.com

(g)     if to a Consenting Centerbridge Lender or a transferee thereof, to:

        Jones Day
        222 E 41st Street
        New York, New York 10017
        Attention: Lisa Laukitis
        E-mail address: llaukitis@jonesday.com

(h)     if to a Consenting Apax Party or a transferee thereof, to the address set forth below following the Consenting Apax Party's signature (or as directed by any transferee thereof), as the case may be.

        with copies to:

        Simpson Thacher & Bartlett LLP
        425 Lexington Avenue
        New York, New York 10017
        Attention: Peter Pantaleo
        E-mail address: ppantaleo@stblaw.com

(i)     if to the Consenting Senior Unsecured Notes Trustee or a transferee thereof, to:

        Kilpatrick Townsend & Stockton LLP
        1100 Peachtree Street, NE, Suite 2800
        Atlanta, Georgia 30309
        Attention: Todd Meyers

E-mail address: tmeyers@kilpatricktownsend.com

(j)     if to the Consenting PIK Notes Trustee or a transferee thereof, to:

Loeb & Loeb LLP
345 Park Avenue
New York, New York 10154
Attn: Walter H. Curchack
E-mail address: wcurchack@loeb.com

Any notice given by hand delivery, electronic mail, mail, or courier shall be effective when received.

9.12.   <u>Waiver</u>. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Supporting Party or the ability of each of the Supporting Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its Claims against or interests in the Debtors.  If the Amended Plan is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

9.13.   <u>No Modification</u>. For the avoidance of doubt, no provision of this Plan Support Agreement or the Plan Term Sheet shall be deemed to modify or amend any provision of the First Lien Credit Facility, including without limitation section 10.04 thereof or any of the Consenting First Lien Agent's rights and obligations thereunder.

9.14.   <u>Several, Not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.  It is understood and agreed that any Supporting Party, to the extent applicable, may trade in its Claims or other debt or equity securities of the Debtors without the consent of the Debtors, subject to applicable laws, if any, Section 4.01(b) hereof, and the First Lien Credit Facility, First Lien Indenture, Second Lien Indenture, Unsecured Notes Indenture and PIK Notes Indenture (as each may be applicable).

9.15.   <u>Remedies</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

9.16.   <u>Specific Performance</u>. This Agreement is intended as a binding commitment enforceable in accordance with its terms against the Parties. It is understood and agreed by each of the Parties that money damages would not be a sufficient remedy for any breach of this

Agreement by any Party, and each non-breaching Party shall be entitled solely to specific performance and injunctive or other equitable relief as a remedy of any such breach.

9.17.   No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

9.18.   Automatic Stay. The Parties acknowledge that the giving of notice or termination by any Party pursuant to this Agreement shall not be violation of the automatic stay of section 362 of the Bankruptcy Code.

9.19.   Survival of Agreement.  Each of the Parties acknowledges and agrees that (a) the rights granted in this Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court, and (b) the Debtors waive any rights to assert that the exercise of such rights violate the automatic stay, or any other provisions of the Bankruptcy Code.

9.20.   Settlement Discussions.  This Agreement and the Plan Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, the Absolute Mediation Privilege, and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

9.21.   Consideration.  The Parties hereby acknowledge that no consideration, other than that specifically described herein, the Plan Documents and Term Sheet shall be due or paid to any Party for its agreement to vote to accept the Amended Plan in accordance with the terms and conditions of this Agreement.

9.22.   Publicity.  The Debtors shall not (a) use the name of any Consenting Holder (or any of its controlled affiliates, officers, directors, trustees, managers, stockholders, members, employees, partners, representatives or agents, in such capacity) in any press release or filing without such Consenting Holder's prior written consent or (b) disclose to any person or entity, other than legal, accounting, financial and other advisors to the Parties hereto who are under confidentiality obligations, the principal amount or percentage of Claims held by any Consenting Holder or any of its respective subsidiaries or affiliates; provided, however, that the Debtors shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Claims held by the Consenting Holders in the aggregate.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Debtors and any Consenting Holder.

*[Signatures on Following Page]*

**<u>Exhibit A</u>**

**Plan Term Sheet**

## CENGAGE LEARNING HOLDINGS II L.P., ET AL.

## PLAN TERM SHEET

### February 1, 2014

THIS TERM SHEET (THE "**TERM SHEET**") DESCRIBES THE PRINCIPAL TERMS AGREED TO BY AND AMONG (I) CENGAGE LEARNING HOLDINGS II, L.P. ("**CL HOLDINGS**"); CENGAGE LEARNING HOLDCO, INC. ("**CL HOLDCO**"); CENGAGE LEARNING ACQUISITIONS, INC. ("**CLAI**"); AND CENGAGE LEARNING, INC. ("**CLI**"), AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, THE **DEBTORS**") IN THE CHAPTER 11 CASES PENDING IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK (THE "**BANKRUPTCY COURT**") CAPTIONED *IN RE CENGAGE LEARNING, INC., ET AL., CASE NO. 13-44106 (ESS)* (BANKR. E.D.N.Y. 2013) (THE "**CHAPTER 11 CASES**") AND (II) THE SUPPORTING PARTIES (AS DEFINED IN THE PLAN SUPPORT AGREEMENT) MODIFYING THE *DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 780] (THE "**EXISTING PLAN**").[1]

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET CONTAINS A SERIES OF ASSUMPTIONS, COMPROMISES AND SETTLEMENTS OF ISSUES AND DISPUTES THAT WILL BE RESOLVED IN CONNECTION WITH CONFIRMATION OF A CHAPTER 11 PLAN. IN THE EVENT THE CHAPTER 11 PLAN CONTEMPLATED UNDER THIS TERM SHEET IS NOT CONFIRMED OR DOES NOT BECOME EFFECTIVE, NOTHING HEREIN SHALL BE CONSTRUED AS AN ADMISSION OF OR THE POSITIONS OF THE PARTIES WITH RESPECT TO THESE ISSUES OR DISPUTES. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE, THE ABSOLUTE MEDIATION PRIVILEGE, AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROHIBITING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Existing Plan.

| **OVERVIEW** | |
|---|---|
| **Summary** | Certain Holders of Claims (including certain Holders of economic interests or economic rights with respect to such Claims), representatives of Holders of certain Claims, the First Lien Credit Facility Administrative Agent, the Second Lien Indenture Trustee, the Senior Notes Indenture Trustee, the PIK Notes Indenture Trustee, Apax (all provisions hereof applicable to "Apax" in a given capacity shall also be deemed binding on, applicable to, and/or for the benefit of, the successors of, transferees of, and assigns of Apax in such capacity), the Debtors, and the Committee shall have executed the plan support agreement to which this Term Sheet is attached (the "**Global PSA**") pursuant to which (a) the parties to the Global PSA have agreed to a good faith compromise and settlement of various issues and disputes, including the Disputed Issues, and (b) the Debtors will modify and amend the Existing Plan to implement the terms contained herein and implement a restructuring process consistent with the Existing Plan, except as modified to be consistent with this Term Sheet, including to remove the Disputed Unsecured Escrow, in order to consummate a plan of reorganization (the "**Amended Plan**") that the Debtors will seek to have confirmed pursuant to sections 1123 and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019. <br><br> This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are contained in the Existing Plan and to be contained in the Amended Plan and the documents necessary to give effect to the terms of the Amended Plan, including without limitation, the documents of the Plan Supplement (the "**Definitive Documents**").  The Definitive Documents, including the supplement to the Disclosure Statement, all Plan Supplement documents, all motions, and related orders and the plan solicitation documents shall satisfy the requirements of the Bankruptcy Code and be consistent in all respects with the Existing Plan except as modified to be consistent with the Global PSA and this Term Sheet. Consent and consultation rights with respect to the Definitive Documents shall be as set forth in the Global PSA and to the extent inconsistent with the Existing Plan shall be deemed to modify the Existing Plan. |
| **Total Enterprise Value** | $3.6 billion for all purposes. |
| **Treatment of Second Lien Claims, Senior Notes Claims, and General Unsecured** | Holders of Allowed Second Lien Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims (other than Intercompany Claims as set forth herein) shall receive in full and final satisfaction of their Claims the following (the "**Other** |

| Claims | **Unsecured Creditor Distribution**"): |
|---|---|
| | (1) On the Effective Date, New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election of each Holder, which election shall be made pursuant to an amended Ballot) in an aggregate amount of $225 million, subject to the following terms: |
| | (a) the calculation of the value of New Equity for the purpose of such distribution shall be based on a $3.6 billion total enterprise value for the Reorganized Debtors less the amount of the New Debt Facility (which shall be in an amount between $1.5 billion and $1.75 billion as set forth in the Existing Plan) plus Available Cash[2] less Distributable Cash;[3] |
| | (b) an election of New Equity shall only be permitted if after giving effect to the election such Holder (on the Effective Date) would not have more than 14.9% of the New Equity first taking into account other New Equity such Holder would receive under the Plan (the "Equity Election Cap") and any amounts exceeding the Equity Election Cap as a result of such election will be paid in Cash); and |
| | (c) notwithstanding any election to receive New Equity instead of Cash by a Holder of a General Unsecured Claim, to the extent determined by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Committee, to be necessary to ensure that the total number of recipients of New Equity pursuant to the Plan does not cause the Reorganized Debtors to become subject to the reporting requirements of the Securities Exchange Act of 1934 (the "**Reporting Requirements**"), the Debtors or the Reorganized Debtors, as applicable, shall be permitted to make Cash distributions to Holders of General Unsecured Claims that elected to receive New Equity to the extent necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements, which Cash distribution shall start with the smallest Allowed |

---

[2]   "**Available Cash**" means any Cash remaining on any of the Debtors' balance sheets as of the Effective Date after funding all payments and reserves required under the Plan (other than distributions on account of principal and interest to the Holders of First Lien Claims), including the Other Unsecured Creditor Distribution (for the avoidance of doubt, any cash not distributed to the Holders of Other Unsecured Claims should be included in Available Cash).

[3]   "**Distributable Cash**" means Available Cash less an amount agreed to by the Debtors and the Required Consenting Lenders, in consultation with the Supporting Parties, which amount agreed to by the Debtors and the Required Consenting Lenders, in consultation with the Supporting Parties, shall be between $50 million and $175 million and shall be set forth in the Plan Supplement.

General Unsecured Claim that elected to receive New Equity and will proceed in ascending size of Allowed General Unsecured Claims as necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements.

and

(2) an aggregate of $12.0 million of Cash from the first Cash distributions that would be received by Apax in its capacity as a Holder of Allowed Second Lien Claims and Allowed Senior Notes Claims shall be withheld from Apax by the Debtors (the "**Withheld Apax Distribution**") and instead distributed to all non-Apax Holders of Allowed Second Lien Claims, Allowed Senior Notes Claims, Allowed General Unsecured Claims, and Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution consistent with the Other Unsecured Creditor Distribution Allocation (as defined herein). Apax will be deemed to elect to receive at least $12 million of its Other Unsecured Creditor Distribution in Cash to ensure that the Withheld Apax Distribution will be $12.0 million in Cash and the Withheld Apax Distribution, to the extent reasonably practicable, will be comprised 62.5% from Cash that would have been distributed on account of Apax's Allowed Second Lien Claims and 37.5% from Cash that would have been distributed on account of Apax's Allowed Senior Notes Claims.

The Other Unsecured Creditor Distribution shall be allocated as follows (the "**Other Unsecured Creditor Distribution Allocation**"):

(a) 62.5% of the Other Unsecured Creditor Distribution shall be distributed to the Holders of Second Lien Claims, including Apax (the "**Second Lien Distribution**"); provided that the portion of the Second Lien Distribution consisting solely of the Withheld Apax Distribution shall be shared Pro Rata amongst Holders of Second Lien Claims other than Apax;

(b) (i) 37.5% of the Other Unsecured Creditor Distribution (excluding the Withheld Apax Distribution) shall be distributed to Holders of Senior Notes Claims (for the avoidance of doubt, including Apax), General Unsecured Claims, and Holders of PIK Notes Claims, which shall be allocated as follows: (w) $72.14 million to Holders of Senior Notes Claims (including Apax), (x) $11.22 million (in the aggregate) to both Holders of General Unsecured Claims against CLAI and Holders of General Unsecured Claims against CLI, (y) $801,944.09 to Holders of the PIK Notes Claims on account of PIK Notes Claims (the "**First PIK Notes Distribution**"),and (z) $218,055.91 to Apax (the "**Apax Share**," and

|  | together with the First PIK Notes Distribution, the "**Settlement Share**") and (ii) 37.5% of the Withheld Apax Distribution, which shall be allocated as follows:  (x) $3.85 million to Holders of Senior Notes Claims, (y) $0.60 million (in the aggregate) to Holders of General Unsecured Claims against CLAI and Holders of General Unsecured Claims against CLI and (z) $0.05 million to Holders of PIK Notes Claims (the "**Second PIK Notes Distribution**," and together with the First PIK Notes Distribution, the "**PIK Notes Distribution**"); provided that to the extent that recoveries to Holders of Allowed General Unsecured Claims against CLAI would exceed 7.2%, any such excess in distributions shall be instead distributed Pro Rata amongst Holders of General Unsecured Claims against CLI; provided further that the portion of distributions consisting solely of the Withheld Apax Distribution shall not be distributed to Apax as Holders of Senior Notes Claims, and instead shall be shared Pro Rata amongst Holders of Senior Notes Claims other than Apax.

(3) For the avoidance of doubt, other Classes of Claims, including, but not limited to, Holders of First Lien Deficiency Claims, Intercompany Claims, Section 510(b) Claims, and Other Priority Claims shall not be entitled to any recovery from the Other Unsecured Creditor Distribution.

First Lien Claims, Second Lien Claims,[4] Senior Notes Claims,[5] PIK Notes Claims, and Subordinated Notes Claims shall be permanently Allowed under the Amended Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims.

For the avoidance of doubt, the Second Lien Distribution shall not be subject to any subordination or turnover under the Second Lien Intercreditor Agreement and the Other Unsecured Creditor Distribution shall not be subject to any subordination or turnover to the Holders of First Lien Claims.

For the avoidance of doubt, the Other Unsecured Creditor Distribution Allocation gives effect to the subordination and turnover rights of the Holders of Second Lien Claims and Senior Notes Claims against Holders of Subordinated Notes Claims, except as modified and/or waived under this Term Sheet. |
| **Treatment of PIK Notes** | To the extent that the Class of Holders of PIK Notes Claims votes to |

---

[4]    The amount of the Allowed Second Lien Claims shall be $753,103,855.

[5]    The amount of the Allowed Senior Notes Claims shall be $306,331,899.

| | |
|---|---|
| Claims | accept the Plan and the PIK Notes Indenture Trustee does not take any action in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA, Holders of PIK Notes Claims shall receive the PIK Notes Distribution, which PIK Notes Distribution shall be shared amongst all the Holders of PIK Notes Claims in accordance with and subject to the terms of the PIK Notes Indenture and shall not be subject to any subordination right or obligation, and Apax shall receive the Apax Share.  To the extent that the Class of Holders of PIK Notes Claims does not vote to accept the Plan and/or the PIK Notes Indenture Trustee takes any action in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA, (i) the Settlement Share shall be distributed to Holders of Senior Notes (including Apax) and Holders of General Unsecured Claims pursuant to the terms of this Term Sheet and in accordance with the ratios utilized herein and (ii) the Second PIK Notes Distribution shall be distributed to Holders of Senior Notes Claims (excluding Apax) and Holders of General Unsecured Claims pursuant to the terms of this Term Sheet and in accordance with the ratios utilized herein. |
| **Classification and Treatment of Intercompany Claims** | Intercompany Claims shall be separately classified and removed from the definition of General Unsecured Claims. <br><br> No distribution shall be made on account of Intercompany Claims and such Intercompany Claims shall be Reinstated or cancelled as of the Effective Date at the election of the Debtors; <u>provided that</u> such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the Holders of First Lien Claims or Holders of Second Lien Claims, Senior Notes Claims, Subordinated Notes Claims or General Unsecured Claims, and any such cancellation or reinstatement that has such an adverse effect shall be null and void *ab initio*. |
| **Treatment of First Lien Claims** | Holders of First Lien Claims,[6] including Apax, shall receive in full and final satisfaction of their Claims the following (the "**First Lien Claim Distribution**"): <br><br> (a) 100% of the New Equity, reduced by the New Equity distributed as part of the Other Unsecured Creditor Distribution, and subject to |

---

[6]   The amount of the Allowed First Lien Claims shall be not less than $3,901,878,598.78 on account of the obligations under the First Lien Credit Agreement Facility and $742,832,986.11 on account of obligations under the First Lien Notes Indenture.  A breakdown between allowed principal, interest, and swap claims will be set forth in the Amended Plan.

| | |
|---|---|
| | dilution for the Management Incentive Plan; |
| | (b) the New Debt Facility Consideration; and |
| | (c) the Distributable Cash. |
| **Disputed Unsecured Escrow** | The Disputed Unsecured Escrow as defined in the Existing Plan, and all related provisions, shall be eliminated under the Amended Plan. |
| **Apax Claims** | The First Lien Claims, the Second Lien Claims, the Senior Notes Claims, and the Subordinated Notes Claims, in each case in respect of principal and interest, held by Apax (the "**Apax Claims**") and the Apax Fees (as defined herein) shall be permanently Allowed under the Amended Plan and not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims and the Holders of such Claims shall receive their distribution consistent with Article VI of the Existing Plan on the Initial Distribution Date, and to the extent applicable, thereafter (in the case of the Apax Claims) or on the Effective Date (in the case of the Apax Fees), as applicable, and shall otherwise receive the applicable treatment provided for such Allowed Claims under the Amended Plan in accordance with, and subject to the terms hereof, in full and final satisfaction of all Claims held by Apax against the Debtors. |
| | Apax's proofs of claim for unpaid management fees and other obligations [Claim Nos. 3312-3324] shall be withdrawn prior to the Effective Date. |
| | Article XII.D of the Existing Plan shall be amended to provide for the payment, on the Effective Date, by the Debtors to Apax of $8 million in Cash in respect of its Claim for accrued fees and expenses (the "**Apax Fees**") in full and final satisfaction of all of Apax's Claims against the Debtors for accrued fees and expenses. Subject to and in exchange for the foregoing, the treatment under the Amended Plan contemplated under this Term Sheet of the Allowed Apax Claims and Apax's other treatment under the Amended Plan, on the Effective Date, Apax shall irrevocably waive any and all other Claims against the Debtors, including without limitation any Claims against the Debtors for fees, expenses or indemnification under the First Lien Documents, including under Section 11.04 or 11.05 of the First Lien Credit Facility Agreement, the First Lien Intercreditor Agreement, the First Lien Indenture or the Second Lien Intercreditor Agreement. |
| | In addition, subject to and in exchange for the treatment of the Apax Claims under the Amended Plan as contemplated under this Term Sheet, Apax shall not be entitled to, and shall be deemed to have |

| | waived on the Effective Date of the Amended Plan, any distribution, recovery, reimbursement, claim or other payment (i) under Sections 2.12 and 2.13 of the First Lien Credit Facility Agreement for any pre-Effective Date actions, (ii) under clause "Second" of Section 8.04 of the First Lien Credit Facility Agreement, (iii) under Section 6.06 or 6.13 of the First Lien Indenture for any pre-Effective date actions, or (iv) from or related to any pre-Effective Date breach or alleged breach of the First Lien Intercreditor Agreement, including, without limitation, Sections 2.01, 2.02(d), 2.03(a) and 2.03(b) of the First Lien Intercreditor Agreement, or the Second Lien Intercreditor Agreement, and in each case Apax shall irrevocably release, on the Effective Date, the First Lien Credit Facility Agents, the First Lien Trustee and each Holder of a First Lien Claim in connection with any (a) pre-Effective Date claim or cause of action solely with respect to clauses (i), (iii) and (iv) and (b) any claim or cause of action solely with respect to clause (ii); _provided_ that the foregoing release and waiver (1) shall not apply to any payments or distributions from the Debtors to or for the benefit of a Holder of a First Lien Claim made after the date hereof and prior to the Effective Date that are not provided for in the Final Cash Collateral Order (as amended to date and hereafter solely for the purposes described in Section 4.01(c) of the Global PSA) and (2) shall not apply to Apax's rights to share in any excess payments solely of principal or interest (but in no case to recover any portion of the Withheld Apax Distribution) under Section 2.13 of the First Lien Credit Facility Agreement or any similar sharing provision in any other agreement, all of which rights are and shall be fully preserved. |
| **Releases** | The Second Lien Indenture Trustee, the Consenting Second Lien Holders, the Senior Notes Indenture Trustee, the Subordinated Notes Trustee, the PIK Notes Indenture Trustee, Centerbridge and such entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, shall be added to the definition of Releasee, Releasing Parties, and Exculpated Parties; _provided_ that the PIK Notes Indenture Trustee shall be removed from the definition of Releasee, Releasing Parties, and Exculpated Parties if the PIK Notes Trustee is directed by Holders of PIK Notes Claims to take action (and does take such action) in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA; _provided further_ that the Subordinated Notes Trustee shall be removed from the definition of Releasee, Releasing Parties and Exculpated Parties if the Subordinated Notes Trustee objects to or challenges |

| | |
|---|---|
| | confirmation of the Amended Plan or seeks to delay confirmation of the Amended Plan.<br><br>For the avoidance of doubt, the existing Release and Exculpation provisions and definitions in the Existing Plan in favor of Apax, and the Apax related parties more fully described in the Existing Plan, shall remain in place and become effective on the Effective Date. Without limiting the foregoing, such Release provisions shall be deemed to include any and all pre-Effective Date Claims and Causes of Action which may be asserted against Apax and such related parties at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax. |
| **Adversary Proceedings** | Upon the Effective Date of the Plan, all pending adversary proceedings in the Chapter 11 Cases shall be deemed dismissed with prejudice. For the avoidance of doubt, all inter-creditor disputes, including those arising in connection with the Second Lien Intercreditor Agreement, shall be waived and released and the pending adversary proceeding relating thereto shall be dismissed with prejudice in the Confirmation Order, effective on the Effective Date of the Amended Plan. |
| **Payment of Certain Professional and Indenture Trustee Fees** | Article XII.D of the Plan shall be amended to provide for the payment in full by the Debtors of all of the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases, through the Effective Date (and for any reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases on or after the Effective Date in connection with supporting the Amended Plan in any appeal of confirmation that continued after the Effective Date or with respect to performance of any of such parties' obligations under the Amended Plan) by the Second Lien Indenture Trustee, the Consenting Second Lien Holders (solely with respect to such Holders' professional fees and expenses), the Senior Notes Indenture Trustee, the Subordinated Notes Indenture Trustee, the PIK Notes Indenture Trustee, and Centerbridge (solely with respect to such Holders' professional fees and expenses) (the "**Non-Estate Fees**"), collectively up to an amount of $20 million in the aggregate; (the "**Non-Estate Professional Fee Cap**"); <u>provided</u> <u>that</u> such Non-Estate Professional Fee Cap shall be allocated up to $15 million in the aggregate to the fees incurred by the Second Lien Indenture Trustee and the Consenting Second Lien Holders and up to $5 million in the aggregate to the Senior Notes Indenture Trustee, the Subordinated Notes Trustee, the PIK Notes Indenture Trustee and Centerbridge; <u>provided</u> <u>further</u> <u>that</u> the PIK Notes Indenture |

9

Trustee shall not be entitled to any payment of fees and expenses from the Non-Estate Professional Fee Cap if the PIK Notes Trustee is directed by Holders PIK Notes Claims to take action (and does take such action) in the Chapter 11 Cases, including regarding the Amended Plan, that is inconsistent with the Amended Plan or any agreements under the Global PSA; provided further that the Subordinated Notes Trustee shall not be entitled to any payment of fees and expenses from the Non-Estate Professional Fee Cap if the Subordinated Notes Trustee objects to or challenges confirmation of the Amended Plan or seeks to delay confirmation of the Amended Plan. For the avoidance of doubt, to the extent the Non-Estate Fees are less than $20 million, the Reorganized Debtors shall retain such difference.

Prior to entry of the Approval Order, an indenture trustee may elect out of this provision, and in such event (a) the Non-Estate Professional Fee Cap will be reduced by the reasonable and documented fees of such indenture trustee as acceptable to the Relevant Parties (as defined below) (it being understood that such reduction will be applied to the portion of the Non-Estate Professional Fee Cap allocable to the relevant indenture trustee), (b) such indenture trustee will be removed as a beneficiary of this provision for all purposes, and (c) a new additional distribution of Cash will be provided to the holders of claims under such indenture trustee's indenture in the amount of the reduction of the Non-Estate Professional Fee Cap; provided for the avoidance of doubt that such additional distribution shall be subject to the charging lien of such indenture trustee; provided further that if the reasonable and documented fees of the relevant indenture trustee are not acceptable to the Relevant Parties, then such indenture trustee shall not be permitted to elect out of this provision. "Relevant Parties" means (i) with respect to an election by the Second Lien Indenture Trustee, the Debtors, the Consenting Second Lien Holders, the First Lien Credit Facility Administrative Agent, and the Ad Hoc First Lien Group and (ii) with respect to an election by any other indenture trustee, the Debtors, the First Lien Credit Facility Administrative Agent, the Ad Hoc First Lien Group, the Senior Notes Indenture Trustee, the PIK Notes Indenture Trustee and Centerbridge.

Non-Estate Fees shall be paid (a) on the Effective Date of the Plan (subject to the receipt by the Debtors of invoices for such amounts at least ten days prior to the Effective Date) and (b) with respect to any reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases after the Effective Date in connection with supporting the Amended Plan in any appeal of confirmation that continued after the Effective Date or with respect to performance of any of such parties' obligations under the Amended

| | |
|---|---|
| | Plan, within ten days after the receipt by the Reorganized Debtors of invoices for such amounts.<br><br>Payment of the fees and expenses of the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee shall be paid pursuant to the Cash Collateral Order and the Existing Plan. |
| **Release of Avoidance Actions** | Section IV.BB of the Existing Plan shall be expanded to provide that Avoidance Actions against any parties shall be released and extinguished pursuant to the Amended Plan. |
| **Shareholders Agreement and Minority Protections** | The Shareholders Agreement and the other New Corporate Governance Documents shall be reasonably acceptable to the "Required Consenting Lenders" (as such term is defined in the Existing Plan) and shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity. The Shareholders Agreement shall expressly identify Apax as the "15%" holder entitled to nominate and have elected one director and one board observer on the Effective Date, so long as Apax is entitled to at least 15% of the New Equity on account of its First Lien Claims as of the Effective Date.<br><br>Any minority shareholder protections in the New Shareholders Agreement shall apply to all minority Holders of New Equity on an equal basis; provided, however, the foregoing does not mean that all minority shareholders will have the same protections regardless of percentage of holdings. Any pre-Effective Date disputes over the Shareholders Agreement, minority protections, or the other New Corporate Governance Documents shall be resolved by Judge Drain. |
| **Other Amended Plan Provisions** | The Amended Plan shall provide for (a) the compromise and settlement of inter-creditor and inter-debtor issues and disputes as set forth in this Term Sheet and (b) the payment of professional fees of the Debtors and the Committee and the establishment of the professional fee escrow by the Debtors, notwithstanding anything contrary in the Cash Collateral Order, for the purpose of paying Allowed professional fee claims incurred through the Effective Date.<br><br>On the thirtieth (30th) day after the Effective Date, except with respect to (a) fee applications and Non-Estate Fees; (b) appealing and taking any action concerning an appeal in any court that is pending as of the Effective Date; (c) any pending litigation or contested matters to which the Committee is a party (excluding any such litigation or contested matter as to any Causes of Action released by the Plan); (d) interpretation, enforcement or implementation of the Amended Plan, in each case to the extent |

there is a dispute, disagreement, controversy or issue, including, but not limited to, a contested matter or adversary proceeding or other litigation and as it relates to or otherwise affects the Other Unsecured Creditor Distributions or the classification or treatment of Second Lien Claims, Senior Notes Claims, PIK Notes Claims, Subordinated Notes Claims and General Unsecured Claims or otherwise relates to or affects unsecured creditors of the Debtors; and (e) consulting with the Debtors or Reorganized Debtors with respect to the reconciliation of claims and the adjudication, objection, settlement and resolution of General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims, the Committee shall dissolve for purposes of these Chapter 11 Cases. The Reorganized Debtors shall promptly pay the reasonable and documented post-Effective Date fees and expenses of the Committee's professionals; _provided, however,_ the Reorganized Debtors' obligation to pay the fees and expenses of the professionals of the Committee, including but not limited to the Committee's attorneys and financial advisors, with respect to (e) above, shall not exceed $250,000, and thereafter such fees and expenses will be otherwise satisfied and paid from the Other Unsecured Creditor Distributions allocated to General Unsecured Creditors. For the avoidance of doubt, for purposes of this paragraph, Other Unsecured Creditor Distributions shall not include distributions to the Holders of Second Lien Claims, Senior Notes or PIK Notes. The Debtors or Reorganized Debtors will reserve and escrow $150,000 of the Other Unsecured Creditor Distribution allocated to Holders of General Unsecured Claims for the benefit of the professionals of the Committee as provided above. The Reorganized Debtors shall consult with the Committee and its professionals after the Effective Date regarding the reconciliation, resolution, objection to, and settlement of, General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims; _provided further that_ the Committee's consent is required, which consent shall not be unreasonably withheld, to compromise, settle or otherwise resolve Claims that are (i) filed or scheduled or asserted in excess of $1 million or (ii) proposed to be compromised, settled or resolved by the Debtors or Reorganized Debtors by allowing such claim as a General Unsecured Claim in excess of $1 million. On the Effective Date the Committee will use its best efforts to form a subcommittee consisting of not less than two members and not more than three members. The Committee will use its best efforts to first permit trade or other non-funded debt committee members, and for the avoidance of doubt, excluding indenture trustees, to serve on such subcommittee. The subcommittee shall be delegated the responsibility and authority with respect to those matters set forth in (e) above.

| | The Reorganized Debtor will agree to post annual and quarterly financial statements (with MD&A being posted at least annually, and with any other MD&A provided to any lender or other entity being posted as well) with a carve out that the company can withhold commercially sensitive information in its reasonable discretion (provided that the deletion of the withheld information from the financial statements does not make the redacted statements not compliant with GAAP). |
| | |
| | In the event the New Equity is not book entry and Depository Trust Company eligible, then the Prepetition Indentures Trustees shall not serve as Disbursing Agent for such New Equity, and the Disbursing Agent for such New Equity shall not distribute any consideration in the form of stock without the express consent of the applicable Prepetition Indenture Trustee, which consent shall not be unreasonably withheld, and without first providing such Prepetition Indenture Trustee the opportunity to exercise its Charging Lien against such New Equity, as provided for under the applicable Prepetition Indenture, which Charging Lien shall be deemed, until the Disbursing Agent has disbursed the New Equity, to exist against such New Equity in the same manner as if such New Equity were in possession of the applicable Prepetition Indenture Trustee. |
| **Plan Supplement** | The deadline for filing and serving notice of, to the extent known, the identity of members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code shall be extended to seven days prior to the Confirmation Hearing. |
| **Management Incentive Plan** | See Amended MIP Term Sheet, attached hereto as <u>Exhibit 1</u>. |

**Exhibit 1**

**Amended MIP Term Sheet**

## Cengage Learning

## Summary of Post-Emergence Compensation

| | Key MIP Terms |
|---|---|
| % of Equity Reserved | ■ 5.6% |
| Allocation | ■ 80% allocated at emergence, 50% of which is allocated to CEO (i.e., 40% of the total 100% pool) and which includes an equity grant for the CFO.<br>■ 20% reserved for future awards to current execs, new hires and Board members |
| LTI Vehicles Used | ■ 60% incentive stock options (ISOs) with an exercise price equal to the per share Plan Equity Value assuming a $3.6 billion total enterprise value for the Reorganized Debtors less the amount of the New Debt Facility (which shall be in an amount between $1.5 billion and $1.75 billion as set forth in the Existing Plan) plus Available Cash[1] less Distributable Cash[2]<br>■ 40% RSUs |
| Vesting Schedule | ■ ISOs – 4 year ratable vesting (7 year exercise term)<br>■ RSUs – 5 year ratable time vesting |
| Vesting – Change-Of-Control (CoC) | ■ ISOs and RSUs will vest unless awards are assumed in full |
| Vesting – Termination without Cause or For Good Reason | ■ ISOs and RSUs vest in full<br>■ Change of Control: exercise period reduced to lesser of (i) the remaining option term or (ii) the greater of (X) 1 year following termination or (Y) 3 years following the date of a change in control which occurs within 18 months of emergence<br>■ All Other Cases: exercise period reduce to lesser of (i) 1 year post-termination or (ii) the remaining option term |
| Vesting – Death / Disability | ■ ISOs and RSUs vest in full<br>■ Exercise period reduced to lesser of 1 year or the remaining term |
| Vesting – Voluntary Resignation | ■ Unvested equity is forfeited<br>■ Exercise period reduced to 30 days |
| Vesting – Termination for Cause | ■ Unvested equity and unexercised options are forfeited |
| Dividends | ■ Unvested RSUs accrue dividends<br>■ Vested RSUs and exercised options receive a proportionate share of dividends paid with respect to common shares<br>■ Unexercised options do not accrue nor receive dividends<br>• Customary anti-dilutive clause to be negotiated with regards to special dividends |

---

[1] "**Available Cash**" means any Cash remaining on any of the Debtors' balance sheets as of the Effective Date after funding all payments and reserves required under the Plan (other than distributions on account of principal and interest to the Holders of First Lien Claims), including the Other Unsecured Creditor Distribution (for the avoidance of doubt, any cash not distributed to the Holders of Other Unsecured Claims should be included in Available Cash).
[2] "**Distributable Cash**" means Available Cash less an amount agreed to by the Debtors and the Required Consenting Lenders, which amount agreed to by the Debtors and the Required Consenting Lenders shall be between $50 million and $175 million and shall be set forth in the Plan Supplement.

| Monetization | ■ Termination Without Cause or For Good Reason or due to death or disability: cashless exercise & ability to pay taxes through share withholding<br>■ Otherwise: no cashless exercise |
|---|---|
| Stockholders' Agreement | ■ Equity participants required to enter into a Stockholders' Agreement (containing transfer restrictions, call rights, tag along rights, registration rights, drag-along rights, etc.) as a condition to receiving any equity award or stock thereunder; provided that in the event a change in control occurs within 18 months of emergence, the call right cannot be exercised within 3 years of the change in control |
| Restrictive Covenants | ■ Equity participants will continue to be bound by current restrictive covenants in existing employment agreements |

| **Key Annual Incentive Plan (AIP) Terms** | |
|---|---|
| Terms | ■ The AIP will be structured to focus on the achievement of annual performance objectives, especially revenue and EBITDA growth and expense control<br>■ Annual performance measures, goals and funding formulas will be set by the Board of Directors reasonably and in good faith in consultation with management (including FY 2014 performance measures)<br>  • Actual bonuses may range from 0% to 200% of target bonus levels depending on performance achievement<br>  • While funding formulas will be set each year, it is anticipated that the threshold at which bonuses will begin to be funded will be set at least at 85% of goal(s), at which level 50% of the target bonus amounts would be earned |
| Performance Award Type | ■ Cash |

| **Key Employee Contract Terms** | |
|---|---|
| CEO | ■ Term: 4 years with annual 1 year extensions beginning on 4th anniversary<br>■ Base Salary: unchanged<br>■ Target Bonus: 100% of Base Salary (per terms in AIP)<br>■ Incentive Equity: 40% of MIP<br>■ Severance: If terminated without Cause, for Good Reason or failure of Cengage to extend Employee Agreement, CEO to receive:<br>  • Pro-rata Target Bonus<br>  • Cash payment equal to 3x (Base Salary + Target Bonus) paid in 12 monthly installments with remaining balance paid in lump sum thereafter<br>■ Current restrictive covenants<br>■ Definition of Cause (as defined below) will not include cure for breach of non-compete / non-solicitation<br>■ No 280G Gross up |
| All Other Key Employees | ■ Cash compensation levels, severance and restrictive covenants unchanged from current agreements; provided that the nine members of Executive Team, excluding the CEO, will receive 2x severance if (i) a change in control occurs within 18 months of emergence and (ii) the Executive is terminated without Cause or with Good Reason within 6 months after the change in control<br>■ Any executive not currently subject to restrictive covenant agreement will enter into one on substantially same terms as other non-CEO executives |

|  | ■ Definition of Cause (as defined below) – those employees who currently have agreements would adopt the Cause definition in this term sheet; definition will not include cure for breach of non-compete / non-solicitation<br>■ No 280G Gross up<br>■ Definition of Good Reason (as defined below) – only those employees who currently have Good Reason in their employment agreement will retain Good Reason in their employment agreement |
|---|---|
| Definitions | ■ "Cause" – Defined as (i) willful failure to perform substantial job functions that continues after written notice from Cengage, (ii) material fraud or material dishonesty in performance of duties, (iii) conviction or plea or guilty or *nolo contendere* to a felony, (iv) willful malfeasance or willful misconduct in performance of duties or any willful act or omission (other than in the good faith performance of duties) that is materially injurious to the financial condition or business reputation of Cengage, (v) a material breach of confidentiality that is not cured within 15 days following notice, (vi) a material breach of non-disparagement that is not cured within 15 days following notice, or (vii) a material breach of non-compete, non-solicitation<br>■ "Good Reason" – Defined as (i) material reduction in base pay or target bonus, (ii) material reduction in title, duties or responsibilities, (iii) an adverse change in reporting requirements, (iv) with respect to the CEO and CSMO only, relocation of more than 50 miles or (v) material breach of a material agreement, that, in any case, is not cured within 30 days of written notice from the executive<br>    • Only those employees who currently have Good Reason in their employment agreements will retain Good Reason in their employment agreement, provided that only for the 6 month period following a change in control occurring within 18 months of emergence, "Good Reason" will be included for all executives. |

## Exhibit B

## Form Transfer and Joinder Agreement

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Plan Support Agreement (the "Agreement"), dated as of February 1, 2014 by and among the Debtors and the Supporting Parties, including the transferor to the Transferee of any Claims (the "Transferor"), and agrees to assume, be bound by and timely perform all of the terms and provisions of the Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) to the extent Transferor was thereby bound, and shall hereafter be deemed to have all of the rights and obligations of, and to be, a Supporting Party for all purposes under the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement, a copy of which, together with the Plan Term Sheet (as defined in the Agreement), is attached hereto as Exhibit A.

With respect to all Claims held by the Transferee, all related rights and causes of action arising out of or in connection with or otherwise relating to such Claims, the Transferee hereby makes all of the representations and warranties of a Supporting Party as set forth in the Agreement, including, without limitation, the representations and warranties set forth in Section 5.01 of the Agreement, as applicable.

The Transferee specifically agrees (i) to be bound by the terms and conditions of the First Lien Credit Facility, First Lien Indenture, Second Lien Indenture, Unsecured Notes Indenture and/or PIK Notes Indenture, as applicable, and the Agreement and (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the Transfer of any Claim.

Date Executed: _____, 2014

|  |
|---|
| **Print name of Transferee** |

**Name:**

**Title:**

**Address:** _____

_____

**Attention:** _____

**Telephone:** _____

**Facsimile:** _____

| Principal Amount Held | |
|---|---|
| **(Type of Claim)** | **Amount** |
|  |  |

## <u>Exhibit 2</u>

**Confirmation and Effective Date Notice**

Jonathan S. Henes
Christopher Marcus
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-44106 (ESS) |
|  | ) | Case No. 13-44107 (ESS) |
|  | ) | Case No. 13-44105 (ESS) |
|  | ) | Case No. 13-44108 (ESS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF (I) ENTRY OF ORDER
## CONFIRMING THE DEBTORS' AMENDED JOINT PLAN OF
## REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE
## AND (II) OCCURRENCE OF EFFECTIVE DATE

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that an order [Docket No. ___] (the "***Confirmation Order***") confirming the *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be modified, the "***Plan***"), was entered by the Honorable Elizabeth S. Stong, United States Bankruptcy Judge, and docketed by the Clerk of the United States

Bankruptcy Court for the Eastern District of New York (the "**Court**") on [___]. Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan and the Confirmation Order.

       **PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, the Plan, and the related documents, are available on the Court's website at http://www.nyeb.uscourts.gov. To access the Court's website, you will need a PACER password and login, which can be obtained at http://www.pacer.psc.uscourts.gov.

       **PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on _____, 2014.

       **PLEASE TAKE FURTHER NOTICE** that, unless otherwise provided by the Plan, the Confirmation Order, any other applicable order of the Bankruptcy Court, or agreed to by the Holder of an Allowed Administrative Claim and the Debtors, all requests for Payment of Administrative Claims must be Filed and served on the Debtors **no later than [___], 2014** (the "***Administrative Claims Bar Date***").  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

       **PLEASE TAKE FURTHER NOTICE** that, unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based upon the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice, Claims, and Solicitation Agent **no later than [___], 2014**.

*[Remainder of page intentionally left blank.]*

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder or Entity voted to accept the Plan.

Dated: [___], 2014
      Brooklyn, New York

*Draft*

Jonathan S. Henes
Christopher Marcus
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*